**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**SCOTT LOUIS PANETTI,**

**Petitioner,**

**-vs-**                                                                          **Case No.  A-09-CA-774-SS**

**RICK THALER,**

**Respondent.**

_____

**O R D E R**

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Petitioner Scott Louis Panetti's Amended Petition for Writ of Habeas Corpus [#17]; Respondent Rick Thaler's Motion for Summary Judgment [#22], Panetti's responses [## 36, 40] thereto, and Thaler's reply [#42].  Having reviewed the documents, the relevant law, and the file as a whole, the Court now enters the following opinion and orders GRANTING Thaler's motion, and DENYING Panetti's petition.

**Background**

Panetti asks the Court to vacate his 1995 Texas state court conviction for capital murder, and his subsequent death sentence, on the basis of the Supreme Court's decision in *Indiana v. Edwards*, in which the Court held that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* [*v. United States*, 362 U.S. 402 (1960)] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."  554 U.S. 164, 178 (2008).

There can be no question Panetti suffered from mental illness, to varying degrees, throughout much of his life. It is likewise beyond dispute that Panetti's mental condition affected his ability to represent himself at trial. Nor was Panetti's trial performance impressive, though the Court thinks he might be overstating the case somewhat by describing it as "abysmal." Pet. [#17] at 74. Ultimately, however, the Court finds it lacks authority to grant habeas relief, because retroactive application of the *Edwards* rule to Panetti's case is barred by the Supreme Court's decision in *Teague v. Lane*, 489 U.S. 288, 311–16 (1989). Accordingly, the Court must deny Panetti's petition.

In the alternative, a review of the record persuades the Court that Panetti, though unskilled and ineffective, was not incompetent, by reason of severe mental illness, to conduct trial proceedings by himself. Consequently, the Court finds *Edwards* does not render Panetti's trial unconstitutional, and concludes Thaler is entitled to judgment as a matter of law. Accordingly, the Court grants Thaler's motion for summary judgment.

## I.      Prior Proceedings

A jury found Panetti guilty of capital murder on September 21, 1995, in the 216th Judicial District Court, Kerr County, Texas, for the September 8, 1992 double murder of his parents-in-law, Joe and Amanda Alvarado.[1] The following day, in accordance with the jury's unanimous answers to the special issues submitted to them, the trial judge sentenced Panetti to death. On December 3, 1997, the Texas Court of Criminal Appeals affirmed Panetti's conviction and sentence, and the United States Supreme Court subsequently denied Panetti's petition for writ of certiorari.

Having exhausted his direct appeals, Panetti then sought post-conviction habeas relief. On May 20, 1998, the Texas Court of Criminal Appeals denied Panetti's state application for writ of

---

[1] Panetti admitted he shot the Alvarados, but asserted the defense of insanity.

habeas corpus without written order.  On March 9, 2001, this Court denied Panetti's federal habeas petition.  The Fifth Circuit affirmed this Court's judgment, and the United States Supreme Court again denied Panetti's petition for writ of certiorari.

Upon the exhaustion of his direct and collateral attacks, Panetti's execution was scheduled for February 5, 2004.  Panetti subsequently filed a federal habeas petition, arguing he was not competent to be executed.  Following an evidentiary hearing, this Court denied Panetti's petition, and the Fifth Circuit affirmed the judgment.  Finding the Fifth Circuit's competency standard inconsistent with the protections of the Eighth Amendment, however, the Supreme Court reversed, remanding Panetti's case to this Court for further proceedings.  Accordingly, on February 6, 2008, the Court held another evidentiary hearing on Panetti's competency to be executed, and on March 26, 2008, again concluded he was competent to be executed.

Panetti appealed, but before the Fifth Circuit could address his competency-to-be-executed claims, he filed a motion to stay and abate the proceedings so he could return to Texas state court to raise a claim under *Indiana v. Edwards*.  On December 17, 2008, the Fifth Circuit granted Panetti's motion.[2]  On October 21, 2009, the Texas Court of Criminal Appeals dismissed Panetti's successive state habeas application because his claim "fail[ed] to meet the dictates of Article 11.071, §5."  *Ex parte Panetti*, No. WR-37,145-02, 2009 WL 3368707 at *1 (Tex. Crim. App. Oct. 21, 2009).

---

[2] Although the record is unclear, the Court presumes Panetti's competency-to-be-executed case remains stayed in the Fifth Circuit, pending the resolution of this case.

II.     **This Case**

The following day, on October 22, 2009, Panetti filed his federal habeas petition in this case. Pursuant to 28 U.S.C. § 2244(b)(3), Panetti sought, and received, permission from the Fifth Circuit to file a successive petition for writ of habeas corpus. Panetti filed an amended habeas petition on March 26, 2010, but the Court found many of the attached exhibits illegible; consequently, the Court ordered Panetti to file a second amended petition with legible exhibits, which Panetti did on April 15, 2010.

On April 27, 2010, Thaler filed his motion for summary judgment. The Court granted two unopposed motions filed by Panetti, giving him until June 24, 2010, to respond to Thaler's motion. However, on June 17, 2010, Panetti filed a motion to stay this case so he could once again return to the Texas Court of Criminal Appeals and seek reconsideration of its dismissal of his habeas application in light of a subsequently decided case from that court. On July 1, 2010, the Court granted Panetti's motion, and stayed further proceedings in this case, pending the outcome of the state court proceedings. On December 15, 2010, the Court of Criminal Appeals dismissed Panetti's successive application, again concluding his claims "fail[ed] to meet the dictates of Article 11.071, § 5." *Ex parte Panetti*, 326 S.W.3d 615, 615 (Tex. Crim. App. 2010). On June 20, 2011, the United States Supreme Court denied Panetti's petition for writ of certiorari. On June 28, 2011, Panetti sought, and was granted, a stay of proceedings in this case for thirty additional days.

On August 19, 2011, Panetti filed a response to Thaler's motion to summary judgment, which he supplemented on September 22, 2011. On September 30, 2011, the Court ordered Thaler to file within fifteen days his reply, if any, to Panetti's motion. Thaler did so on October 6, 2011.

**Analysis**

The Court begins its analysis with an examination of *Edwards*, and its potential relevance to this case. The Court then considers, and rejects, Thaler's argument that Panetti's federal habeas petition is procedurally barred. Finally, the Court turns to the merits of Panetti's petition, and finds he is not entitled to relief, because the *Edwards* rule does not retroactively apply to his collateral attack; and, alternatively, because Panetti was not incompetent to represent himself under *Edwards*.

**I.    *Indiana v. Edwards***

At the outset, the Court rejects Thaler's argument that the Supreme Court's decision in *Edwards* is, by definition, inapplicable to Panetti's case.

Of course, the Court agrees the issue in *Edwards* is not the same as that raised by Panetti in this case. Indeed, the claims are polar opposites, factually: whereas Panetti was allowed to represent himself at trial and now argues he should not have been, Ahmad Edwards twice requested that he be allowed to represent himself at trial, and was twice denied. *Edwards*, 554 U.S. at 167–69. Accordingly, the Supreme Court characterized the issue before it as whether, when a state court finds a criminal defendant "mentally competent to stand trial if represented by counsel but not mentally competent to conduct that trial himself," "the Constitution prohibits a State from insisting that the defendant proceed to trial with counsel, the State thereby denying the defendant the right to represent himself." *Id.* at 167. The Court concluded the Constitution does not prohibit a State from so insisting, under such circumstances. *Id.*

Here, of course, the question is whether the trial judge erred by *not* insisting that Panetti proceed to trial with counsel. As Thaler correctly points out, the question of what the Constitution *permits* a State to do is not the same as the question of what the Constitution *requires* a State to do,

and the answer to the former is not necessarily germane to the latter.  However, the Court disagrees that *Edwards* is therefore irrelevant to Panetti's claims, as Thaler suggests.  For instance, if the trial judge allowed Panetti to represent himself only because he believed he was not constitutionally permitted to insist on appointed counsel—an erroneous belief, as *Edwards* later revealed—then Panetti's trial might have been constitutionally deficient, even though *Edwards* speaks of "may" and not "must."

However, this hypothetical also assumes Panetti is a "gray-area defendant," as *Edwards* refers to one who is competent to stand trial under the standard articulated in *Dusky v. United States*, but who nevertheless "lacks the mental capacity to conduct his trial defense unless represented."  *Id.* at 173–74.  *Edwards* gives little explicit guidance about whether Panetti (or any defendant) falls into this category, though, because the Supreme Court declined to articulate a specific competency-to-represent-oneself standard, deferring instead to case-specific determinations by trial judges: "[T]he trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant."  *Id.* at 177.

This approach, though it sensibly gives trial judges room to exercise their judgment and discretion, also puts them in an awkward position.  Under *Edwards*, judges are called upon to predict, in advance of trial, whether a given defendant will be of sufficiently sound mind, during trial, to conduct his defense unassisted; and, presumably, to review this prediction periodically as the trial proceeds.  Such prediction, difficult under any circumstances, is only made more so by the absence of a clear standard.

Nor is the review process straightforward in all cases, as a pro se defendant's deficient trial performance may be caused by mental illness, simple inexperience, fear of public speaking, or a

combination of these or many other factors.  As this Court reads *Edwards*, States are permitted to restrict a criminal defendant's constitutional right of self-representation only when that defendant is incapable of conducting his or her trial defense *because of a lack of mental capacity*; other forms of incapacity, though they may in fact be equally devastating to the presentation of an effective defense, are left to the defendant to weigh against the perceived benefits of self-representation. *Edwards* thus requires trial judges, unassisted by any definite standard, to play both fortune-teller and psychiatrist in making their determinations about a criminal defendant's constitutional rights.

Regardless of these practical difficulties, however, the Court concludes that *Edwards* is potentially applicable to Panetti's case.  Accordingly, the Court proceeds to the parties' other arguments.

## II.      Procedural Default

Thaler argues Panetti's claims are procedurally defaulted because the Texas Court of Criminal Appeals based its dismissal of Panetti's state application on an independent and adequate state ground, namely Texas's abuse-of-the-writ doctrine.  The Court disagrees.

## A.      Legal Standard

"In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism."  *Coleman v. Thompson*, 501 U.S. 722, 730 (1991).  "A federal habeas claim is procedurally defaulted when the state court has based its rejection of the claim on a state procedural rule that provides an adequate basis for relief, independent of the merits of the claim."  *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008).  The Fifth Circuit has recognized Texas Code of Criminal Procedure Article 11.071, § 5, as a valid basis for procedural default under the independent and adequate state ground doctrine.  *See id.* at 342 ("[S]ince 1994, the

Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and . . . it is an independent and adequate state ground for the purpose of imposing a procedural bar.").

However, consideration of the independent and adequate state ground doctrine is complicated somewhat where, as here, the reason for the State court's rejection is not clear.  "[W]hen . . . a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so."  *Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983).  However, this presumption "applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision."  *Coleman*, 501 U.S. at 739.

Dismissal of a successive state habeas application under Texas Code of Criminal Procedure Article 11.071, § 5 can be based on either State procedural grounds, or federal constitutional grounds.  Section 5(a) states:

> If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
>
> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.

TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(a).

In *Ex parte Campbell*, the Texas Court of Criminal Appeals stated that, "to satisfy Art. 11.071, § 5(a), 1) the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications; and 2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence." 226 S.W.3d 418, 421 (Tex. Crim. App. 2007). The Fifth Circuit has characterized the first *Campbell* element as a state law question, and the second as a question of federal constitutional law. *See Balentine v. Thaler*, 626 F.3d 842, 853 (5th Cir. 2010) ("The first element of the *Campbell* analysis is a state-law question, but *Rivera* categorizes the second element as a question of federal constitutional law.") (internal quotations omitted) (citing *Rivera v. Quarterman*, 505 F.3d 349, 359 (5th Cir. 2007)).

Given the ambiguity inherent in § 5, what is a federal court to do in cases such as this, where the state court judgment is silent on whether the application was dismissed on state or federal law grounds? The Fifth Circuit has considered the issue on at least two occasions, and has provided this Court with much-appreciated guidance on how to proceed.

In *Ruiz v. Quarterman*, the Fifth Circuit stated the *Michigan v. Long* presumption "gives to state courts control over the federal review of their opinions. It has become a rote rule at the fingertips of every writing member of state courts of last resort—where studied ambiguity or clarity in the decisional footing is an art form and an absence of clarity in an opinion is seldom inadvertent."

-9-

504 F.3d 523, 527 (5th Cir. 2007). Faced with an ambiguous judgment from the Court of Criminal Appeals, the *Ruiz* court broadened the scope of its inquiry, noting: "both the concurring and dissenting opinions, by their unanswered language, strongly suggest that the CCA debated and reached the federal merits question, not the independent state law ground." *Id.* at 528.

In *Balentine v. Thaler*, the Fifth Circuit explicitly addressed the issue of how a federal court should proceed, in light of the Supreme Court's decision in *Coleman*, *supra* page 7, when the Court of Criminal Appeals' judgment is silent on its precise grounds for dismissal under Article 11.071, § 5: "There must be more than silence. In some form, the state court has to make a fair indication that the merits of the claims were reached." 626 F.3d at 854. A "fair indication" exists where one or more state court judges address the merits of a prisoner's claim, or where a merits review can be inferred from the parties' arguments at the state court. *Id.*

**B.    Application**

Here, the opinion of the Texas Court of Criminal Appeals gives a fair indication that the state judges considered, and rejected, the merits of Panetti's federal constitutional claim. First, Panetti's original state habeas application was disposed of by the Texas Court of Criminal Appeals in 1998, and the United States Supreme Court announced the new constitutional rule in *Edwards* in 2008: it is therefore difficult to imagine Panetti's successive applications were dismissed for his failure to raise an *Edwards* claim ten years before that case was decided.

More telling, however, is the dissenting opinion of Judges Holcomb and Johnson in the Court of Criminal Appeals' dismissal of Panetti's second successive habeas application. The dissenting opinion discusses the merits of Panetti's challenge at some length—indeed, at far greater length than the majority's summary dismissal—and ultimately concludes: "The trial record in this case

establishes conclusively that Panetti is severely mentally ill and has been so for a very long time. The Eighth Amendment was thus violated when the trial court permitted Panetti to represent himself." *Ex parte Panetti*, 326 S.W.3d 615, 620 (Tex. Crim. App. 2010) (Holcomb, J., dissenting).

It strains credulity to suggest that Judges Holcomb and Johnson devoted so much attention to the merits of Panetti's claim, but the majority based its dismissal solely on state procedural grounds that are, to this Court's thinking, highly dubious, if not temporally impossible. Of course, the Court of Criminal Appeals easily could have said it was dismissing Panetti's application on state procedural grounds if it had wanted to, thereby largely insulating his claim from federal review. Its election instead to remain silent, though obviously a decision wholly within its authority and discretion, was, as the Fifth Circuit noted, unlikely to have been inadvertent. Thus, although this Court has neither the inclination nor the authority to second-guess Texas courts on matters of Texas law, it nevertheless cannot defer to the Texas Court of Criminal Appeals' ambiguous resolution of Panetti's case.

## C.    Conclusion

For the foregoing reasons, the Court finds the state court judgment gives a fair indication that the Texas Court of Criminal Appeals considered the merits of Panetti's federal constitutional claims. Accordingly, the Court rejects Thaler's argument that Panetti's federal claim is procedurally defaulted under the independent and adequate state ground doctrine, and proceeds to address its merits.

## III.    Panetti's *Edwards* Claim

## A.    Retroactivity of the *Edwards* Rule

At the outset, Thaler argues Panetti is not entitled to habeas relief because the rule announced

in *Edwards* does not apply retroactively to Panetti's case, under the principles announced by the Supreme Court in *Teague v. Lane*, 489 U.S. 288, 311–16 (1989).  Although the question is close, the Court agrees.

"*Teague*'s nonretroactivity principle acts as a limitation on the power of federal courts to grant habeas corpus relief to state prisoners." *Beard v. Banks*, 542 U.S. 406, 412 (2004) (quotation and alterations omitted).  Accordingly, "federal habeas corpus courts must apply *Teague* before considering the merits of a claim, whenever the State raises the question." *Id.* (quotation and alteration omitted).

"Under *Teague*, the determination whether a constitutional rule of criminal procedure applies to a case on collateral review involves a three-step process." *Id.* at 411.  First, a court must determine the date on which the defendant's conviction became final, and second, the court must determine whether the rule is actually "new," in light of existing constitutional precedent as of that date. *Id.*  The parties appear to agree that *Edwards* announced a new constitutional rule of criminal procedure, in light of the precedent as of the date Panetti's conviction became final.[3]

"Finally, if the rule is new, the court must consider whether it falls within either of the two exceptions to nonretroactivity." *Id.*  "First, the bar [to retroactive application] does not apply to rules forbidding punishment of certain primary conduct or to rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Id.* at 416 (quotation and alteration omitted).  "The second exception is for watershed rules of criminal procedure implicating

---

[3] Any argument to the contrary would be unavailing, in any case.  *Edwards* was decided long after Panetti's conviction became final, and the Supreme Court itself acknowledged the rule in *Edwards* was not compelled by then-existing precedent: "Our examination of this Court's precedents convinces us that those precedents frame the question presented, but they do not answer it." *Edwards*, 554 U.S. at 169.

the fundamental fairness and accuracy of the criminal proceeding." *Id.* at 417 (quotation omitted). Because *Edwards* neither forbids punishment of any primary conduct, nor prohibits any category of punishment because of a defendant's status or offense, the first exception is clearly inapplicable. However, whether the second exception applies is a closer question.

At first glance, the *Edwards* rule seems to fit squarely within the second *Teague* exception. Indeed, *Edwards* specifically emphasized the importance of its newly announced rule to the fairness of criminal proceedings: "[I]nsofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial." *Edwards*, 554 U.S. at 176–77. In addition to the *actual* fairness of trials, the Court was similarly concerned that they *appear* fair: "proceedings must not only be fair, they must appear fair to all who observe them." *Id.* at 177 (quotation omitted).

If this Court was asked to decide whether the *Edwards* rule fell under the second *Teague* exception solely on the basis of the language quoted above, its answer would be an unequivocal "yes." However, the Supreme Court has "repeatedly emphasized the limited scope of the second *Teague* exception, explaining that it is clearly meant to apply only to a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty." *Beard*, 542 U.S. at 417 (quotation and alteration omitted). "In providing guidance as to what might fall within this exception, we have repeatedly referred to the rule of *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel), and only to this rule." *Id.*

By contrast, the Supreme Court has held that other, less fundamental, rules of criminal procedure do not fall within *Teague*'s second exception: that a capital defendant must be allowed

-13-

to inform the sentencer he would be ineligible for parole if the prosecution argues future dangerousness, *see O'Dell v. Netherland*, 521 U.S. 151, 167 (1997); that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere," *Caldwell v. Mississippi*, 472 U.S. 320, 328–29 (1985), a rule the *Beard* court broadly characterized as one that "effectively withheld relevant information from the sentencer," *Beard*, 542 U.S. at 419; and the rule announced in *Mills v. Maryland*, 486 U.S. 367 (1988), which invalidated "capital sentencing schemes that require juries to disregard mitigating factors not found unanimously," *Beard*, 542 U.S. at 408, 419–20.  In concluding the *Mills* rule did not fall within the second *Teague* exception, the *Beard* court said the following:

> However laudable the *Mills* rule might be, it has none of the primacy and centrality of the rule adopted in *Gideon*.  The *Mills* rule applies fairly narrowly and works no fundamental shift in our understanding of the bedrock procedural elements essential to fundamental fairness. We therefore conclude that the *Mills* rule does not fall within the second *Teague* exception.

*Beard*, 542 U.S. at 420.

The *Edwards* rule thus faces a higher bar than the language of *Teague*, taken alone, might suggest.  Is it on par with *Gideon*'s rule, announcing a universal right to counsel for defendants in felony cases?  Does it work a fundamental shift in our understanding of the bedrock procedural elements essential to fundamental fairness?  Is it implicit in the concept of ordered liberty?  Even held to such a standard, and considering the guidance above, resolution of this issue is not certain.

On one hand, the *Edwards* rule was motivated by a concern for the actual and perceived fairness of trial proceedings.  Moreover, it clearly represented a departure from the conventional wisdom, that competency to stand trial was equivalent to competency to represent oneself.  Further,

-14-

*Edwards* struck a blow for individual dignity, allowing judges to make a frank assessment of a criminal defendant's mental competence, thereby potentially avoiding a "spectacle . . . at least as likely to prove humiliating as ennobling." *Edwards*, 554 U.S. at 176.  Finally, the *Edwards* rule is not entirely dissimilar to the rule in *Gideon*, which guarantees counsel to criminal defendants in felony cases.  Requiring judges to allow "gray-area" defendants to conduct their own defenses, when such defendants are by definition incompetent to do so, is tantamount to denying them counsel; thus, to the extent the *Edwards* rule allows judges to appoint counsel to "gray-area" defendants, it is cut from the same cloth as *Gideon*.  In some ways, therefore, *Edwards* appears to satisfy the second *Teague* exception, by announcing a rule that: (1) significantly shifted our understanding of the procedural elements necessary to guarantee a trial that is fair; (2) respects a defendant's autonomy and dignity in a meaningful, but realistic, way; and (3) satisfies society's expectations of how our system of justice should operate.

On the other hand, it must be acknowledged that the *Edwards* rule applies to a limited class of criminal defendants.  Specifically, the *Edwards* rule applies to: (1) criminal defendants; (2) who are competent to stand trial; (3) who insist on representing themselves; and (4) who potentially fall into the "gray area" of *Edwards*.  Data cited in *Edwards* suggests this is a very small subset of criminal defendants, likely less than 0.1% of the total.  *See id.* at 178 (citing a study indicating approximately 0.3–0.5% of defendants elect to proceed pro se, and approximately 20% of federal pro se defendants are ordered to undergo competency evaluations).  Obviously, this is merely an estimate, and not a precise figure, but it calls into question whether the *Edwards* rule, no matter how fundamental it may be to those affected by it, can be deemed comparable to the bellwether rule of *Gideon*, that every felony criminal defendant is entitled to counsel.

-15-

Ultimately, the Court reluctantly concludes the *Edwards* rule does not satisfy the second *Teague* exception, and therefore cannot be applied retroactively to Panetti's trial. The Court is convinced *Edwards* represented a substantial shift in criminal procedure, and one that is likely to improve the fairness of trials. However, "in the years since *Teague*," the Supreme Court has "rejected every claim that a new rule satisfied the requirements for watershed status." *Whorton v. Bockting*, 549 U.S. 406, 418 (2007). As noted above, this set of non-"watershed" rules include several affecting when and how the death penalty may be imposed, a subject that evokes some of society's most profound feelings about the concepts of fundamental fairness and ordered liberty. If such rules do not satisfy *Teague*, the Court cannot see how the *Edwards* rule, important though it may be, does.

## B.     Merits

In the alternative, even if the *Edwards* rule is retroactively applicable to Panetti's case, the Court finds Panetti is not entitled to habeas relief.

To reiterate the Court's conclusion above, the Court thinks Panetti is entitled to habeas relief under the circumstances of this case only if he can show: (1) the trial judge would have appointed counsel against Panetti's wishes if the judge had felt constitutionally permitted to do so; and (2) Panetti was incompetent to conduct trial proceedings by himself because he lacked the mental capacity to do so.[4] Having carefully reviewed the trial court record and the other relevant evidence, the Court finds Panetti has met his burden with respect to the first element, but has failed to do so with respect to the second.

---

[4] There is no question Panetti was at least competent to stand trial. Although his first competency trial ended with a hung jury and a mistrial, Panetti was found competent at his second trial.

1.      **Would Judge Ables Have Appointed Counsel Against Panetti's Wishes?**

The Court is persuaded Judge Stephen Ables, who had the difficult and unenviable task of presiding over Panetti's trial, would have appointed counsel against Panetti's wishes, if he had felt constitutionally permitted to do so.

The trial record contains ample evidence of Judge Ables's reluctance to allow Panetti to proceed pro se.  First, in a June 22, 1995 hearing on a motion to withdraw, filed by Panetti's appointed attorneys, Judge Ables flatly stated: "Mr. Panetti, . . . I want you to understand that I do not want you to represent yourself.  I would feel more comfortable if you had an attorney representing you . . . ."  15 RR 10.[5]  Shortly thereafter, Judge Ables required Panetti to confer with counsel before deciding whether Panetti "really, truly want[ed] to represent [him]self," and was, in fact, "insisting on that."  15 RR 11.

During the same hearing, the State itself conveyed its misgivings about allowing Panetti to represent himself: "[T]he State has a concern here because of the nature of the case and any time we get into this issue I think it presents concerns for the Court and the State and everyone else, but from what the Defendant has stated today, the State has a concern."  15 RR 23–24.  The District Attorney continued: "[T]he State does have an interest in protecting [Panetti]'s rights, and for that reason, . . . I would technically or officially lodge an opposition to this motion to withdraw."  *Id.*

After listening to Panetti's negative reaction to the State's opposition, Judge Ables said: "Your constitutional right, Mr. Panetti, is that you have a constitutional right to voluntarily and intelligently waive your right to counsel and represent yourself, and I cannot take that right away

---

[5] Consistent with Panetti's method of citation, the Court will cite to the reporter's record in the format [volume] RR [page].

from you . . . ." 15 RR 25. Judge Ables referred again to Panetti's "constitutional right to represent himself" later in the hearing, when he found Panetti had voluntarily and intelligently waived his right to counsel. 15 RR 29.

In a hearing on July 20, 1995, approximately one month later, Judge Ables made another reference to Panetti's constitutional right to represent himself, and assured Panetti any standby counsel appointed by the court would not "interfere in that right." 16 RR 24. On August 8, 1995, in a hearing on Panetti's motion to dismiss his standby counsel, Judge Ables made a more forceful statement on the subject to Panetti: "You've asked me to be your own attorney. Constitutionally, you can insist on that, and I can't take that away from you . . . ." 18 RR 6.

Later in the same hearing, the Court suspects Judge Ables may have come very close to stating explicitly that he would not allow Panetti to represent himself if he felt he had a choice: "Mr. Panetti, all the warnings and all the instructions that I gave you at the previous hearing still hold true, that as far as you having a right to represent yourself, you can. You can insist on it. You have insisted on it and I have no choice, even though—" 18 RR 16. Unfortunately, Judge Ables did not finish his thought, because Panetti interrupted him with a rambling speech, the purpose of which appears to have been, at least in part, to praise his standby counsel. 18 RR 16–17.

These statements by Judge Ables demonstrate two things with clarity. First, Judge Ables was strongly opposed to Panetti's self-representation. In addition to making an outright statement to that effect, Judge Ables made repeated attempts to convince Panetti to accept both appointed counsel, and, failing that, standby counsel. Second, Judge Ables considered self-representation to be a constitutional right that Panetti could "insist" on, and one that Judge Ables himself could not take away, and indeed had "no choice" but to honor.

-18-

By contrast, there is little in the record to suggest Judge Ables was comfortable with Panetti's decision. Although Judge Ables did his best to inform Panetti about his options, and ultimately found that Panetti voluntarily and intelligently waived his right to counsel, the record, taken as a whole, gives the strong impression that Judge Ables made these findings because he felt compelled to do so, and not because he wanted to do so.

Accordingly, the Court concludes Panetti has satisfied the first requirement for relief under the *Edwards* rule.

**2.     Was Panetti Incompetent to Conduct His Own Trial Defense Because of Mental Incapacity?**

As noted above, it is an undeniable fact that evidence of Panetti's mental illness permeates the trial record. However, the Court does not believe Panetti's mental illness rendered him incompetent to represent himself under *Edwards*. The Court is aware this is a remarkable conclusion, particularly in light of Panetti's long history of serious mental illness. For this reason, and to allow for meaningful appellate review, the Court analyzes, in detail, Panetti's performance throughout his trial, from voir dire to Panetti's closing statement at the punishment stage.

**a.     Voir Dire**

*Qualification of the Jury*

Qualification of the jury in Panetti's trial took place on August 21, 1995. After Judge Ables gave the venire panel[6] general information about jury service, he allowed jurors to come to the bench to claim exemptions or give reasons why they should be excused from jury service.

The record indicates Panetti was actively engaged in this process, and was apparently taking

_____

[6] As explained further below, Judge Ables examined half of the panel in the morning, and half in the afternoon.

notes, as he occasionally asked the court to repeat a juror's number after hearing that juror's exemption or excuse. *See, e.g.*, 20 RR 16, 30, 32, 41. After hearing the potential jurors' exemptions and excuses, Panetti asked for "a moment to sort of study these names," stating that "there is [sic] a couple of them, they're are [sic] kind of borderline that I would like to think about." 20 RR 45. The court suggested in response that Panetti and the State should take care of the "obvious" cases first, and they could take up "borderline" cases after Panetti had a chance to think about them. 20 RR 45–46.

Rather than going into needless detail about the potential jurors who were excused by agreement, the Court simply notes the record clearly shows that Panetti had been taking notes about the jurors' excuses, and appeared to have a rational understanding of those excuses. *See, e.g.*, 20 RR 46 (Panetti agreeing to excuse one juror because "he's under contract to have the work [for the Department of Public Safety] done," and a second because of "adoption and leaving the state"). Panetti asked for time to think about ten potential jurors—numbers 12, 35, 48, 73, 87, 106, 107, 135, 185, and 227[7]—but the court overruled his request with respect to juror 185.[8] 20 RR 45–58.

Of the nine "borderline" jury panel members examined in the morning, Panetti initially asked to retain seven for voir dire: 107, an elementary school teacher; 135 and 106, both Jehovah's Witnesses; 35, a nurse at State Hospital; 73, who was in Fredericksburg (the town in which Panetti shot the Alvarados) on the date of the murders; 48, who knew Panetti's first wife; and 227, a

---

[7] Although the record of Panetti's trial is public, the Court will nevertheless refer to jurors by number, out of respect for their privacy.

[8] Juror 185 was a doctor, who Panetti was apparently considering because of his "education and his knowledge of afflictions overall." 20 RR 56. Judge Ables excused this juror because he was "a family practitioner with a real extensive practice in town." *Id.*

pharmacist.[9]  20 RR 59–62.  Of the two who were released, one (juror 87) was disqualified for a prior felony conviction, and one (juror 12) was excused at Panetti's request, apparently because of "experience [Panetti] had with fathers."  20 RR 61–62.  Upon learning that juror 135 was seven months pregnant, and had concerns about her health and the health of her child, Panetti agreed to release her as well.  20 RR 65–66.

Qualification of the second half of the panel occurred in the afternoon of August 21, and the court followed the same procedure.  Again, the record shows Panetti was attentive to the proceedings, asking for juror numbers to be repeated.  *See, e.g.*, 20 RR 95, 106.  Although Panetti expressed some concern over releasing jurors 230, a middle school teacher;[10] 244, a surgeon; and 357, a taxidermist, he ultimately agreed they should be released.  20 RR 107–114.  Likewise, Panetti was reluctant to retain jurors 254, a city council member; and 279, whose brother was a lawyer,[11] but finally agreed they both should be retained for voir dire.  20 RR 109–111.

It is, of course, questionable whether Panetti made wise decisions about which people to release, and which to retain.  However, the record shows Panetti was aware of both the purpose of jury qualification, and the basic procedures for going about it.  Further, to the extent the Court can make a determination from this record, Panetti appears to have made meaningful decisions, grounded in fact, about which panel members to excuse, and which to keep.

---

[9] Panetti indicated he was considering keeping juror 227 because of his "knowledge of medication."  20 RR 57.

[10] Panetti expressed concern with excusing jurors like 230, saying he was reluctant to release "people that have an education."  20 RR 108.

[11] Panetti withdrew his objection when he learned her brother was a criminal defense attorney.  20 RR 111.

*General Voir Dire*

General voir dire took place the next day, on August 22, 1995. At the beginning of the proceedings, Panetti informed the court he was feeling "quite paranoid" and "quite sick" that day. 21 RR 8. Judge Ables responded: "Okay, just take a deep breath and we'll move pretty slow." *Id.* After the panel was seated, the court gave its preliminary instructions and conducted a basic voir dire. 21 RR 31–50. The State then conducted its general voir dire, after which the court allowed Panetti to proceed. 21 RR 51–63.

Panetti's general voir dire, like much of his later trial performance, was unfocused. Although he began by questioning certain observers about why they were in the courtroom, he quickly segued from that topic to a discussion of his history of alcoholism, his recent sobriety, and his religious beliefs. 21 RR 63–64. He briefly hinted at his inexperience with legal procedure ("I was presented with a ragtag law book in Atascosa County."), tried to impress upon the jury the importance of the case ("It's a matter of my life and liberty, whether I have a future, rehabilitation, any help to the future as far as society."), and expressed his intention to testify. 21 RR 64.

Panetti then told the panel about both his current feelings of paranoia, as well as his long history of mental illness, specifically telling them he had suffered from schizophrenia since 1986. 21 RR 65. After a brief and questionably relevant introduction about cowboys and cowboy pride, Panetti told the jury about a severe electric shock he received in his youth, as a result of which he spent time in a hospital burn ward and became addicted, briefly, to morphine. 21 RR 65. Panetti went on to make a vague reference to having "had some death experiences," *id.*—a theme he would return to several times throughout his trial.

Next, Panetti discussed his attempts to get proper medication for his schizophrenia, his

lengthy pretrial incarceration, and prison conditions generally.  21 RR 66.  After telling the panel he

did not have a criminal record, he said he had "had a rough time as far as jailhouse doctors go,

getting the proper medication . . . ."  *Id.*  Panetti then recounted, at some length, his difficulty while

incarcerated in getting the medication he thought was appropriate.  21 RR 66–67.  He concluded by

telling the panel: "I'm not going to expect to explain mental illnesses to you and expect you folks

to understand all these medicines.  I do expect a little bit of compassion as far as that I do have the

affliction and it's documented well before I was ever in trouble."  21 RR 67.  As will be seen, Panetti

went to some lengths during trial to establish this point as well.

    After making a passing reference to the Alvarados, who Panetti said he "didn't hate," but in

fact "loved dearly," Panetti addressed the issue of his self-representation.  21 RR 67–68.  Again,

Panetti's comments were unfocused and disjointed, and punctuated with frequent asides, but the gist

of his statements was reasonably clear: although he "needed a lawyer," Panetti, "in his mental illness

and paranoia, . . . thought all lawyers [were] in cahoots," and therefore "put [his standby counsel,

Scott Monroe] through a lot of unnecessary garbage."  21 RR 68.  Later, however, Panetti "started

to trust Scott Monroe," and to take his advice.  *Id.*  The import of Panetti's next statement on the

issue is unclear, because Judge Ables interrupted him to release the panel for a lunch break, but

Panetti appears to have been about to comment on the financial implications of having a lawyer:

"[S]o I . . . need a lawyer, but I'm not going to throw money at a situation that I don't have or expect

my parents to . . . ."[12]  21 RR 68–69.

---

[12] The remainder of Panetti's comment, before he is interrupted by Judge Ables, is, as best this Court can tell,
a lead-in to one of his not-uncommon digressions, this one apparently on the subject of the wealth of hill country farmers
and ranch managers.  Whether Panetti would have circled back to his original point, or otherwise made this detour
relevant to his self-representation, is obviously a question on which this Court can only speculate.

The court may have had a dual purpose in breaking for lunch when it did, because, once the jury panel had been excused, Judge Ables said the following:

> Mr. Panetti, you said something right toward the end that I wanted to stop and finish up a little later. You told the jury panel that you do need an attorney and I'm always willing to appoint you an attorney. I always have been, always will appoint you an attorney, and I'm not sure if I understood what you were saying when you told the jury that you need an attorney. Do you want to elaborate on that a little bit?

21 RR 70. Panetti replied:

> Well, I'm not an actor, but I kind of feel like—like the cartoons when I was a kid stuck out one of those big old hooks, drug me off the stage. If you would have let me continue, I would have just went on to say how much I appreciate the assistance, but I haven't changed my mind, especially in light of what the DA said about the State always pursuing the death penalty. No, I was just in the process, sort of making amends with Scott Monroe . . . . Scott Monroe is what's keeping this thing rolling, what's keeping me from not totally making too much of a darn fool of myself, and I was just thanking him . . . .

21 RR 70–71.

The Court explicitly asked if Panetti still wanted to represent himself, to which Panetti replied, "Oh, definitely." 21 RR 71. Judge Ables, scrupulously protecting Panetti's rights (and maybe hoping he would relent), continued: "[I]f you want court-appointed counsel, you absolutely, unequivocally will get court-appointed counsel. You're entitled to that and I'll appoint you court-appointed counsel, if you don't feel like you can represent yourself or don't want to represent yourself." 21 RR 72. Panetti again confirmed he wanted to represent himself. *Id.* Immediately prior to recessing for lunch, the court inquired one last time whether Panetti wanted to represent himself, and Panetti said he did. 21 RR 74.

After lunch, Panetti resumed his general voir dire. He began by thanking the panel, apologizing that they had to come back after lunch, and acknowledging that some of them may have

-24-

had to miss work to be there.  21 RR 75.  Panetti also referred to his "rambling on" in the pre-lunch voir dire: "I have a habit of doing that and it's not all mental illness.  I ramble on, but I did make a short list, which is probably bad, and I'll get it over with, turn you loose and I want to thank you again and we'll start the individual voir dire, French word."[13]  21 RR 76.

Panetti then returned to the matter of his self-representation, emphasizing the authority of the jury to make the final decision in the case (and, perhaps, foreshadowing his insanity defense):

> [T]he reason I'm up here and not a lawyer is the same reason I'm not going to flood you with a bunch of doctors I couldn't afford, anyway, because it's going to be up to the jury, ladies and gentlemen.  In that ragtag law book told [sic] me you could have five experts and the defense and prosecution can both say this guy was completely flipped out and it's still up to the jury.  It's going to be y'all's decision.

21 RR 76.

Continuing, Panetti established a local connection ("I dearly love the Hill Country and seventeen years in Fredericksburg, I was probably in Kerrville a couple of times a week."), and expressed his displeasure at the release of doctors and teachers from the jury panel, because he "thought [they] would understand maybe more about mental illness."  21 RR 76–77.

Apparently demonstrating an appreciation of the practical difficulties in prevailing on a defense of insanity, Panetti referred in passing to the distinction between religious law and secular law ("In my religious convictions I have this Old Testament law . . . . I didn't make the laws.  In the State of Texas they say you can be acquitted by reason of insanity . . . ."), and then attempted to refute the media's portrayal of him as a "thirty-nine-year-old Rambo."  21 RR 77.  In fact, Panetti

---

[13] These opening statements to the panel well illustrate a larger trend that extends throughout Panetti's trial: although Panetti's presentations are typically made in an unpolished, stream-of-consciousness fashion, they are also usually appropriate, comprehensible, and apparently motivated by reasonable concerns.  Here, Panetti seems to be trying to make a favorable impression with the jury panel, showing appreciation for their concerns and respect for their time, and addressing his own personal weaknesses as an advocate.  This Court routinely sees trained lawyers doing the same thing with juries, though—usually—more directly.

said, he was a thirty-seven-year-old veteran with an honorable discharge, who wore camouflage when he bow-hunted. *Id.*

Panetti's next comments to the panel were more disjointed than usual, covering, in quick succession: his drinking the night before the shootings; seeing "the Sheriff and his cronies in the [sic] Andy's Diner"; that one member of the jury panel knew his ex-wife; and the fact that his mental illness went undiagnosed for a long time. 21 RR 78. His unfocused commentary continued, with Panetti briefly touching on his confession to the Texas Rangers, mentioning in passing that he wrote a "buckaroo poetry book," and reiterating his intention to testify on his own behalf. 21 RR 77–78.

In the midst of this circuitous speech, Panetti told the panel, for the first of what would turn out to be many times throughout his trial: "I don't want to get into opening statement, but I can't tell you what happens if a jury was to acquit me. I can't tell you that. That's the law." 21 RR 79.

Returning to his scattershot commentary, Panetti began by praising standby counsel Scott Monroe ("he's been pretty much straight-up and I want to thank him for it"), veered suddenly to the topics of drug and alcohol use and his unpleasant experiences while incarcerated ("in a sense as far as court goes, yeah, I have suffered some"), and then returned equally abruptly to the subject of his self-representation: "I just don't think that I can hire a lawyer or depend on a lawyer, that if I was sentenced to death or life, treatment, and I can [sic] trust a major decision like this to anyone." 21 RR 79–80.

In another quick shift, Panetti told the panel about his legal setbacks, including: his failure to have Judge Ables recused from the case; his lack of communication with his previous counsel; and the reversal of a ruling suppressing his confession. 21 RR 80–81. Panetti referred to Judge Ables as "a very honorable man" who had been "tolerant" with him, but who had "cut [him] no

slack."  21 RR 81.

Then, in what may have been an attempt to minimize the cruelty of his crime, but was almost certainly a serious tactical error, Panetti stated: "[F]rom what I have read, my in-laws died instantly, but no skill or no—because I didn't aim."  21 RR 81–82.

Panetti then began an extended, rambling speech about religion which was, for the most part, irrelevant to his case.  21 RR 82–84.  Any fair reading of this part of the record leaves little doubt that Panetti was struggling to maintain a coherent train of thought at that time.  Remarkably, however, even in the midst of one of his most meandering discourses, Panetti interjected two relevant points.  First, he reiterated his inexperience as an advocate, while at the same time reaffirming his commitment to representing himself: "I'm doing something right now I'm really not qualified to do, but I'm doing it and I'm not backing out now.  It's sort of halfway through the ride."  21 RR 83.  Second, Panetti made a surprisingly compelling statement about the importance of juror impartiality and the presumption of innocence:

> In the United States justice system it is important that the jurors have an open mind.  They can't have their minds made up before they get into the courtroom.  They must always remember that a person is considered innocent until proven guilty, even for those who never expect to find themselves on the wrong side of the law.  It is a comfort to know that guilty [sic] is not assumed, but it has to be proven.

21 RR 84.  After Panetti began digressing from this point, Judge Ables called him and the District Attorney to the bench, and had a conference off the record.

When Panetti resumed speaking after the bench conference, he appeared to be somewhat more focused.  He first addressed, at some length, the issue of his appearance, and in particular his limited wardrobe, saying:

-27-

I got things from my mom in the mail that says [sic] "Dress to acquit." It says O.J. Simpson's suits mean more than his blood samples. Menendez boys are wearing sweaters. Look innocent. . . . Well, I have never been able to afford—this is a week's pay here. I get a pension check from Social Security for schizophrenia and disability. It's four seventy and I have had this outfit in a suitcase for three months and you will see next Monday I will be a [sic] different colored shirt, but the day after it will be green [sic] shirt again . . . . I don't believe this garbage. I'm glad my mother sent it. I love my mother. There is a lot of truth in it, but I'm going to depend on the jury, however you twelve, fourteen are to look through this O.J. crap. Jurors think that a dark blue is the most provable color, followed by gray and tan and—this makes me sick.[14]

21 RR 85–86.

After saying this, and indicating he was "going to wind it down," Panetti seemed about to address the few members of the panel who had previously indicated they would, due to their religious beliefs, have difficulty sitting in judgment of another: "Oh, the people with religious convictions that said, 'Well, I can't judge,' my dear mother-in-law wanted to go to Blanco to a Greek Orthodox minister . . . ." 21 RR 86. However, as the Court's truncated quotation indicates, Panetti almost immediately got sidetracked, and, upon returning to his original point, simply said: "Well, by coming in a place and saying, 'I'm not going to judge,' you have already judged." 21 RR 86–87.

The remainder of Panetti's voir dire was likewise disjointed, with only brief and barely comprehensible references to insanity; his near-death experiences; the racial prejudice he suffered; his negative publicity; his "little suicide box" at Gillespie County Jail; whether he was remorseful;

---

[14] The Court finds this speech significant for several reasons. First, on a surface level, it suggests Panetti's mother believed he was mentally coherent enough to comprehend the strategy of putting on an innocent appearance through wardrobe choice, and, further, to carry out that strategy. Second, Panetti's statement demonstrates he did, in fact, absorb and retain the material. Third, regardless of whether Panetti's words represented his heartfelt feelings, or were merely an exercise in calculated artifice, they were practically overflowing with concepts that might reasonably be expected earn sympathy from a jury: Panetti's modest means, his schizophrenia and disability, his complete rejection of gimmicks and trust in the jury's good sense—even love for his mother. Again, the weakness in Panetti's presentation was his delivery, not his message.

and his apparent intent to excuse panel members who seemed antagonistic or unsympathetic to him. 21 RR 87–89. Judge Ables then excused the jury panel until August 28, 1995, when the court would proceed with individual voir dire. 21 RR 89.

With the exception of his closing, Panetti's general voir dire was rambling, but not incoherent. As with the jury qualification process, Panetti's choices about what to discuss in general voir dire, and what not to discuss, were perhaps poor ones. However, the same could be said of most pro se litigants, and, indeed, many lawyers. As this Court reads it, *Edwards* does not apply to a criminal defendant who has the mental capacity to make meaningful decisions, even if the actual decisions that defendant makes are disastrous to his or her defense. Put another way, what *Edwards* protects against is a trial rendered unfair by a defendant's mental incompetence, not that defendant's inexperience or ineptitude. Extending the holding of *Edwards* to cover the latter situation would, considering the amount of legal training enjoyed by most criminal defendants, be tantamount to requiring appointed counsel in all cases.

All that said, however, the record indicates Panetti experienced extreme confusion, and difficulty concentrating, during portions of his closing voir dire statements. It is this Court's opinion that, if Panetti had displayed this same level of confusion and incoherence throughout any extended portion of his trial, he may well have been incompetent to represent himself. However, as discussed further below, the Court finds this was not the case.

*August 23 Pretrial Hearing*

On August 23, 1995, the court held a hearing, primarily to discuss which of Panetti's many requested subpoenas the court would issue. Notably, prior to discussing Panetti's subpoena

applications, the court granted Panetti's request for a list of the State's potential exhibits, as well as his requests for increased access to the law library, and copies of the Texas Code of Criminal Procedure and Texas Rules of Evidence.  22 RR 17–24.  At Panetti's request, the District Attorney was excused from the courtroom before the court questioned Panetti about his subpoena applications, because Panetti was concerned the answers to the judge's questions "could incriminate [Panetti] or could be used against [him]."  22 RR 29.

Because the record is voluminous, the Court will only briefly summarize the results of this hearing.  During the morning, Judge Ables considered many of Panetti's subpoena applications.  Of these, Panetti's subpoena application was: quashed, for the judge who reversed the suppression of Panetti's confession, 22 RR 32; withdrawn, for a Kerr County Jail doctor and associated medical records, 22 RR 33; withdrawn, for Sheriff Kaiser, 22 RR 33; granted, for Panetti's prior appointed counsel, 22 RR 34–35; granted, for the Bexar County Coroner, 22 RR 36; quashed, for a person who served with Panetti in the Navy, and allegedly put LSD into Panetti's beer, 22 RR 36–37; withdrawn, for a friend who would testify that Panetti was not a racist, 22 RR 37; granted, for a doctor who conducted a psychiatric evaluation of Panetti, *id.*; granted, for three doctors, and medical and financial records from Starlite Hospital (and quashed for the other employees of Starlite), 22 RR 38–47; withdrawn, without explanation, for Marshall Kuykendall, 22 RR 47; quashed, for a therapist at Atascosa County jail,[15] 22 RR 48–51; granted, for a friend who could testify to Panetti's non-violent character, 22 RR 51; granted, after a long, rambling explanation by Panetti, for three members of the Maenius family (and quashed as to two), 22 RR 52–56; withdrawn, for two

---

[15] The court later reconsidered, and granted Panetti's application as to this therapist.  22 RR 72.

professional acquaintances who could testify about Panetti's character, 22 RR 56–57; granted, for

a veterinarian who worked with Panetti, 22 RR 57; withdrawn, after a meandering explanation, for

an inmate who was housed for six months in Bell County, in a cell next to Panetti's, 22 RR 58–59;

carried, again after a lengthy, unfocused explanation, for an inmate who could describe Panetti's

treatment while in jail,[16] 22 RR 59–63; withdrawn, for various members of Panetti's family, 22 RR

63–64; withdrawn, for a member of an unspecified "treatment team," 22 RR 64; quashed, for a man

Panetti used to work with, and who he described as his "best friend" (and withdrawn as to that man's

father), 22 RR 64–65; quashed, for three friends from Panetti's youth, 22 RR 66; withdrawn, for a

Navy friend of Panetti's, *id.*; quashed, for a bank president who could testify about a background

check, apparently related to Panetti's military service, 22 RR 67; granted, for a reporter from the

Fredericksburg Standard Post, and all articles written about Panetti in the previous twenty years, 22

RR 67–69; withdrawn, for various other members of the newspaper and radio media,[17] 22 RR 70;

quashed, for a man who worked at a radio station and knew Panetti through Alcoholics Anonymous,

22 RR 71; withdrawn, for two more members of the media and one person at a law firm, 22 RR

74–75; withdrawn, for two friends, one of whom was the chaplain at Panetti's church, 22 RR 76;

granted, after a long, rambling explanation, for a friend of Panetti's from Alcoholic's Anonymous,

---

[16] Panetti's long-winded explanation suggests he also wanted this witness at trial "for the jury to see a man condemned to death"—a man, according to Panetti, who "was kind of everything [Panetti] wasn't," who "whopped jailers," "[threw] urine on corrections officers," and who had a "prison record." 22 RR 60–61. Despite this man's much more serious record, however, Panetti said they both "got the same treatment, . . . got the same cuffs, the same separation, the same discipline." 22 RR 61–62. The Court suspects, based on these comments, that Panetti may have wished to show the jury a hardened criminal, with a serious disciplinary record, and who was sentenced to death, in order to appear relatively harmless by comparison. The trial court later agreed to the issuance of a subpoena for this inmate. 22 RR 72.

[17] Panetti's explanation for why he wanted to call these witnesses was so he could "make the relationship of how talk travels. Well, look at what the San Antonio Express-News wrote about me and a lot that was just totally inaccurate, but . . . a friend of my neighbor's, who described, thought he knew me, didn't know me and wrote some things that are inaccurate." 22 RR 73–74.

-31-

but quashed as to that man's father, 22 RR 76–79; quashed, for two other character witnesses who also knew about Panetti's history of mental illness, 22 RR 78–80; granted, for the doctor who first treated Panetti for psychiatric problems, and related records, 22 RR 80; quashed, for a different doctor who apparently committed Panetti to State Hospital, 22 RR 81; granted, after extended discussion, for a jail official in Fredericksburg who observed Panetti during his incarceration (and withdrawn or quashed as to other jailers), 22 RR 82–85; granted, for two corrections officers (and withdrawn as to two others), 22 RR 85–86; quashed, for Panetti's ex-wife's attorney, 22 RR 87–88; quashed, for a man Panetti thought was a priest, and who he met in jail, 22 RR 89; withdrawn, for a man named "Ronnie Ottmers," but who was not otherwise described, *id.*; granted, for Panetti's first wife, *id.*; withdrawn, for four members of his first wife's family, 22 RR 90; and granted, after a very long discussion, for some character witnesses from Panetti's church (and withdrawn as to the rest), 22 RR 91–97.  The court then broke for lunch, admonishing Panetti to get the remainder of his list "culled down to the bare minimum," so they could finish in the afternoon.  22 RR 97.

The Court recites the fates of Panetti's subpoena applications at length, not because the court's rulings are of particular significance to the resolution of Panetti's claims in this case, but because Panetti's list of desired witnesses, and his explanations about why he felt they were necessary, are relevant to his mental capacity.  The lengthy list above shows that, while Panetti cast far too wide a net in terms of desired witnesses, he was clearly aware that the issues of his mental illness and his character were going to be important to his trial.  Indeed, Judge Ables refused to subpoena many of Panetti's requested witnesses (or Panetti withdrew his applications as to them) because their expected testimony was cumulative with that of witnesses the court had already agreed

to subpoena, and not because the requested witnesses had nothing of relevance to say.

Again, one could easily question Panetti's decision to request so many subpoenas, or his choice of potential witnesses. Further, the record shows that Panetti, in typical fashion, occasionally had difficulty articulating why he wanted to call certain witnesses. However, the record also leaves the Court with the impression that Panetti knew where he was, what he was doing, and why he was doing it. In short, although Panetti's mental illness may have had some negative impact on his performance during this hearing, the Court does not think any such impact was large enough to render him mentally incompetent.[18]

In the afternoon, the court resumed its consideration of Panetti's subpoena applications. To salvage what little brevity it may, this Court will forego an exhaustive recap of the proceedings, and recite only matters of particular note.

One such matter occurred early in the afternoon, when Panetti asked the court for the criminal records of his ex-wife, his two victims, and several other members of the Alvarado family. 22 RR 99, 165. The court indicated Panetti's request was a matter that would have to be taken up when the State was present. *Id.* Later in the hearing, the court sent Panetti's criminal record request to the District Attorney, to see if he had any objections. 22 RR 131–32. The State ultimately agreed to Panetti's request. 22 RR 164–65. At the close of the hearing, after consulting with standby counsel, Panetti further requested the criminal records of several potential State witnesses. 22 RR 166. Again, the court advised Panetti the matter would have to be taken up with the District Attorney, and

---

[18] In reaching this conclusion, the Court is also mindful that Panetti at one point intended to subpoena Jesus, *see* Am. Pet., Ex. 9, a move that obviously calls into question Panetti's mental state at the time. However, it appears he later withdrew that subpoena, *see* 36 RR 1207, reducing its significance in the overall picture of Panetti's ability to conduct the basic tasks required to present his own defense.

suggested it could be done during jury selection.  *Id.*

Judge Ables and Panetti also had an extended discussion about whether it was appropriate to subpoena Panetti's children, including his eight-year-old daughter Amanda Alvarado, who was present when Panetti shot his mother- and father-in-law.  22 RR 138–41, 156–58.  With respect to Amanda, Panetti said he "[j]ust wanted the jury to see that [she wasn't] a scarred child," and that "any suffering she did [was] by the repeated questions by therapists."  22 RR 140.  After the court indicated it would quash the subpoena for Amanda, Panetti added: "The issue is I want the jury to see that she's not scarred, she loves me and that she doesn't see blood and guts and gore . . . ."  22 RR 141.  The court likewise quashed Panetti's subpoena for his fourteen-year-old son, although Judge Ables indicated Panetti could re-urge his requests after the State's case, if appropriate.  22 RR 139–40, 156.

Panetti also had a moment of particular incoherence during the afternoon, when discussing his subpoena request for a man named Elmer Seybold:

> Elmer Seybold is in Texas.  He taught me the farrier's art.  He taught me how to be a blacksmith.  If you called him up and said, "Tell me about Scott Panetti," he wouldn't know.  If you called him up and said "John Wayne, Jr.," it was the handle he put on me, good friends with John Wayne.  He was the only one that the Duke would let shoe Dollar.  Although, Elmer Seybold is weird.  He asked me—I had—when I went to the farrier's college I had my wife Jani with me and I had the only woman and he kept offering me to sell me his opium bed.  He has a dude ranch that half of it is abandoned and it's filled with—what he would do is go to foreign countries that were being—or like he taught the Shah of Iran shoers how to—for all I know the guy's a witch, but so I don't think we need him, Your Honor, but, you know—

22 RR 152.  Panetti was apparently cut off at this point by Judge Ables, who took Panetti's statements in stride: "We won't issue one on Seybold."  *Id.*  Despite Panetti's initial difficulty

explaining Mr. Seybold's relevance, he appears to have recovered quickly, stating: "I think what I put on him [sic] there for is that he knows that I know my trade . . . ." *Id.*

The afternoon was notable also because Panetti mentioned "Sergeant Iron Horse," a purported separate personality that was apparently somehow caused or created by his schizophrenia. 22 RR 160. As discussed below, this alleged alternate personality was central to Panetti's insanity defense.

Finally, as the hearing was drawing to a close, Panetti asked Judge Ables whether the court had excused two potential jurors: 387, a volleyball coach who was receiving treatment from a psychiatrist; and 201, who worked at State Hospital. With respect to the former, Panetti said: "[T]he reason I was requesting him is that being a patient with a psychiatrist, he's going to know a little bit about mental illness if he suffers." 22 RR 167–68. With respect to the latter, Panetti appears to have trailed off, or been interrupted: "You know, anybody that works at State Hospital, like the guy that's been to psychiatrist [sic], they're going to understand more about—although—" 22 RR 168. After establishing that juror 201 had been excused and 387 retained, the Court recessed until Monday, August 28, 1995, and the beginning of jury selection. 22 RR 171, 173.

As on previous occasions, Panetti's focus ebbed and flowed during the afternoon. However, as on previous occasions, Panetti was also attentive to appropriate trial matters, including: potential impeachment of witnesses through reference to past criminal convictions; attempting to reduce, in the jury's eyes, the seriousness of his crime by minimizing the harm it caused his daughter; and consideration of the sorts of people he wanted to serve on the jury. For all his lack of training, and his occasional tendency to get sidetracked, Panetti appears to have had rational goals in mind.

*Individual Voir Dire*

Individual voir dire of the jury panel took seven days, running from August 28 to September 6, 1995.  Because the record of these proceedings is over 1,000 pages long, the Court necessarily omits the vast majority of it, and discusses only the portions most significant to Panetti's claim.

That said, the Court nevertheless begins with a relatively detailed summary of Panetti's voir dire of the first panel member, to give a sense of Panetti's manner, typical areas of inquiry, and overall mental capacity.

Panetti began by addressing his self-representation: "Do you find it kind of strange that a man charged with such a crime would defend himself?"  23 RR 15.  After the panel member replied, "A little bit," Panetti moved on to what the venireman had read in the newspaper about the shootings, and whether he knew either the District Attorney or Panetti's standby counsel.  23 RR 16.

After a brief discussion about the venireman's hay farming business, *id.*, Panetti said, "If you were selected as juror in this case, you must judge the facts and evidence presented in the courtroom. Could you do that, like just not hearsay or anything like that, just the facts," and the panel member said he could.  23 RR 16–17.  After another short discussion about hay, Panetti asked a similar question, about the venireman's ability to follow the law: "[Y]ou wouldn't have no problem, as the D.A. said, following the law as it comes to whether [sic] if you figured I was dangerous or if you figured I wasn't or if you figured I was guilty or not just by the evidence and the law.  You would just follow the law?"  23 RR 17.  The venireman said he would.  *Id.*

Then, Panetti brought up the proverbial elephant in the room: "Do you find it strange that a man that is using the insanity defense can be capable enough to sit and talk with you like a normal

human being?"  23 RR 18.  Panetti followed up with questions about the man's feelings about mental institutions ("Would it terrify you to ever end up like in an institution?"), and whether he knew what would happen to Panetti if he was acquitted by reason of insanity.[19]  *Id.*  The venireman answered the latter question, "No," and (after a short digression) Panetti went on to say: "Oh, the consequences of being acquitted by reason of insanity is terrifying.  It's not an open door, I can tell you that much."  23 RR 19.  It does not take an expert in psychology to detect Panetti's not-so-subtle implication, that he would be locked up in a mental institution if he was acquitted by reason of insanity.

Following this exchange, Panetti discussed with the panel member his questionnaire answers regarding capital punishment, threw in one more question about hay, and then moved on to the subject of drinking.  23 RR 19–21.  Panetti then covered the venireman's knowledge of the lawyers in the case, his exposure to the news media, why he wanted to serve on the jury, and his feelings on criminal sentences and appeals.  23 RR 22–23.

Panetti had a fairly extended discussion with the venireman about mental illness.  The man indicated he did not know much about mental illness, but did have an uncle who had "a problem," such that he was "in and out of the State Hospital."  23 RR 23.  Panetti questioned the panel member about his uncle's specific diagnosis, as well as the venireman's feelings about it.  23 RR 24.  After

---

[19] The full exchange is potentially revealing about Panetti's motive in asking these questions.  When Panetti asked if it would terrify the panel member to end up in an institution, the man asked, "Terrify me to end up in one?" and Panetti confirmed, "Yeah."  23 RR 18.  The venireman answered, "Yeah, a little bit."  *Id.*  Panetti: "'One Flew Over the Cuckoo's Nest' type of syndrome?"  *Id.*  Venireman: "Yes."  *Id.*  Then, maybe significantly, Panetti: "It is terrifying. It is terrifying to think you're going to."  *Id.*  Immediately thereafter, Panetti asked the panel member whether he knew the consequences of an acquittal by reason of insanity.  *Id.*  It seems likely Panetti was trying to make the connection, in the venireman's mind, between mental institutions and an acquittal based on insanity.  As discussed below, this impression is strengthened by Panetti's subsequent questions.

quickly mentioning that he, too, had been in the State Hospital, Panetti returned to the venireman's feelings about criminal sentences. 23 RR 24–25. The two then discussed the panel member's opinions regarding acquittal of criminal defendants because of "technicalities," 23 RR 25–27, the value of steer, 23 RR 27, and whether the venireman had ever had "any unpleasant experience with law enforcement," 23 RR 28.

Panetti questioned the man about whether he thought an insane person could be restored to sanity, made a brief detour to the subject of hunting, then asked the panel member's views on whether capital punishment was a deterrent for drug addicts or the insane. 23 RR 28–29. During the course of this latter line of questioning, Panetti asked a pointed question: "[L]et's say the State proved that you were insane or a couple of people said you was insane [sic], would that make you decide different whether to find a man guilty or not guilty?" 23 RR 29. When the man equivocated in his response ("It could have some bearing on it, yes," but "I don't think it would be clear-cut"), Panetti asked: "Let me see if I can make that a little easier for you. The laws in the State of Texas say you can be acquitted if you're insane. If a guy was insane and you believe he was insane, would you acquit him?" *Id.* The venireman said he would. *Id.*

Moving on, the pair discussed the venireman's religious beliefs, his musical tastes, and his family's criminal record. 23 RR 29–31. They also briefly covered the man's prior jury service, his friends on the highway patrol, and his educational background. 23 RR 31–32. Panetti then asked at some length about the venireman's son's Navy service. 23 RR 32–33. Panetti asked the man where he lived, whether (and how well) he knew a potential witness in the case, and his level of familiarity with Starlite Hospital. 23 RR 33–35.

After Panetti asked about the panel member's marital status, the two had the following

weighty exchange:

| | |
|---|---|
| Panetti: | I was going to ask you if you were going to go to a rodeo, would you go to see a good ride or to see a cowboy fall? |
| Venireman: | I would rather see a good ride. |
| Panetti: | You don't want to see nobody get hurt? |
| Venireman: | No. |
| Panetti: | Do you despise me? |
| Venireman: | No. |
| Panetti: | How about what I'm charged with? |
| Venireman: | Yes. |
| Panetti: | Do you think it's possible that I could get the death penalty? |
| Venireman: | I think it's possible, yes. |
| Panetti: | Do you think it's probable that I'll get the death penalty? |
| Venireman: | I don't know that without hearing the evidence. |

23 RR 35–36.

After being prompted by Judge Ables to conclude, Panetti asked the venireman: "What if I

got up and decided that I wasn't going to testify?  What would you think about that?"  23 RR 36.

The panel member said he had no problem with that, and Panetti followed up, asking both "Do you

know the reason why a man wouldn't do that," and "I mean, legally, do you understand why a man

wouldn't get up and testify?"  *Id.*

Shortly thereafter, Panetti returned to an earlier issue, asking, "You don't have no problem

with the fact that a man was insane or been [sic] restored to sanity?  You think that's possible?"  23

RR 37.  The man again said he thought it was possible.  *Id.*  Panetti also returned to the matter of his

insanity defense, as it related to his decision to represent himself: "And you don't find it

contradictory to your belief that a man can talk like a normal human being and defend himself in a

court of law if he was insane?"  *Id.*

-39-

Panetti then asked more about the venireman's religious beliefs, before turning back to the question of legal technicalities: "If a technicality arose where you pretty much have to, or the State couldn't prove or if a situation came, could you put all the things aside and just follow the law as it's written and put your conscience aside?"[20]  23 RR 38.

The two discussed the panel member's experiences playing football, whether he considered himself a leader as a result of those experiences, and whether he would, therefore, be comfortable if chosen as foreman of the jury.  23 RR 38–39.  The man's hypothetical role as foreman segued, fairly jarringly, back into whether he would hold it against Panetti if Panetti did not testify.  23 RR 39.  Panetti told the man, "[T]he law says if I was to get up and incriminate myself, that it would ruin an appeal," confirmed that the man understood "the law is that a man doesn't have to testify," and then asked (with some obvious difficulty): "Would you sort have [sic] been sympathetic where a man might have to bite his tongue in a situation as the law is written?  In other words, instead of being able to—if he's up for any future at all, that may not—there's some things that may not—would that offend you if some things weren't addressed?"  23 RR 39–40.

The man confirmed he would not be unduly inconvenienced if the trial took longer than a week, and said he had no problem with the State having the burden of proof.  23 RR 40–41.  Then, he and Panetti had the following exchange:

| | |
|---|---|
| Panetti: | Ever heard the expression "justice is blind"? |
| Venireman: | Yeah. |
| Panetti: | Did you know if you're blind, you might not be able to be a juror? |
| Venireman: | Right. |
| Panetti: | Did you know that? |

---

[20] The transcript reveals the venireman interrupted Panetti twice during his question, both times to answer in the affirmative.  33 RR 38.  The Court has omitted these interruptions from its quote, above.

| Venireman: | I didn't know that. |
| Panetti: | You do now.  Kind of crazy, isn't it?  Do you think people kind of throw around the expression like "I'm crazy"?  Do you think that gets thrown around? |
| Venireman: | No, not really. |
| Panetti: | Did you like to hit people when you played football? |
| Venireman: | Oh, yeah. |
| Panetti: | Controlled violence? |
| Venireman: | Mhm. |
| Panetti: | Some would say that's kind of crazy.  I love the game, too.  Not hurting people, but on the field.  Did you have real fond memories of playing that game?[21] |

23 RR 41.

Finally, Panetti asked about the panel member's experiences with, and feelings regarding, domestic violence, moved quickly over the topics of luck, prayer, and (again) hay, and concluded by confirming the venireman had no particular desire to serve, or not to serve, on the jury, but was just doing his duty.  23 RR 42–45.

After Panetti finished questioning the venireman, and the court had him step out of the courtroom, Judge Ables explained the procedure for making challenges for cause, as well as for exercising peremptory strikes.  23 RR 45–46.  Neither the State nor Panetti challenged the man for cause, but Panetti had some difficulty deciding whether to strike him from the jury.  23 RR 46–49. In making his decision, Panetti sought clarification from the court:

| Panetti: | These peremptory strikes have to be used individually on each individual juror?  They can't be saved and used at the end? |
| The Court: | Right. |
| Panetti: | It's on [sic] one-on-one thing? |

---

[21] This exchange is remarkable for two reasons.  First, it is a good illustration of Panetti's "stream of consciousness" style of speech that, while almost always present to some degree, tended to be exaggerated when he lost focus.  Second, and related, it shows that, even when Panetti did lose his focus, he was nevertheless able—sometimes—to redirect his loose associations toward relevant subjects.

| The Court: | Right. |
|---|---|
| Panetti: | That means if I reviewed several jurors tomorrow and it looked like there was a [sic] influx of better than average and so I was to play poker and gamble and strike a few people today on the subjects, that maybe tomorrow I wouldn't strike nobody; and so kind of turned out that after the cards went around the table that it would gradually end up by the time we picked twelve jurors that I used my—I think there's 17? |
| The Court: | Fifteen. |

23 RR 48.  Panetti ultimately opted to strike the venireman from the jury.  23 RR 49.

As noted above, with respect to the remainder of voir dire, the Court mentions only topics of particular significance to the issue of whether Panetti was mentally competent to represent himself.  Thus, using the first venireman as a rough baseline (in terms of both topics covered, and overall coherence), the Court notes when Panetti's performance deviates substantially from it.[22]

Panetti broached the subject of insanity with the second venireman, as he had with the first.  However, while questioning the second man, Panetti referred explicitly to multiple personality disorder, asking whether the man had heard of it, and whether he thought it could exist.  23 RR 72–73.  When the man said he "didn't know for sure" whether multiple personality disorder could exist, Panetti asked whether expert testimony or "paperwork" could persuade him that it could.  23 RR 73.

Panetti also quarreled with the man, accusing him of filling out his questionnaire "haphazardly," 23 RR 76, and saying "that's pretty much grounds for cause, sir," 23 RR 77.  Shortly thereafter, while in the midst of questioning the venireman, Panetti addressed the court: "I don't

---

[22] The Court acknowledges this method is inherently subjective, and obviously does not capture every nuance and detail of Panetti's conduct.  However, given the extensive record in this case, it is simply not feasible to comprehensively document Panetti's performance at trial.  Suffice it to say, the Court has reviewed the entirety of the trial record, and omits nothing that would change its conclusion about Panetti's competence to represent himself.

know why we don't let this man leave right now, Your Honor, and save the Court a little time.  He changed his mind on several [questionnaire questions], 82 and 83 he marked yesterday, which is contrary to the laws of the State of Texas, and it seems like it was chalked off as a stroke of the pen . . . ."  23 RR 78.  Later, Panetti sharply questioned the panel member about why he did not devote more time to the questionnaire.  23 RR 82.  When the man admitted he would have preferred being questioned by an attorney, rather than by Panetti, Panetti berated the man, saying: "Well, that's contrary to the law, because I got the law [sic] to be asking you these uncomfortable questions and you will be sitting up in a panel of twelve jurors, sir, and, you know, to sort of haphazardly or to be passing time, I'm not up here to—you know, but—I mean, you got to understand that what this is all about."  23 RR 84.  At the end of his questioning, Panetti returned to the subject, saying:

> Well, the reason I'm asking you all these—what you're going to say, "This guy asked me a bunch of trick questions."—is because of the way you filled out your application and the last questions, one of the major questions on the form, we should have turned you loose right in the beginning. . . .  But the D.A. questioned you; you changed your mind, and you changed your mind again, and it seems to me like you just sort of want to sit in the air conditioner and be here, but enough.  There's air conditioner at the V.A. Hospital, too.

23 RR 92.

Given Panetti's relentless attack, it is perhaps unsurprising that, when Panetti asked, "Do you despise me," the man replied, "No, I'll just be glad when it's over. . . .  This questioning."  23 RR 92.  Also unsurprisingly, Panetti challenged the man for cause.  23 RR 93.  When the court denied Panetti's challenge, Panetti used a peremptory strike against the venireman.  23 RR 94.

Panetti's questioning of the third venireman was brief, and notable only because it suggests Panetti had an appreciation of the legal definition of insanity.  23 RR 117.  Neither party challenged

-43-

the man for cause, but the State exercised a peremptory strike against him.  *Id.*

The fourth panel member, a seventy-nine year old woman, claimed an exemption based upon her age, and health problems she had experienced over the weekend.  23 RR 119–20.  The court used the unexpected break to resolve further subpoena issues with Panetti.  23 RR 120–25.

Panetti's questioning of the fifth panel member was fairly brief, and was unremarkable.  23 RR 147–51.  The court overruled the State's challenge for cause, and neither party exercised a peremptory strike against the woman.  23 RR 151–52.

The sixth venireman, who said during the State's questioning that she had preconceived notions about Panetti's guilt, and who could not swear to set them aside in reaching her verdict, was excused for cause.  23 RR 156–161.

The issue of Panetti's self-representation was discussed at some length during the questioning of the seventh potential juror.  On his questionnaire, the man indicated he did not want to be a juror in the case, "and [his] answer had to do with the fact that [Panetti was] representing himself."  23 RR 172.  Perhaps the most notable part of the discussion, for the purposes of this case, was not the venireman's comments, but the State's explanation of Panetti's right: "Let me explain or say this: As you may already know, any defendant in any criminal case has the constitutional right to defend himself. . . .  And that the Court can't force somebody to have representation. . . .  In fact, it would be a problem with the Court to force someone to have—do you understand that?"  23 RR 173.  The State's comments, combined with the court's apparent acceptance of them, simply reinforces the Court's conclusion that Judge Ables felt compelled to allow Panetti to represent himself.

Beyond a somewhat extended line of questioning about religion, 23 RR 197–200, the

remainder of Panetti's examination of this panel member was unremarkable.  Panetti opted to exercise a peremptory strike, apparently because of the man's acquaintance with the District Attorney.  23 RR 202.

Panetti's questioning of the eighth potential juror was extensive, and covered a variety of topics, but was not otherwise exceptional.  23 RR 218–240.  What was exceptional, however, was Panetti's choice to exercise a peremptory strike against the man—a choice he apparently made after flipping a coin.  24 RR 241.  Whether this was an arbitrary decision on Panetti's part, an ostentatious theatrical display, or just a quick way to resolve a close question, the Court obviously cannot say; but it is certainly noteworthy.

The ninth potential juror, a recent widow with an eleven-year old child, and who was also ten weeks pregnant, was excused by agreement between the parties.  23 RR 256–57.

The tenth and last panel member of the day was peremptorily struck by Panetti after a comprehensive, but unexceptional, examination.  23 RR 271–91.

The parties questioned ten more potential jurors on the following day, August 29, 1995. Panetti exercised a peremptory strike against the first venireman after she indicated she would give him the death penalty if he was convicted.[23]  24 RR 320, 325.  Aside from the brevity of Panetti's questioning—upon hearing the woman's answer, he quickly stopped questioning her and challenged her for cause—the examination was not noteworthy.

The twelfth potential juror was excused by agreement, after she asked to be disqualified for

---

[23] The woman appears to have been confused by the questioning, and gave several inconsistent answers on this point.  24 RR 318–22.  Ultimately, when questioned by the court, she indicated she could keep an open mind, and would base her answers to the punishment questions on the evidence presented.  24 RR 322.

family reasons.   24 RR 326–37.   Notably, Panetti requested, and was granted, an additional peremptory strike, apparently because he felt the eleventh venireman should have been excused for cause.  24 RR 327.

The thirteenth panel member became the second juror in the case, after Panetti opted not to question the man, and neither party challenged him for cause, or exercised a peremptory strike against him.  24 RR 339–40.

The fourteenth venireman told the court she was not sure she could be fair in Panetti's case, because her nephew had been killed in a shooting; consequently, the woman asked to be excused. 24 RR 343.  The parties excused her by agreement.  24 RR 344.

Panetti questioned the fifteenth potential juror at length, with no remarkable deviations from his usual topics.  24 RR 353–71.  Neither party challenged the man for cause, nor exercised a strike, and he was therefore selected as the third juror in Panetti's case.  24 RR 371–72.

The sixteenth venireman suffered from headaches, was hard of hearing, and had been a victim of domestic violence in the past, at the hands of her alcoholic husband.  24 RR 384–87. Panetti's examination of the woman covered these topics, but was otherwise unexceptional. *Id.*  The State peremptorily struck her from the jury.  24 RR 388.

After the seventeenth potential juror indicated she could not impose the death penalty, the State challenged her for cause, and the court sustained the State's challenge.  24 RR 396–98.

Panetti did not question the eighteenth panel member, nor did he challenge her for cause or peremptorily strike her.  24 RR 411–12.  Thus, she became the fourth juror in Panetti's case.  24 RR 412.

Panetti's questioning of the nineteenth venireman was both more adversarial, and (from what the Court can glean from the transcript) more agitated, than normal.  24 RR 427–40.  Panetti appeared particularly concerned with the panel member's prior exposure to media coverage, 24 RR 433, and whether he could acquit someone by reason of insanity, 24 RR 434–35.  Panetti also questioned whether the venireman felt he should serve on a jury, given the man's history of depression.  24 RR 436–37.  Most of Panetti's questions, and his characterizations of the venireman's answers, seem to have been aimed at getting the man to agree he did not want to, and should not, serve on the jury.  Panetti, unsurprisingly, challenged the venireman for cause, but the court denied his challenge, so Panetti exercised a peremptory strike against the man.  24 RR 441.

Panetti declined to question the twentieth, and the day's final, potential juror.  24 RR 459.  Neither party challenged him for cause, nor exercised a peremptory strike against him, and he consequently became the fifth juror.  24 RR 459–60.

August 30, 1995, day three of individual voir dire, saw the examination of nine potential jurors.  Panetti did not question the first venireman, but he opted to exercise his eighth (of sixteen) peremptory strike against her.  25 RR 495–97.

The State questioned the twenty-second potential juror at length, 25 RR 498–525, and Panetti indicated he had no questions for her, 25 RR 525–26.  When Judge Ables asked Panetti if he wished to challenge her for cause, Panetti gave some insight into his lack of questioning: "No, Your Honor.  The District Attorney is asking the questions where they're eliminating a need for me to ask a lot of them.  It's not because I'm drifting away; although, I'm drifting away.  I'm ready to go on."  25 RR 526.  It is unclear what, exactly, Panetti meant by his second-to-last sentence, but it suggests to the

-47-

Court that, despite some difficulties, Panetti was nevertheless paying attention to the proceedings. The State peremptorily struck this venireman.  *Id.*

The twenty-third panel member was excused by the court, without examination, because she was under accusation for theft.  25 RR 527.

Although Panetti's questioning of the twenty-fourth venireman began with a few seemingly unusual questions ("Ever had any bad experiences with cowboys?" "Didn't you wear an earring when I seen you in here? . . . Why ain't you got it on today?"  25 RR 540), his examination was coherent and relevant.  The State exercised a peremptory strike against the man.  25 RR 546.

Panetti had no questions for the next potential juror, and neither party challenged or struck her. 25 RR 567–68.  Accordingly, she became the sixth juror in Panetti's case.  25 RR 569.

Panetti made a significant comment at the beginning of the State's questioning of the twenty-sixth venireman.  After the man left the room, Panetti addressed the court, saying:

> I haven't really had time to contemplate this specific juror; although, with my paperwork in my right pocket, I can open it up and by what the District Attorney asks come to a decision; although, he was an after-lunch juror that's here early.  May I request of the Court to confer with my standby counsel, sir?

25 RR 571.  Although the court allowed Panetti to so confer, Panetti changed his mind, indicating he would "go by what's in [his] pocket and by what the D.A. has to ask the man."[24]  25 RR 572.

Nor was the remainder of the questioning routine.  During the State's questioning, the man admitted he was biased against Panetti. 25 RR 575.  The judge asked the venireman to step out of

---

[24] The Court finds these comments significant for two reasons.  First, they indicate Panetti typically prepared in advance for his questioning of potential jurors, an impression consistent with some of Panetti's comments during examinations of several veniremen.  Second, they demonstrate that Panetti felt free to ask the court for time or assistance when he felt he needed it.  This impression, too, is consistent with other parts of the trial record.

the courtroom, after which the judge asked Panetti if he wished to challenge the man for cause. *Id.* Oddly, even though the judge indicated he was prepared to excuse the juror for cause, Panetti asked to question the man. 25 RR 575–76. Panetti's examination was brief, and was aimed mostly at learning how the Hispanic community viewed his crime. 25 RR 577–580. Panetti said he was "just trying to get a feeling for the scuttlebutt of the community," a topic he found "very helpful for [his] defense" of insanity. 25 RR 579. After Panetti's questioning, he challenged the man for cause, and the court granted his challenge. 25 RR 581.

After the twenty-seventh venireman expressed, during the State's questioning, his serious difficulty in comprehending the term "reasonable doubt," he was excused for cause, over Panetti's objection. 25 RR 586–89.

The twenty-eighth venireman was likewise excused for cause, because he indicated to the State that he could not acquit an otherwise-guilty defendant by reason of insanity. 25 RR 596–98.

August 30th was not a good day for jurors, because the twenty-ninth panel member was also excused for cause, after she told the State that she had "basically" already formed the opinion that Panetti was "probably guilty." 25 RR 603, 605.

Panetti's questioning of the thirtieth potential juror was extended but unremarkable, and Panetti exercised a peremptory strike against her. 25 RR 626–45.

Another nine veniremen were examined on August 31, 1995. Panetti opted not to ask any questions of the first panel member, stating: "I believe the District Attorney has asked about all the questions that need to be asked of this woman, Your Honor." 26 RR 674. The State peremptorily struck the woman from the jury. 26 RR 675.

Nor did Panetti ask any questions of the thirty-second potential juror, who went unchallenged and unstruck by both sides, and thereby became the seventh juror in Panetti's trial.  26 RR 701–02.

By contrast, although Panetti also asked no questions of the thirty-third panel member, that venireman was excused for cause at Panetti's request, after the venireman indicated he thought Panetti was a liar, and already had "a couple of strikes against him" in the venireman's mind.  26 RR 706, 729–30.

Panetti continued his trend of not questioning potential jurors with the thirty-fourth venireman, saying the "District Attorney pretty much asked [the venireman] the questions that [Panetti] might have."  26 RR 752.  Neither side challenged or struck the man, and he was thus accepted as the eighth juror in the case.  26 RR 752–53.

The next potential juror was excused, without examination, on the basis of his religious beliefs.  26 RR 754–55.

Panetti briefly questioned the thirty-sixth venireman, and she was excused, by agreement between the parties, for economic reasons.  26 RR 778–79.

Both parties questioned the thirty-seventh potential juror routinely, and the State peremptorily struck him.  26 RR 781–94.

Panetti covered a variety of topics with the next panel member, but focused primarily on the question of whether he would follow the law on the affirmative defense of insanity.  26 RR 811–21.  Panetti exercised a peremptory strike against the man.  26 RR 821.

The thirty-ninth venireman became the ninth juror in Panetti's case, after Panetti opted not to question him, and neither side challenged or peremptorily struck the man.  26 RR 824–39.

-50-

Panetti briefly questioned the last potential juror of the day, and ultimately exercised a peremptory strike against the man.  26 RR 861–66.  The court indicated Panetti had five strikes remaining, and the State had nine.  26 RR 867.

True to form, the parties examined ten more potential jurors on September 1, 1995.  The first potential juror of the day also became the tenth juror in Panetti's case, after the parties questioned him—unremarkably—and neither challenged him for cause, nor peremptorily struck him.  27 RR 876–900.

Panetti very briefly questioned the forty-second panel member, who was ultimately struck by the State.  27 RR 919–20.

The next potential juror was excused for cause after he indicated, during the State's questioning, that he could not consider giving a person convicted of capital murder a sentence of life in prison.  27 RR 930–31.

The following venireman was likewise excused for cause, after he told the State he could not follow the law on the insanity defense.  27 RR 940–43.

Panetti declined to question the forty-fifth potential juror, and exercised a peremptory strike against her.  27 RR 965.

He also opted not to question the following venireman, but apparently both parties found her acceptable, and she was thus accepted as the eleventh juror.  27 RR 989–91.

Though incomplete, a passing comment in Panetti's questioning of the next potential juror bears mentioning.  Panetti told the venireman, "In this case I have to prove that I was insane," which would "be a tough thing to do, would you not agree? . . . Tell you straight up the reason why I'm

doing it because I don't figure no one else can explain it better than one who—"[25]  27 RR 1016–17.

After Panetti's questioning, and a discussion with the court about peremptory strikes,[26] Panetti once

again flipped a coin, and decided to exercise a strike against the potential juror.  27 RR 1017–19.

The judge also granted Panetti another peremptory strike (for a total of 17), because he had

misinformed Panetti about the number of strikes he had remaining; thus, after striking this

venireman, Panetti had four peremptory strikes remaining.  27 RR 1020–21.

      Panetti questioned the forty-eighth panel member at length, particularly about whether she

could acquit by reason of insanity, even if she did not know what would happen to a defendant who

was so acquitted.  27 RR 1044–52.  Panetti ultimately decided to exercise a peremptory strike against

her.  27 RR 1052.

      After she told the State that she had formed a negative opinion of Panetti, and would be

unable to be impartial, the next venireman was excused for cause.  27 RR 1058–60.

      Panetti peremptorily struck the final potential juror of the day, the fiftieth venireman overall,

after routine questioning.  27 RR 1080–84.  At the end of the day, the State was left with eight

peremptory strikes, and Panetti with two.  27 RR 1085.

      Voir dire resumed on September 5, 1995, on which date the parties examined nine potential

jurors.  Panetti's questioning of the first potential juror focused mostly on her knowledge of potential

---

[25] The Court acknowledges that the meaning of this fragment is not crystal clear; however, it appears to reflect Panetti's reason for wanting to represent himself.  Specifically, Panetti may have felt that he, with his purported history of insanity, would be best situated to prove that he was insane at the time of the offense.  This is consistent with a later remark by Panetti, that "when it comes to something as insane as insanity, [he] did not think that anybody could do it better than [he.]"  28 RR 1293.

[26] Panetti asked the court whether his five remaining peremptory strikes carried over, and could be used to strike alternate jurors, or if he lost them after choosing the twelfth juror.  27 RR 1018.  After consulting the statute, the court said the latter was correct.  27 RR 1019.

witnesses, particularly David Morquecho.  28 RR 1106–12.  Panetti challenged the woman for cause, on the basis of her casual acquaintance with Morquecho, but the court overruled his challenge.  28 RR 1113.  Consequently, Panetti exercised his second-to-last peremptory strike against her.  *Id.*

The next venireman was excused for cause, because she said her religious beliefs neither allowed her to sit in judgment of another, nor to impose the death penalty.  28 RR 1118–20.

The fifty-third potential juror was likewise excused, because she suffered from migraine headaches, and indicated they might affect her ability to concentrate.  28 RR 1123–25.

The trend continued with the next potential juror, who was excused for cause because she had "some preconceived ideas or just maybe emotions" about the case, based on her husband's medical treatment of Panetti's children.  28 RR 1130–32.

After extended questioning by both parties, during which the venireman acknowledged that some of Panetti's comments during general voir dire might affect her decision in the case, Panetti challenged the next woman for cause, but the court overruled his challenge.  28 RR 1135–56.  However, Panetti opted not to peremptorily strike the woman, and the fifty-fifth panel member became the twelfth juror in Panetti's case.  28 RR 1156–57.

The court continued with voir dire proceedings, so the parties might select two alternate jurors.  The first of the potential alternates was acceptable to both parties after their examinations, and was accordingly selected as first alternate.  28 RR 1162–79.

The second potential alternate juror was excused for cause, for personal reasons, based on answers he gave during the State's questioning.  28 RR 1184–86.

After very extensive questioning, particularly on the issue of the insanity defense, the third

potential alternate juror was excused for cause at Panetti's request.  28 RR 1187–1214.

The final venireman of the day was also excused for cause at Panetti's request, because the man indicated he could not credit testimony from psychiatrists or psychologists.  28 RR 1226–32.

On September 6, 1995, the final day of voir dire in Panetti's case, the parties questioned two potential jurors.  Panetti questioned the first of the two, a law enforcement officer, at great length, occasionally quarreling with him, and making clear his opposition to the venireman's serving on the jury. 29 RR 1245–75.  Panetti was chastised on several occasions by the judge for taking too long, and once by the State for making a joke about the O.J. Simpson trial.  29 RR 1263, 1269, 1270, 1273.  The court denied Panetti's challenge for cause, at which point Panetti exercised his sole peremptory strike against the man.  29 RR 1275.

Finally, Panetti questioned the sixth potential alternate juror, and the sixty-first potential juror overall, but did not challenge her for cause, and had no remaining peremptory strikes. 29 RR 1289–98.  Because the State did not challenge or peremptorily strike her, she became the second alternate juror.  29 RR 1298–99.  Having concluded voir dire, the court, at Panetti's request, indicated it would hold a pretrial hearing after a brief recess.[27]  29 RR 1300–01.

Panetti's conduct during individual voir dire was, for a pro se litigant, actually fairly impressive.[28]  As in past proceedings, Panetti's style of speech and manner of questioning were often

---

[27] Panetti requested the hearing to discuss outstanding subpoena issues, the court's resolution of which is unimportant to this case.  As noted below, the court also complimented Panetti on his performance during voir dire, and Panetti raised the issue of an upcoming psychiatric appointment.  30 RR 5–12.

[28] Judge Ables himself appears to have felt likewise: "I thought you did a good job, Mr. Panetti, and I thought that considering you were unfamiliar with the technical aspects of it, you picked up on it well, and I appreciate how you handled voir dire, and we have picked a jury in a reasonable amount of time, so I'm happy with the time it took and how it went."  30 RR 6.

unusual, and sometimes difficult to follow.  However, Panetti's questions were usually relevant, and clear enough for potential jurors to understand them.  With the possible exception of his coin flips (which, again, may simply have been a way to resolve close calls in Panetti's mind), Panetti appears to have exercised his peremptory strikes with deliberation.  His challenges for cause, while sometimes legally insufficient, did not appear irrational.

In sum, Panetti managed to keep his wits about him during the questioning of sixty-one potential jurors, over the course of seven days.  The record shows he clearly knew where he was, what he was doing, and why he was doing it.  When he opted not to question potential jurors, it appears he made that choice because the State's extensive examination left him with no questions of his own.  To the extent there were deficiencies in Panetti's voir dire questioning, they appear to have been caused by his lack of skill and legal knowledge, and not any mental incompetence.  Not to overstate Panetti's effectiveness, but the Court has seen many pro se litigants perform far below this level of competence; nor, sadly, are lawyers uniformly better.  Thus, the Court finds nothing in this record to indicate Panetti was mentally incompetent to conduct his own defense.

**b.    Guilt–Innocence Phase**

The guilt–innocence phase of Panetti's trial began on September 12, 1995, and lasted until September 21, 1995.  Because the Court is primarily concerned with Panetti's performance, and not necessarily the merits of the case, the Court will omit most of the court and the State's comments and questions.  With respect to Panetti, the Court will, in light of the extensive record, mostly summarize his statements and questions, except where verbatim quotations are particularly relevant.

On the morning of September 21, 1995, before the jury was brought into the courtroom,

Panetti expressed, in a rambling (and apparently frantic) monologue, that he was not prepared to

proceed.  31 RR 13–17.  In small and heavily edited part, Panetti said:

> I'm not prepared to present my case, even, or to cross-examine the witnesses. . . . [I]n
> light of a situation of my mental illness, paranoid schizophrenia and the thought
> disorder and the manic depression that has gone untreated . . . .
>    . . . .
>    . . . I wish I could say it was simply a shower, a shave, a night [sic] sleep and
> a decent meal would help me.  I'm not looking for a long delay, but I'm going to
> definitely need a couple of days to get the medicine, to see my doctor and to prepare
> my case. . . .
>    . . . .
>    . . . [I]n the zeal to put me on the suicide watch [in jail], my treatment has
> basically been isolation, separation and quite a bit of degradation.
>    . . . .
>    . . . I wish I could just say give me a shower, shave and a haircut and a decent
> meal and I'll be ready to go; but to get the medicine, to see my psychiatrist, to be
> prepared to cross-examine, to think clearly, to cross-examine witnesses clearly, I in
> no way want to turn it over to someone I feel probably no more competent than I.
>    . . . .
>    . . . [I]t seems like I have been neglected certain rights that I have under the
> Constitution.
>
>    In other words, I'm expected to prepare my case without my shot of insulin,
> and I consider my mental illness just as debilitating when I have been on a pension
> since '86 and its been there since before this happened, this ever came to trial, that
> I have been kept from the normal procedures of care . . . .
>
>    I wish I could just say a shower and a shave and a haircut and a decent meal
> I'm ready to go, but with the doctor and the medicine and the files, the preparation,
> not being able to clearly cross-examine the witness, I don't think it would be
> comfortable for the Court for me to recall all of the State's witnesses because I'm not
> prepared.  I could wing it on opening statement, but it just seems like it's just all
> strikes of just trying to run me through the shoot [sic] without just a simple adequate
> time to prepare simply when I prepared and bent over backwards as far as law
> enforcement to make this run smoothly.

31 RR 13–17.  Judge Ables indicated the case would proceed to trial in approximately ten minutes,

but that Panetti's case, if any, would probably not be presented for several days.  31 RR 18.

-56-

After Judge Ables had the jury sworn, and he gave them preliminary instructions, he asked if Panetti was ready for trial. 31 RR 19–23. Although Panetti replied that he was not, the court indicated the trial would nevertheless proceed, at which point the State read the indictment against Panetti. 31 RR 23–24. Panetti entered a plea of "not guilty by reason of insanity." 31 RR 24. The State gave a brief opening statement, and Panetti elected to give his opening statement immediately thereafter. 31 RR 24–27.

*Opening Statement*

Panetti's opening statement was, to put it simply, not good. In addition to being delivered in a pronounced stream-of-consciousness manner, it also rambled between topics without regard for their relevancy, and was so long that the court eventually cut it short. 31 RR 27–39. In brief summary, Panetti's opening statement covered the following topics: his appearance (and specifically his inability to shower and shave prior to trial), 31 RR 27; his Sarge Ironhorse personality, 31 RR 28; his long-undiagnosed mental illness, *id.*; voluntary intoxication, *id.*; gaps in the State's chosen evidence, *id.*; his own lack of preparation, in part because of his incarceration, 31 RR 28–29; the insanity defense, 31 RR 29; an alternate theory of the hostage situation involving his wife and daughter, 31 RR 29–30; the suppression of his confession, and the subsequent reversal of that ruling, 31 RR 30; questionable practices and statements by law enforcement and Fredericksburg residents, 31 RR 30–31; the term insanity, which Panetti said meant "just not in sound mind," 31 RR 31; his religious rebirth as "the born again April fool," and how he "depended on the Lord to do for [him] what the medicine wasn't doing," 31 RR 31–32; his earlier competency hearings,[29] 31 RR 32; his

_____

[29] As noted above, Panetti's first competency trial ended with a hung jury and a mistrial; he was found competent after his second trial.

difficulties with various doctors and medicines, 31 RR 32–33; the court's denial of his request to postpone the trial, 31 RR 33; more about the difficulties of preparing for trial while incarcerated, *id.*; how "total honesty," and not sympathy or luck, kept him sober,[30] 31 RR 33–34; his conversion to Catholicism, 31 RR 34; the fact he was being denied his proper medication, 31 RR 35; more about his lack of preparation, and the fact he "may have to call back certain witnesses," 31 RR 36; more about multiple personality disorder, and that "Sarge Ironhorse [was] known over the last couple of years or a good year before [Panetti] was arrested," 31 RR 36; his lack of time to speak with witnesses, and his observation that it "could be an advantage, because there's no coaching going on," 31 RR 36; another less-than-lucid comment ("Demons, demons, evil spirits. A demon affects mental stability."), followed immediately by what appears to have been an attempt to impeach the credibility of some of the State's witnesses, and concluding with another reference to his untreated schizophrenia and manic depression, 31 RR 37; the mishandling of his medication between jail facilities, 31 RR 37–38; and, before Panetti was cut off by the court, a reference to his military service and the "major quantity of LSD" somebody put into his beer, 31 RR 39. Panetti objected to the court's limitation of his time to make an opening statement. 31 RR 38–40.

*State's Case-in-Chief*

*Herbert W. Vorauer*

The State's first witness was Herbert W. Vorauer, a Fredericksburg police officer who was

---

[30] Panetti concluded this point with a fairly unintelligible narrative: "You might say three years in jail, well, it's easy to stay sober. After the Mexican mafia put me on trial in Atascosa County, a kangaroo trial at a church meeting, there was no more church meetings after this, but mysteriously the next day the a.k.a. Roy Rogers showed me up and handed me a ragtag law book and I passed up some jailhouse intoxicants, not by luck, but by prayer and grace." 31 RR 34. Although this story may have some basis in fact, and seems tied to the larger theme of his religious rebirth, it is an example of one of Panetti's less lucid moments during his opening statement.

the first responder to the Alvarado home, the scene of the murders. 31 RR 40–42. After the State walked through Vorauer's investigation of the scene, Panetti cross-examined the officer. 31 RR 42–51. First, Panetti challenged Vorauer's interpretation of the crime scene, specifically his conclusion about how one of the Alvarados' bedroom windows had been broken: "With your experience, if someone was to bust through a door, there would be a lot more glass on the inside?" 31 RR 51–53.

Later, Panetti tried to get the witness to agree that the chaotic nature of the crime scene was a sign of a spontaneous, rather than a premeditated, crime: "And in your experience wouldn't you think in most—if someone was to plan out a crime, they don't leave their weapons lying around, do they?" 31 RR 54. When Voraurer avoided that question, Panetti followed up: "But not usually in your experience if someone was going to go think out and do a crime, they leave a firearm laying around?" *Id.* The witness unhelpfully answered, "I couldn't really answer that question. I have never planned a crime. I don't know." *Id.*

The remainder of Panetti's questions were of questionable relevance, but (as he did many times with later witnesses) Panetti took advantage of his pro se status on several occasions by essentially testifying during his cross-examination. Although there are several examples in Panetti's questioning of Vorauer alone, the Court provides only a single example:

> But alls you noticed is that the glass and that most of the glass was on the concrete, abandoned shotgun, when you walked in the house, my mother- and father-in-law laying there? The "in-law" sticks, because they were truly my mother- and father-in-law, but in a lot of ways they were my mom and dad. They treated me such. It's really difficult to address a situation and be callous and then—but also stipulate the remorse is involved in a year in jail.

31 RR 57. Panetti's editorializing eventually became so pronounced that the State objected because

he was "making statements and argument, apparently."  31 RR 58.

Panetti's cross-examination of Vorauer was not particularly effective, but that is not surprising, for at least two reasons.  First, and most obvious, Panetti was not skilled at questioning uncooperative witnesses, and was thus often unable to get Vorauer to agree with him.  Instead, Panetti often argued with the witness, which proved to be as unpersuasive as it was ineffective.  Second, Vorauer simply had little to contribute to Panetti's insanity defense.[31]  Panetti tried to establish that his crime was spontaneous and unpremeditated, and also that he had deep affection for his victims—both of which are consistent with his defensive theory.  Panetti did not get the answers he wanted from Vorauer, and did not know how to handle Vorauer's recalcitrance, but he did ask questions relevant to his insanity defense.

*Sonja Alvarado*

The State's second witness was Sonja Alvarado, Panetti's ex-wife and the daughter of Panetti's victims, Joe and Amanda Alvarado.  31 RR 59–60.  Sonja witnessed the murders, and the State, naturally, examined her at length.  31 RR 61–85, 88–103.  Panetti's cross-examination, of course, put her in the distressing position of being questioned by the man who had killed her parents.

Obviously recognizing this unpleasant fact, Panetti began his questioning with a preamble, and an accusation that she had lied during direct examination:

> Sonja, for the benefit of the jury, I'm going to have to ask you some questions, because if I was to call you in a couple of days, there would be doubt that I may not have questioned you, so there's some pretty much spontaneous, uncomfortable questions I'm going to have to ask, so the jury knows the truth.

---

[31] As later testimony and evidence revealed, Panetti had no factual defense to the charges against him; accordingly, he was obligated to rely solely on his legal defense of insanity.  Because some of the State's witnesses had little of relevance to say on that topic, Panetti's cross-examination of them was necessarily limited in its effectiveness.

> I know this is difficult for you, as it would me [sic], and half of the questions
> I was going to ask you that I thought about I didn't write down, and it doesn't make
> any sense; so I'm just going to do like I did in the beginning and this morning, is just
> no strategy, no guts, just honesty, and, Sonja, you're not being honest.

31 RR 103–04.  Immediately after this accusation, Panetti began addressing Sonja in a personal fashion ("You look lovely, and I know I don't, but—"), at which point the State objected.  31 RR 104.

The unusual and unpleasant circumstances of Panetti's questioning of Sonja, combined with Panetti's frequent editorializing and commentary, made for a fairly disjointed and objection-filled cross-examination.  The Court will generally omit from its discussion the many instances in which Panetti made some inappropriate statement rather than asking a question, the State objected, and the court sustained the objection.  Suffice it to say, there were many such instances, and Panetti seemed to use his cross-examination of Sonja as much as an opportunity to communicate with her, as a way to present evidence to the jury.

When Panetti did finally question Sonja, he first broached the subjects of his gun ownership, and her claim that he had previously hit her with the butt of a rifle.  31 RR 107–08.  Panetti tried to downplay his image as a gun fanatic ("In other words, Sonja, I didn't have a lot of guns, and I only had a bow and arrow and I just acquired the saddle rifle, the 30.06, not long before all of this?"), and also tried to cast doubt on Sonja's testimony, that Panetti had tried to shoot her after he killed her parents, but that the rifle had jammed: "Well, Sonja, you said it jammed, but it was brand new."  31 RR 108.

Significantly,[32] Panetti explained why, even though he was insane at the time of the killings, he could nevertheless remember the details: "Sonja, this is difficult, because Sarge was in possession of me and being I wasn't drunk, I can remember these things."  31 RR 108.

Panetti asked Sonja a lot of questions about the beginning of their relationship, and occasionally interjected questions that appear to have been aimed at showing Sonja's bias against Panetti ("Did you ever make a remark after all this that you wanted to see me burn and do life or die, not to have me with another woman or have a life?" ), and to impeach Sonja ("What were you in jail for, Sonja?") and her family ("[Y]ou were in a family with a lot of domestic violence, a lot of trouble with the law?" ).  31 RR 115–16.  Panetti also brought up Sonja's drug use: "Did you make a habit of smoking a joint or half a joint as you took your shower to prepare yourself for work as a waitress?"  31 RR 118.

Later, Panetti returned to the subject of "Sarge Ironhorse," and Sonja's familiarity with the name or persona.  31 RR 120–21.  He also asked questions (or, more accurately, made statements) seemingly designed to paint himself as a good provider for Sonja: "[I] didn't turn down any work, picking peaches or whatever job came, breaking rock.  I took it to give us more money."  31 RR 121.

In what was probably a serious strategic error, Panetti started to walk through Sonja's account of the crime, sometimes narrating what he did, and sometimes asking Sonja questions.  31 RR 122–125.  He implied he hit Sonja with the butt of the 30.06 rifle because Sonja had armed herself with a knife from the kitchen: "The only time I ever hit you with the butt of that 30.06 was at that

---

[32] This is significant for at least three reasons.  First, it is another example of Panetti taking advantage of his pro se status to testify while questioning a witness.  Second, it shows Panetti was focused on his chosen defense of insanity. Finally, Panetti's claim—that he was somehow observing events, while not being in control of his actions—put him in the advantageous position of being able simultaneously to disclaim responsibility for the crime, but also try to impeach witnesses.

tragedy, and did you have a knife in your hand?" 31 RR 124.  Perhaps realizing he was undermining

his own defense by indicating what he had done, Panetti "clarified" the matter for the jury:

"[T]here's a lot of things I remember, because I wasn't drunk out of my mind, but you have to

remember this is the person.  This is Sarge, so when I say 'I,' I'm saying Sarge, and not to make it

confusing, and for the benefit of the jury and the truth, I'm just trying to go through what happened."

31 RR 124.  After the court sustained an objection by the State, Panetti moved to a different line of

questioning.  31 RR 124–25.

> During the lunch recess, the Court chastised Panetti for arguing with witnesses, saying:
>
> If you don't quit with your dialogues, I'm going to have to cut off the questioning.
> I would never allow Mr. Curry [the District Attorney] to do that. . . . In your mind
> you can make a note that she disagrees with you and you can testify or have
> somebody else testify to that event, but you can't stop and give a little commentary
> about her answers.  That's inappropriate, and perhaps you need to talk to Mr.
> Monroe, your standby counsel, for him to explain the technical aspects of how you
> do elicit testimony from a witness . . . .

31 RR 127–28.  Panetti replied, in part:

> Your Honor, I will not use my untreated thought disorder for an excuse, but
> my thoughts do run a gambit and when I have to go far enough into the case as the
> tragedy and then go back to where we first met, it's difficult, and the reason I
> elaborated or added any details is to get to the point and the memory, and to get the
> facts, and to get the truth and I will confer with Scott Monroe.  I will be more blunt
> and question more precisely . . . .

31 RR 128.

> After lunch, Panetti resumed his questioning of Sonja Alvarado.  31 RR 129.  He quickly

moved into Sonja's family problems, and particularly her father's alleged drinking problem, and her

mother's alleged stabbing of her father.  31 RR 131.  He also asked whether Sonja knew what her

mother had been arrested for, to which she replied, "No, I didn't even know she was arrested."  31

RR 134.  Panetti replied: "I think I have a record somewhere, probably.  Your mom was arrested for assault.  I was just wondering did she assault your dad or did she assault another lady or do you remember any details about that?"  31 RR 134.  Panetti also referred to one of Sonja's sisters, saying she "had a bunch of problems with the law."  31 RR 135.

Panetti moved on to other topics, but later returned to the issue of Sonja's drug use.  After determining Sonja was living with a particular woman, Panetti asked: "Did she offer you that place to stay or was it just convenient, because she had the marijuana and she was the weed dealer and that?"  31 RR 143.

Panetti then returned to the day of the murders, and what happened at the bunkhouse after Panetti killed Sonja's parents.  31 RR 144.  Panetti's version of events was very different from Sonja's, and apparently involved her wanting to make a getaway with him and their daughter, after Panetti shot her parents.  *Id.*; 31 RR 150.  He also implied that Sonja recognized him as "Ironhorse," and not as himself: "Do you remember in the bunkhouse whether you looked at my hair and said, 'You're not you.  You're not the same.'  Do you remember me saying, 'Ironhorse'?"  31 RR 145.  He also flatly denied that she was his hostage at the bunkhouse ("Well, I never had you.  I never took you hostage."), and suggested they parted on surprisingly amicable terms: "Well, when we left the bunkhouse and we all hugged and you got in the Jeep and left, there was no law enforcement except way down maybe there was a [sic] law enforcement."  31 RR 147–48.

Panetti also tried—unsuccessfully—to get Sonja to acknowledge his reputation for being "insane": "Do you remember making remarks about when I was out of my mind, or do you remember hearing any stories about Jane Luchenbach or in '86 when I was gunshot or that I was

-64-

insane?  Do you remember hearing any rumors about when I was out of my mind or insane or rumors about just being crazy?"  31 RR 153–54.

Sonja likewise refused to agree with Panetti, that their daughter developed a speech impediment not because she witnessed the murders of her grandparents, but because of the State's extensive questioning of her about the killings.  31 RR 158.

In another apparent attempt to place the blame on "Sarge Ironhorse," Panetti asked whether Sonja remembered what he was wearing, and if she recalled "making any remarks about [Panetti] being possessed or having a demon look or that it wasn't [him] . . . ."  31 RR 159.  He also tried to establish the existence of his separate personality prior to the murders: "Do you remember anybody ever making fun of me because of Sarge or different names?"; and "Do you remember my personality ever changing drastically from one persona to another, from one person to another and then questioning me about it?"  *Id.*

Panetti asked a long series of questions, including some about Sonja's marijuana use, his suspicions about her infidelity, church, and his behavior toward their daughter, before he returned to the subject of his work history.  31 RR 159–68.  Apparently, Panetti took umbrage with Sonja's characterization of him as a man who did not work: "[D]o you ever remember me lazy, because that's kind of the picture you're painting of me like I didn't work."  31 RR 168.

He then asked more questions designed to show Sonja's bias: "[D]id you have a deep contempt or hatred for me when you came to the jail to get that Jeep title?"  31 RR 170.  "Is it pretty safe to say that especially after my confession that you hate me pretty much?"  *Id.*  Sonja answered both questions "Yes."  *Id.*  "Do you think your hatred for me might want to paint a picture to get me

killed and not treat me—" *Id.* Panetti was cut off at this point by Sonja, who said: "You know what you're doing, Scott. You always have since I have known you." *Id.*

After many questions on irrelevant or repetitive topics, Panetti challenged Sonja's earlier characterization of him as a stalker who violated a protective order she had against him: "Now, while this protective order was in force, you came to the bunkhouse when I was out there to visit me a few times?" 31 RR 178. Sonja replied, "I don't remember when that was." *Id.* Panetti followed up: "Well, there's a witness here that will remember, but what I'm saying is the clear cut—in other words, we were both sort of sidestepping the protective order." *Id.*

Panetti and Sonja also had different recollections of a jail visit she paid him after the murders:

> [W]hen you came to jail to visit me that day you don't remember me breaking down. You don't remember coming back later with the Jeep title. You don't remember me telling—what we spoke about, forgiveness and the Bible, and there's just so many things that aren't remembered that—but you told me then in the jail that you kept the deer, but then now you're saying that the day after I was arrested, you went out to the bunkhouse to the Petsch Ranch?

31 RR 181.

In what the Court can only characterize as a critical tactical blunder, Panetti walked Sonja, in detail, through his shooting of her parents. 31 RR 183–190. Panetti appears to have done so to demonstrate that Sonja had lied about events ("Truth, the truth will set you free. It has for me. . . . You know, just because of your hatred, the truth is going to have to come out."), and to establish that it was "Sarge" who was responsible: "Do you remember when I shot the door, when Sarge, berserk, shot the door?" 31 RR 186–87. He also tried to point out purported inconsistencies in Sonja's account, and to call into question her memory of events:

> Sonja, is it safe to say there's a lot of stuff in the shock and the situation that you just flat don't remember? Numbers of bullets, guns [sic] jams, where Joe was, who had the knife? Where Birdie [Panetti's nickname for their daughter Amanda] was sitting down, in my arms, picked her up, where you ran from the bed that I picked up Birdie, and the shock of the situation? Is it safe to say that as you point-blank told the D.A. everything that happened and the jury, that it may not really be what happened, that you may not remember fact for fact?

31 RR 188. Later, Panetti was even more blunt: "[E]ither you don't remember or you're not telling the truth. I don't know if it is out of hatred for me or you just don't remember and that's okay, plead the Fifth, but to get to just basic questions on what happened, because I wasn't drunk, so I remember." 31 RR 189. Subsequently, Panetti returned to questioning Sonja's recollection of the crime. 31 RR 189–193. Again, Panetti tried to get Sonja to credit his version of events, in which Panetti shot her parents, was "restored to sanity," turned and ran for the Jeep, and, to his surprise, saw that Sonja had followed him of her own free will. 31 RR 190–91. Then, according to Panetti,[33] Sonja said something like, "Make a run for it." 31 RR 191. In Panetti's version, after he, Sonja, and their daughter went to the bunkhouse, "[w]hen the sun was coming up," they "all got together," and Sonja told Panetti she would "always love [him]," whereupon they hugged and Panetti told Sonja that she and Amanda should leave. 31 RR 191–92. Unsurprisingly, Sonja refused to agree that was what had happened. *Id.*

    After a brief recess, Panetti continued. 31 RR 194. Unfortunately, he returned to a detailed and methodical account of Sonja's recollection of the crime. In particular, Panetti seemed intent on impeaching Sonja by recounting—several times, and in excruciating detail—how he shot her parents, and why, given her description of the murders, their daughter could not have been where Sonja

---

[33] In typical fashion, Panetti conveyed his story in part through leading questions, and in part through comments.

claimed she was at the time.  31 RR 195–212.

In fact, Panetti went over the details of the shootings so many times, the District Attorney objected, saying: "Your Honor, I object.  It is just badgering.  We have heard this fifteen times."  31 RR 207.  Although the court sustained the objection, and a similar one shortly thereafter, Panetti persisted in his questioning, until eventually the court cut him off, and instructed him to ask something else.  31 RR 211–12.  Still, Panetti continued to ask about the shootings, and the court ultimately excused the jury, and admonished Panetti: "I have sustained Mr. Curry's objections about six or seven times about you going over the same matters, and we're not going to do this anymore.  If you continue it, I'm just going to stop you from questioning the witness."  31 RR 215.

Panetti replied:

Your Honor, before the jury comes in.  The reason I felt it necessary to ask the same question is I got different answers.  Beg the Court's permission, or the Court's apology for doing so.  I'm not going to blame it on mental illness and thought disorder, that it's that, or lost my train of thought.  I was trying to get what happened to the jury, which over the next few days will come out with pictures and all the evidence.  I was trying to get a straight answer, and I will play by the rules, but in considering all things, on per se defending myself, I haven't had the opportunity, the benefits of being—of another attorney asking Sonja these difficult questions.

31 RR 216.

Despite many warnings, Panetti persisted in asking Sonja about details related to the shootings.  31 RR 216–22.  The court sustained several State objections, and, apart from reiterating his theme that Sonja either did not remember the details of the crime or was lying, Panetti elicited no testimony of particular relevance.[34]  *Id.*

---

[34] The State conducted redirect examination, and Panetti recrossed, but no significant testimony relevant to this Court's conclusion was elicited during either examination.  31 RR 222–34.

Panetti's questioning of Sonja Alvarado was, from the standpoint of his defense, an unmitigated disaster. Any sympathy the jury might still have had for Panetti after Sonja's direct testimony likely evaporated when he forced her to relive the murder of her parents, in excruciating detail, over and over again, simply so he could impeach her on matters of little relevance to his defense. He also showed his inexperience, and his lack of cross-examination skill, by asking Sonja the same question multiple times, apparently expecting more favorable answers on his later attempts than he received on his former. Finally, whether by choice, accident, or as a result of his mental illness, Panetti displayed very little empathy for Sonja, questioning her aggressively, confrontationally, and at length.

However, none of these things rendered Panetti incompetent, by reason of mental illness, to conduct his own defense. Panetti obviously had several points he wanted to emphasize to the jury in his questioning of Sonja, and his questioning frequently returned to these areas during his cross-examination. To name but a few, Panetti tried to show: (1) Sonja had a substantial drug history; (2) Sonja and her family, including her parents, had previous trouble with the law, and in some cases had criminal records; (3) he himself was very close to Sonja's parents; (4) he was a good provider for Sonja, and a good father to Amanda; (5) he had displayed the "Sarge" personality well before the crime, and it was "Sarge" who actually committed the crime; (6) Amanda was not devastated by witnessing the murders; (7) Sonja was somehow accepting of, or maybe even complicit in, Panetti's crime; and (8) Sonja later forgave him.[35]

Panetti's apparent strategy—impeaching a hostile witness; casting doubt on the character of

---

[35] Of course, Panetti also tried to show that Sonja later grew to hate him, and that she was therefore biased and untrustworthy in her testimony against him.

the victims; minimizing his own culpability while emphasizing his positive traits; downplaying the negative effects of his conduct; and trying to establish his defensive theory—was, if not ideal, at least reasonable.  However, his actual performance suffered from two major flaws, mentioned above. First, Panetti simply did not know how to ask the right questions to make his points effectively. Second, and far more important, any points he might have scored with the jury through his probative questions were minuscule in comparison to the points he lost by forcing Sonja to explain, repeatedly and in horrifying detail, exactly how he had killed her parents.

Nevertheless, these errors of strategy, execution, and judgment are common to all pro se litigants, and do not, in this Court's opinion, render Panetti incompetent to represent himself.  To be frank, Panetti put himself in a nearly impossible position when he chose to represent himself, knowing he would either have to let Sonja's no-doubt-damning version of events stand, or to cross-examine her and risk alienating the jury.  Even a lawyer of consummate skill would be hard pressed to question a witness who, along with her young daughter, witnessed her estranged husband murder her parents.  That Panetti failed—spectacularly—to come away from that situation looking like a decent man who was a slave to his mental illness is not a sign of his constitutional incompetence to conduct his own defense, but simply a reflection of the Herculean task he chose to undertake.

*Johnny Waldrip*

The State's third witness was Johnny Waldrip, a Texas Ranger who responded to the hostage situation at the bunkhouse.[36]  31 RR 238–40.  During the State's direct examination, Waldrip

---

[36] After killing Sonja Alvarado's parents, Panetti took Sonja and their daughter to the bunkhouse.  However, he appears to have released them voluntarily, before law enforcement fully responded to the scene.  As will be seen, Panetti objected to the term "hostage situation," in light of his voluntary release of Sonja and their daughter.

testified mostly about how Panetti looked when he surrendered himself, the appearance of the bunkhouse, and the evidence seized from within it.  31 RR 241–53.  The State used Waldrip as a sponsoring witness for the seized evidence and photographs of the scene.  *Id.*

On cross-examination, Panetti first attacked Waldrip's use of the term "hostage situation," saying: "First of all, sir, you sat down to the jury and you said, 'This particular hostage situation.' There were no hostages, and can you see how when you mention hostage situation, it might stick in people's mind as a hostage situation, when, indeed, it wasn't a hostage situation?"  31 RR 255.

Later, Panetti challenged the objectivity of the law enforcement investigation: "So you sort of pick and choose the evidence that you think is going to be part of . . . . You collected the evidence that you think is part of the case, but—you pick some and leave some?"  31 RR 270–71.  Panetti also asked, several times, whether Waldrip had heard about Panetti's mental illness: "When you were having your briefing was there any talk about my mental state?"; "There was no talk of me being mentally disturbed?"; "And the Sheriff never mentioned to you that I had a history of mental illness or—"  31 RR 271.

Panetti also snuck in another reference to his confession, and implied that other Texas Rangers may have been reprimanded or disciplined for their roles in taking a "secret confession" or "having a secret tape."  31 RR 273.

Finally, Panetti made the point that he voluntarily surrendered, and took no aggressive actions toward law enforcement.  31 RR 275.

Panetti's cross-examination of Waldrip was straightforward.  Apart from attempting to impeach Waldrip about the details of exactly where evidence was found, Panetti made the

point—effectively—that he was not involved in a traditional hostage situation or standoff with law enforcement.  He voluntarily released his hostages, and, later, also voluntarily surrendered himself.  These were potentially valuable points to make, and Panetti did so in a fairly direct way.  Nothing about his cross-examination of this witness suggests Panetti was incompetent to conduct his own defense because of serious mental illness.

Day two of Panetti's trial began with routine housekeeping matters, including Panetti's request that the court issue additional subpoenas (which was granted), and Panetti's request for a press conference (which was not).  32 RR 309–11.  The State then called its next witness.  32 RR 313.

*Bob Bertelson*

The State's first witness of the day was Bob Bertelson, a detective with the Fredericksburg Police Department.  32 RR 314.  The State questioned Bertelson about his investigation at the Alvarado house, and used him as a sponsoring witness for some of the evidence taken from that location, and some photographs. 32 RR 315–22.  Panetti objected to the introduction of some of the photographs of the Alvarados' bodies:

> There's four pictures that are above and beyond the actuality of what happened, the crime scene.  Two of them are posed.  It's not natural as what happened, and the facts of—there's two of them.  Maybe we should address this with the crime scene photographer.
>
> Well, there's four pictures in here where wounds are being exposed, where there's my mother-in-law is flipped over, and shots that are not the facts.  My in-laws, my mother and father laying there as they died, a pool of blood, I can see how that's necessary, but after my mother-in-law laid for hours and hours or five or six hours, whatever it was, in her blood, to be flipped over, to have wounds opened up with rubber gloves, I don't think the jury needs to see four pictures in this array of photos, Your Honor.

. . . .

They're graphic and they're just flat unnecessary on the facts that they were shot, died, where they fell.  The other pictures, they're graphic and sickening as gruesome as they are.

32 RR 323–24.  Panetti continued in the same fashion, stressing the gruesome and artificial nature of the pictures, as well as their being unnecessary, for some time.  32 RR 324–35.  The court ultimately overruled Panetti's objection.  32 RR 325.  Most of Bertelson's direct testimony consisted of descriptions of the evidence and photographs.  32 RR 325–45.

Panetti revisited the posed nature of the photographs on cross-examination.  32 RR 348–52, 357.  He also questioned whether the wounds depicted in some of the photographs were gunshot wounds, or knife wounds.  32 RR 352–53.  Later, Panetti questioned Bertelson at length about the broken glass in Sonja Alvarado's bedroom, and what it meant about how the window was broken.  32 RR 358–62.  Specifically, Panetti seemed concerned with the "discrepancy between testimony" about whether he "bust[ed] through" the window, or simply tapped on it and broke it.  32 RR 361–62.

Another area of obvious concern to Panetti was the effect of the crime on his daughter Amanda.  Panetti questioned Bertelson about a photograph of Amanda: "[T]hat first picture was that of my daughter and my heart soared like an eagle because she looked happy.  She looked like she wasn't—how was my daughter in the law enforcement building, like a normal kid or—" 32 RR 365.  Bertelson indicated he had not had the opportunity to speak with Amanda at the time the picture was taken, and Panetti responded: "Just judging from the pictures, she smiled for the camera, and she's wearing that T-shirt.  You didn't see her in the jail at the time going through any strange—like she was in deep shock or, from what I heard, that she was pretty much unaffected?"  *Id.*  Again,

Bertelson indicated he did not know: "I was at the scene the whole time.  I couldn't answer that." *Id.*  Nevertheless, Panetti persisted: "But you were there when you saw my daughter.  She wasn't cowering or was she doing anything abnormal like she had just been through what she had been through, but was it kind of—did she—well, did she appear a little bit in too good a condition, considering what she went through, or would you have any opinion on that or—"  *Id.*  Bertelson repeated that he was at the scene during that time.  *Id.*  Panetti made two more attempts to get Bertelson to acknowledge that Amanda was unaffected by the experience, with similar answers from Bertelson.  32 RR 366.

Notably, Panetti admitted nine photographs into evidence during his cross-examination.  32 RR 368–69.  He used these photographs, Bertelson's interpretation of what they depicted, and a previously created diagram of the crime scene, to attempt to impeach Sonja's testimony from the day before.  32 RR 370–74.

Panetti asked Bertelson if he knew anything about Panetti's reputation, and Bertelson said he had heard only about Panetti's "family problems" with Sonja.  32 RR 374–75.  Panetti tried to get Bertelson to acknowledge he knew that Panetti was receiving a pension for psychiatric problems, but Bertelson said he did not remember having heard that. 32 RR 376–78.  Panetti tried, over several sustained objections, to refresh Bertelson's memory on the topic, but to no avail.  32 RR 378–80.

After some questioning about the number of shots he fired at the Alvarado house, Panetti used a photograph taken at the bunkhouse to impeach Ranger Waldrip's testimony, from the day before, about where the 30.06 rifle and other items were found.  32 RR 380–84.  Panetti also introduced his sawed-off shotgun into evidence, and asked several questions about its condition,

-74-

seemingly for the purpose of challenging Bertelson's statement that it had been cut to an illegal length.  32 RR 385–91.

Panetti's cross-examination of Bertelson is remarkable for three reasons.  First, it demonstrates Panetti knew the importance of introducing evidence into the trial record, and that he was sufficiently competent to do so when necessary.  Second, it shows that Panetti was capable of using one witness's testimony, and other evidence, to impeach prior witnesses.  Finally, although Bertelson often did not have the answers Panetti wanted, Panetti's questions (particularly those aimed at showing that his daughter Amanda was not seriously traumatized by the murders) were not random or incoherent, but seem to have been designed to advance his chosen trial theory.[37]

*Donna Stanley*

After a recess for lunch, the State called Donna Stanley, a Texas Department of Public Safety DNA serologist.  32 RR 402–03.  Stanley had conducted an investigation at the Alvarado house, directing that various photographs be taken, including "luminol" photographs designed to reveal the presence of blood that may not normally have been visible.[38]  32 RR 405–12.  The State also used Stanley to introduce, among other things, bullet fragments and casings found at the scene.  32 RR 430–38.

On cross-examination, Panetti questioned Stanley about the luminol photographs, and

---

[37] Of course, Panetti's choice of trial theory was itself overly optimistic—for instance, no reasonable jury is likely to believe that a young girl would be unaffected by witnessing the murder of her grandparents by her father—but this is an error of judgment, to which all people are susceptible, and is not sufficient to render Panetti mentally incompetent to represent himself under *Edwards*.

[38] The State's questioning of this witness was interrupted by the arrival of the Travis County Medical Examiner, who was, for scheduling purposes, examined out of order.  The Court nevertheless discusses Stanley's testimony in a single section.

observed "it looks like blood everywhere, but in all reality that's minute amount of blood that the chemical puts on and shows up; correct?"  32 RR 445.  Panetti tried to question Stanley about the ballistics report several times, but Stanley told him she was not a firearms expert, did not prepare the report, and therefore could not discuss it with him.  32 RR 445–50.  Most significantly, Panetti got Stanley to acknowledge there was no blood on the tip of the 30.06 rifle.[39]  32 RR 453–54.

Panetti's questioning of Stanley was confused at times, and his confusion seems to have been caused or aggravated by the mid-questioning interruption to accommodate the examination of an out-of-order witness.  Nevertheless, however, Panetti scored probably his most important victory, in terms of impeaching the State's version of events, by getting Stanley to flatly contradict the Medical Examiner.  Of course, being that Panetti admitted to having shot Joe and Amanda Alvarado, this victory proved relatively minor.  But Panetti's cross-examination shows he was paying attention to witnesses' testimony, and was able, at least at times, to use it effectively against other witnesses.

*Robert J. Bayardo*

The State interrupted its examination of Donna Stanley to call Travis County Medical Examiner Dr. Robert J. Bayardo.  32 RR 412–13.  Bayardo performed the autopsies on the Alvarados, and the State examined him about the causes of their deaths, and about their wounds. 32 RR 415–21.

On cross-examination, Panetti established that Joe and Amanda Alvarado's deaths were

---

[39] This is significant because it directly contradicted the testimony of the Medical Examiner, who said the rifle had to be touching Amanda Alvarado to cause the wounds he observed, and that there "definitely" would have been blood on the tip of the rifle under those circumstances.  32 RR 426.

immediate.[40]  32 RR 424.  In light of this, Panetti tried to cast doubt on Sonja's story, that her father had spoken after having been shot.  32 RR 427.  Panetti also got Bayardo to agree that Panetti had not been aiming for Joe Alvarado's heart, but that "the heart just happened to be in the way of the bullet."  32 RR 428–29.

Panetti's questioning of Bayardo was fairly brief, but fruitful.  Potentially very significant to the punishment stage of his trial, Panetti tried to show, with some success, that he did not act with deliberation by aiming, and that his victims did not suffer after he shot them.

*Russell Johnson*

The next State witness was Russell Johnson, a Texas Department of Public Safety ballistics lab employee.[41]  32 RR 396, 458.  Johnson testified that, although most of the bullet fragments recovered at the scene had no marks or pattern areas, and therefore could not be matched to any firearm, two bullet fragments found at the scene were fired from Panetti's 30.06 rifle.  32 RR 460–66.  He likewise testified that shell casings recovered from the scene were fired from Panetti's rifle.  32 RR 466.  Finally, he testified that one of the shells recovered from the rifle may have caused a jam.  32 RR 467–68.

On cross-examination, Johnson acknowledged he could not tell, by examining a shell casing, when the bullet had been fired.  32 RR 475–76.  Panetti also tried to call into question Sonja's story, that Panetti was going to shoot her as well, but was prevented by his rifle jamming, by noting the

---

[40] As noted above, Bayardo testified, in response to Panetti's questioning, that the muzzle of the rifle was touching Amanda Alvarado when Panetti fired.  32 RR 426.

[41] In another scheduling anomaly, Russell Johnson was actually sworn as a witness before Donna Stanley, but his testimony was preempted both by hers, and by Dr. Bayardo's.

rifle was new, and by getting Johnson to admit the gun did not jam during any of his test fires.  32 RR 481–84.

Panetti questioned Johnson, at great length, about the number of bullets that were fired on the morning of the murders, and tried to get him to comment on reports prepared by other members of the investigation team.  32 RR 484–501.  He also asked a number of seemingly irrelevant questions about the shotgun found at the scene, before trying (unsuccessfully) to get Johnson to acknowledge that the barrel had been sawed off "hastily."  32 RR 501–08.  The remainder of Panetti's lengthy questioning was devoted primarily to points he had already made, about the lack of evidence that the rifle had jammed, and the number of bullets fired.  32 RR 508–21.

Although Panetti's cross-examination of Johnson may have cast some doubt on Sonja's story, that Panetti would have killed her if his rifle had not jammed, he devoted a vast amount of time to the question of whether three or four bullets had been fired on the morning of the murders.  This issue, though it may have had some small value in further impeaching the State's theory of the case, was certainly not worth this amount of effort.  In this Court's view, it was a poor choice, but not evidence of mental incompetence to conduct his own defense.

*Donna Stanley — Recall*

The next day, on September 14, 1995, the State resumed its case-in-chief by recalling Donna Stanley, the DPS serologist.  33 RR 541.  The State seems to have recalled Stanley primarily to address questions raised by Panetti during his cross-examination of Russell Johnson, particularly the potential discrepancy between the number of bullet fragments retrieved and the number of bullets fired at the scene.  33 RR 542–46.

Panetti's cross-examination was lengthy and fairly unfocused, and the court instructed Panetti on a number occasions to ask questions, rather than thinking out loud or narrating. *See, e.g.*, 33 RR 549, 551, 554, 556, 560, 564, 568, 572, 575.  Panetti called into question whether bloody boot prints found at the Alvarado house belonged to him, or to law enforcement investigators.  33 RR 556–57, 560–61.  Panetti apparently asked these questions not to deny his presence at the scene, but to impeach Sonja Alvarado's earlier testimony.  33 RR 563–64.  Panetti also spent a lot of time, at various points in his cross-examination, following up on the issue of the number of bullet casings and bullet fragments found at the scene, and how many bullets were actually fired.  33 RR 548, 552–54, 567–68, 571–77, 583–84.  Another topic of considerable interest to Panetti, but of little apparent relevance to his defense, was exactly where his shotgun was found, how it was broken, and whether it had come into contact with a nearby wooden post.  33 RR 549–51, 554–55, 564–66, 582–83.  Panetti also got Stanley to acknowledge that the presence of smeared blood in Sonja's room did not necessarily indicate that a struggle had taken place there.  33 RR 580–81.  Finally, Panetti spent some time discussing his canteen that was found at the Alvarado home, and how full it was when it was recovered.  33 RR 568–70, 583.

Panetti's second cross-examination of Stanley was disorganized, and included as much narration as it did questioning, but it was not wholly without purpose.  Although Panetti devoted a great deal of time to pointing out minor purported discrepancies and inconsistencies in the State's theory of the crime, he also tried to cast doubt on Sonja Alvarado's characterization of Panetti as having acted with premeditated, purposeful aggression.  Indeed, much of Panetti's cross-examination, of this and other witnesses, seems to have been aimed at creating the impression in the

jury's mind, "If Panetti went to the Alvarado home intending to murder its occupants, why would he do X, or bring Y? Only somebody who was insane would do that."  In other words, Panetti may have been trying to demonstrate he was insane at the time of the murders, not through expert testimony, but through an accumulation of circumstantial evidence.  Or, failing that, he might have been hoping to paint his crime as a spontaneous reaction to rapidly escalating events, rather than a premeditated, cold-blooded murder.  The Court obviously cannot say with certainty what Panetti's trial strategy was, but his questioning of Stanley does not indicate that he was incompetent to conduct his own defense, by reason of severe mental illness.

*James Denman*

The State's next witness was James Denman, a sergeant with the Texas Rangers.  33 RR 586. Although Denman had been involved in the investigation at the Alvarado home, the State called him to establish that he obtained a tape recorded confession from Panetti approximately twelve hours after the murders.  33 RR 587–92.  Denman testified Panetti appeared to have been alert during the interrogation, and that he did not seem to have been intoxicated.  33 RR 591–92.  The State also used Denman to rebut Panetti's earlier suggestion, that some member of law enforcement had been disciplined for their role in taking Panetti's confession.  33 RR 592.

Panetti cross-examined Denman at length about the interrogation and confession.  Without going into needless detail on Panetti's lengthy (and repetitive) cross-examination, Panetti attempted to paint his interrogations as irregular and deceptive, if not downright illegal.[42]  33 RR 598–649.

---

[42] After a very lengthy line of questioning about the location of the tape recorder in the interrogation room, and whether it was "open and obvious," Panetti finally scored a victory by impeaching Denman with his testimony at the suppression hearing.  33 RR 643–44.

Though legally irrelevant, Panetti's attempt to paint his confession as having been obtained through dishonest, improper, or illegal means could potentially have been significant to the jury. In particular, jurors who believed that law enforcement officers resorted to trickery to obtain Panetti's confession might be inclined to view the testimony of those officers, or law enforcement generally, with greater suspicion than they otherwise would. Indeed, Panetti forced Denman to acknowledge that he had previously testified the tape recorder was not open and obvious to Panetti during the interrogation. The Court finds this strategy, though inexpertly executed, was well within the broad scope of constitutionally competent self-representation.

*Fred Cummings*

Next, the State called Fred Cummings, another Texas Ranger, who was present during Panetti's interrogations. 33 RR 651. The State used Cummings in part to rebut Panetti's characterization of the interviews as improper or illegal, but mostly to introduce into evidence the audio tapes and written transcripts of Panetti's statements, the former of which were played for the jury and transcribed into the trial record. 33 RR 651–740.

On cross-examination, Cummings admitted he heard from Sonja Alvarado that Panetti suffered from mental illness. 33 RR 743, 763–67. Panetti also tried, with limited success, to get Cummings to acknowledge that there was a discrepancy between Panetti's coherence during his first interrogation, and his unusual appearance. 33 RR 744–45.

Panetti also had a moment of greater than usual incoherence while questioning Cummings. For reasons best known to Panetti, he tried on several occasions to refresh Cummings's memory about various items that Panetti may have had on him when he was arrested, including a belt buckle.

33 RR 751.  Panetti wanted to introduce the belt buckle into evidence, and the court sustained the

State's objection on relevance.  33 RR 751–52.  Panetti tried to convince Judge Ables to reverse his

ruling, prompting Judge Ables to say:

> Mr. Panetti, at this time I don't see how the belt buckle is relevant to any issue this
> jury is going to determine and so if you can't explain the relevance to me, I'm going
> to sustain the objection.  Can you explain to me how the belt buckle is relevant to any
> issue in this case?

33 RR 755.  Panetti replied:

> Yes, I can, Your Honor.  It has to do with jailhouse religion.  It has to do what [sic]
> some men would do for a belt buckle.  It has to do with the difference between a
> rodeo hand and a buckaroo poet.  It has to do with my whole outlook and this will
> come up, God forbid, in the punishment stage.

*Id.*  The court affirmed its original ruling.  33 RR 756.

Later, Panetti returned to the topic of the initial suppression of his confessions, and the

eventual reversal of that ruling.  33 RR 757–58.  The State objected, and the court sustained the

objection, indicating the question of the legality of the confessions was not before the jury.  33 RR

759–60.  In response, Panetti explained his rationale for asking the question—and, in so doing,

displayed a fairly impressive degree of image consciousness:

> I didn't do it appropriately, Your Honor, but I wanted the jury to know why, and
> there was a lot of questions about time of justice, and I thought the jury needed to
> know why it took three years, instead of one year in most cases.  One year things are
> done.  Why it took—in other words, so the jury didn't think it was legal wrangling
> on my part when it was indeed the State's.

33 RR 760.

As he had with Denman, Panetti cross-examined Cummings about the circumstances of his

-82-

interrogations, with the apparent goal of calling into doubt their propriety and legality.[43]  33 RR 767–75; 34 RR 791–94, 796–805.  After admitting the diagram of the crime scene into evidence, the State rested.  34 RR 806.

With the exception of the belt buckle incident described above, Panetti's cross-examination of Cummings was similar to most of his others: lengthy, disorganized, and often of questionable relevance.  However, Panetti focused his questions on issues he felt were important, such as the allegedly deceptive nature of his interrogations, and the evidence of his mental illness.  Even his less-than-coherent comment about the relevance of his belt buckle demonstrated that Panetti was concerned with creating a good image of himself with the jury, or at least rebutting the negative image created by the State's evidence.  Likewise, Panetti wanted to make sure the jury knew that he was not trying to delay his trial through "legal wrangling."

As with other witnesses, Panetti faced an uphill battle in cross-examining Cummings.  In addition to having to question a hostile witness, trained in how to testify effectively, Panetti had to contend with two fairly damning confessions.  Under the circumstances, it is unlikely Panetti could have done much more than attack the circumstances surrounding the confessions, hopefully painting Cummings as an unscrupulous officer bent on obtaining a confession through any means necessary, and himself as a mentally ill man who was unable to resist such devious law enforcement tactics.

In any case, although it appears Panetti lost focus during a portion of his questioning of Cummings, the Court nevertheless concludes, based upon the great bulk of his other cross-

---

[43] Panetti's cross-examination of Cummings spanned from the afternoon of September 14, 1995, to the morning of September 15, 1995.

examination, that he was not rendered incompetent to represent himself because of serious mental illness.[44]

*Panetti's Defense Case*

*Jacqueline Goettsche*

Panetti's first witness was Jacqueline Goettsche, a friend of Panetti's family.  34 RR 808–09. After establishing he had not coached her in her testimony (a question Panetti asked virtually all of his witnesses), Panetti moved on to the question of his mental illness.  34 RR 809–10.  Goettsche said she "always thought [Panetti was] an unstable person," and that she had felt for approximately ten years that he was mentally ill.  34 RR 810–11.

Significantly, Goettsche commented on Panetti's coherence during his trial: "You seem to be better right now than I have seen you ever.  I don't know why.  If you're on some kind of medication or you're not or—"  34 RR 813.  Panetti responded: "No, ma'am, I'm having a lot of problem with an unmedicated thought disorder and I'm trying to get some medicine."  34 RR 814. Somewhat later, at Panetti's prompting, she elaborated about how he looked like "a different person" that day: "Yes, you do, very different, in fact.  When I called the Court last week, I said whether you would be shackled, because I was afraid, and they said no, but that you were doing well; so I came, and I do see a different person here."  34 RR 816.

---

[44] The Court is forced to acknowledge another possibility regarding Panetti's strange comments: as he was relying on the insanity defense, any unusual behavior, feigned or genuine, might reasonably have been expected to inure to his advantage in the jury's deliberations.  Of course, the Court has no reliable way of knowing what Panetti's motives were, much less the impression his various statements left with the jury; thus, the Court merely notes the double-edged nature of his strange courtroom behavior, and does not base any conclusions upon this observation.

Goettche also testified to Panetti's prior drug use, although she knew few details. 34 RR 815. The State did not cross-examine Goettsche. 34 RR 819.

Goettsche's comment, that Panetti seemed better than he had in years, is significant not only because it suggests Panetti may have been experiencing a particularly lucid period during his trial, but also because the same sentiment was later echoed by both Panetti's brother, and his mother. *See* 35 RR 1121; 36 RR 1315. These comments are, in large part, why the Court focuses so closely on Panetti's trial performance, rather than his undeniable history of mental illness. Panetti obviously had good days and bad, but the Court's review of the record suggests the days of Panetti's trial may have been some of his most coherent.

*Sam Preston Douglass, Jr.*

Panetti's next witness was Sam Preston Douglass, Jr., Panetti's prior court-appointed attorney. 34 RR 821. Douglass acknowledged on direct examination that, although he and Panetti had several heated arguments caused, in part, by Panetti's mental illness, Douglass was not afraid of Panetti. 34 RR 821–22. Douglass also testified about Panetti's history of being institutionalized for his mental illness, and Panetti used Douglass to introduce into evidence Panetti's medical records from the various hospitals in which he had received treatment. 34 RR 824–26, 830–34.

On the issue of his self-representation, Panetti asked Douglass: "When we met here in the courtroom when I stood up and stated to the Judge that I was going to defend myself, what did you tell me?" 34 RR 830. Douglass replied: "I told you I thought it was a terrible mistake." *Id.*

After Panetti introduced additional medical records into evidence, the court allowed him to proceed with questioning, at which point Panetti said:

> Your Honor, I didn't prepare and I did not take the advice of my standby counsel and sleep, and I made sure all the records were all from the hospital in the records, but I didn't prepare a list of questions for Preston and at this time I really can't offhand think of—have anything to ask and his partner in the law firm may be called later, so I don't anticipate calling Preston back, or at this time, Your Honor, I don't have any further questions.

34 RR 834–35.  As before, the State elected not to cross-examine Panetti's witness.  34 RR 835.

Panetti's direct examination of Douglass was, as usual, peppered with irrelevant comments, explanations, and asides.  However, Panetti advanced his case substantially by using Douglass to introduce the records of Panetti's various hospital stays.  These records provided objective, documentary evidence of Panetti's mental illness, and corroborated much of the testimony from previous witnesses.  Indeed, if the jury had been inclined to credit Panetti's account of multiple personalities, or even just suspected he might not have known right from wrong at the time of the shootings, these documents may well have been dispositive of the case.[45]  Thus, even considering Panetti's occasional random tangents, his examination of Douglass was not constitutionally deficient under *Edwards*.

*Louis John Panetti*

Panetti's next witness was his father, Louis John Panetti.  34 RR 842.  Although Panetti's questions sometimes appeared irrelevant, his father was a friendly witness, and provided a great deal of favorable testimony for his son.  In brief summary, Louis testified about: Panetti's several near-death experiences; the various kinds of work he and Panetti had done over the years; the first time

---

[45] As it happens, of course, the jury obviously did not believe that Panetti was insane at the time of the murders, thus making any evaluation of the potential importance of this evidence mere educated guesswork.  However, this Court believes Panetti's failure in his trial was a pragmatic one, in that he failed to persuade the jurors, and not a legal one, in that he failed to produce sufficient evidence to support his defensive theory.

he suspected Panetti was mentally ill; Panetti's Navy service;[46] Panetti's drug and alcohol addiction; Panetti's prior problems with the law; his having heard that Panetti had been shot in the leg; and his having urged Panetti's ex-wife to have Panetti committed.  34 RR 842–60.  Again, the State conducted no cross-examination.  34 RR 860.

Louis Panetti presented to the jury the image of Scott Panetti as a man who had experienced many hardships, and who was a victim of serious and longstanding mental illness.  Although much of his testimony was probably more relevant to the question of punishment than guilt or innocence, Louis Panetti told the jury about his son's history of mental illness, an issue directly relevant to Scott Panetti's insanity defense.  Of potentially equal practical, if not legal, importance, Louis Panetti humanized his son, by presenting him as a hard-working but troubled man, rather than a cold and aggressive killer.  Considering the plausible value of Louis Panetti's testimony, neither Scott Panetti's decision to call his father as a witness, nor the questions he asked during direct examination, suggest he was mentally incompetent to conduct his own defense.

*Lester Ray Meier*

Next, Panetti called Lester Ray Meier, a rodeo producer who apparently knew Panetti from his bull riding days.  34 RR 862.  Panetti's decision to call Meier seems to have been unplanned ("I didn't know you were here and I didn't have anything except just what's on top of my head about just a few things about the little bit we know each other."), and his questioning was almost entirely irrelevant to the question of Panetti's guilt or innocence, although it may have had some minor relevance to the question of punishment.  34 RR 862–68.  His few potentially relevant questions

---

[46] Panetti also introduced his military records into evidence through his father's testimony.  34 RR 849–50.

were about Meier's general knowledge of Panetti's character and reputation ("[I]n other words, just from being a lifelong resident in Fredericksburg, just explain to the Court and jury just what you know about anything, about Scott Panetti? . . . The good, the bad, and the ugly, as—"), and Panetti's alcoholism ("You ever heard any scuttlebutt in town about me going to A.A., having drinking problems or getting into problems?").  34 RR 865, 867.  The State once again opted not to ask any questions.  34 RR 868.

There seems to have been little reason for Panetti to call Meier, and Meier did not add much useful testimony.  The record suggests Panetti may have called Meier simply because other witnesses were not yet in the courtroom, and not for any specific purpose.[47]  On the other hand, Panetti may have called Meier to discuss Panetti's rodeo accomplishments, and his skill as a farrier, two subjects of obvious pride for Panetti.  Even assuming Panetti called Meier completely at random, however, this is insufficient, in the context of the entire record, to persuade the Court that Panetti was mentally incompetent to represent himself.

*Richard Mosty*

After lunch, Panetti called his other former court-appointed attorney, Richard Mosty.  34 RR 871–72.  Immediately, Panetti launched into the question of his self-representation, and Mosty explained that he "did everything [he] could possibly do . . . to talk [Panetti] out of it."  34 RR 873.

Later, Panetti asked Mosty to summarize Panetti's various hospitalizations; Mosty discussed them in detail, including in his summary, among other things, Panetti's several diagnoses.  34 RR

---

[47] The court had difficulty serving some of Panetti's requested subpoenas, with the result that Panetti was unable to call witnesses in the order he had planned.

876–81.  Mosty also testified that Sonja Alvarado knew about "Sergeant Ironhorse" as far back as 1990.  34 RR 882.

Panetti admitted into evidence, through Mosty, several items of clothing Panetti had been wearing at the time of his arrest, including Panetti's watch, his belt and buckle, his tie and tack, and his shirt and coat.  34 RR 883–85.

Mosty additionally recounted an argument he had had with Panetti, which culminated in Mosty throwing a cassette tape at Panetti.  34 RR 886.  Panetti asked: "When you threw your fit and you chucked the tape at me, what did I do?"  Id.  Mosty replied: "You didn't do anything.  You shortly thereafter gave me my tape back."  Id.

Panetti finally returned to the issue of his mental state, and in particular seemed to be asking Mosty to confirm that Panetti displayed multiple personalities: "[D]id you ever see different variations of my personalities?"  34 RR 887.

Breaking its pattern of silence, the State elected to cross-examine Mosty.  34 RR 888.  The State emphasized Panetti's many diagnoses of alcoholism over the years, and concluded by observing that the State had also, along with Mosty, opposed Panetti's self-representation.  34 RR 889–95.

On redirect, Panetti asked: "Mr. Mosty, do you remember me stating why I decided to defend myself, briefly?"  34 RR 895.  Mosty responded: "Well, if I could summarize it, I would say that you said God was going to guide you."  Id.  Panetti replied, in closing: "Amen."  Id.

Mosty's testimony was potentially very helpful to Panetti's case, as it contained the most detailed verbal account of Panetti's various hospitalizations and diagnoses of any testimony

presented to the jury.  Panetti also stressed his status as an underdog, by showing how opposed Mosty was to Panetti's self-representation.  Finally, Panetti emphasized his religious faith, a move one reasonably could anticipate would win favor with a rural Texas jury.  In short, nothing in Panetti's examination of Mosty demonstrates that Panetti was incompetent to defend himself.

*Patrick Schuette*

Panetti's next witness was Patrick Schuette, an old friend.  34 RR 896–97.  One of Panetti's main goals in calling Schuette seems to have been so Schuette could identify, and explain the use of, Panetti's "web gear." 34 RR 898–99.  Similarly, Panetti had Schuette explain why Panetti carried knives, and wore military clothing. 34 RR 899.  Panetti then asked a slightly more pointed question: "Have you ever known me to be in a paramilitary group or to be—to be—to do military maneuvers or glorify a war or the taking of human life or find any—did I ever make any remarks about blood trails?" *Id.*

Schuette testified he knew Panetti used several different names, but that he "thought that was just the way [Panetti] signed [his] poetry . . . ." 34 RR 901.  Panetti also asked questions apparently aimed at showing he was a hard worker: "If there was ever a time I was around and y'all were doing the job—well, you know this was work I preferred and didn't prefer the life, but if it come to you calling me up to work, even if it was digging ditches or breaking concrete, would I take that job?" 34 RR 902.  Returning to its previous laconic strategy, the State did not cross-examine Schuette. 34 RR 905.

It seems Panetti called Schuette to combat his "Rambo" image, and to demonstrate that, although Panetti carried knives and wore military outfits, he was not a violent war veteran.  Rather,

Panetti's questions suggest, he wished to give the jury the impression that he was a practical and hardworking hunting enthusiast. Although creating a favorable image with the jury is important in any case, it was of crucial importance in Panetti's case—which featured both gruesome violence and a fairly unsympathetic, potentially alienating, defendant—that he rehabilitate his image as much as possible. Schuette's testimony was probably too little, too late, but Panetti's decision to call him was not unreasonable, under the circumstances.

*John Wolfgang Braeutigam*

Next, Panetti called John Braeutigam, whose exact relationship to Panetti is slightly unclear, but for whom Panetti appears to have worked as a driver. 34 RR 907–10, 913. For the most part, Braeutigam had little memory of the matters about which Panetti asked, and his testimony was essentially irrelevant to either Panetti's guilt or innocence, or his proper punishment. 34 RR 907–13. Predictably, the State did not cross-examine the man. 34 RR 913.

*David Morquecho*

Panetti's next witness was David Morquecho, a longstanding acquaintance. 34 RR 915–17. Morquecho apparently gave a statement to law enforcement on September 11, 1992, about a meeting he had with Panetti the day before the murders. 34 RR 922–23. Presumably by way of impeachment, Panetti wanted Morquecho to admit that he sold marijuana to Panetti, but Morquecho was having none of it. 34 RR 920–21, 925. Panetti also asked a number of questions about Morquecho's criminal record, his drug and alcohol use, and whether he was an informant for police. 34 RR 925–29.

Indeed, Panetti asked several questions, and made several statements, that called

Morquecho's honesty into question: "Well, David, what I'm going to ask you that has relevance to my guilt or innocence is the credibility as you being a witness and you made a statement that could mean my life and we got to find out if you're telling the truth," 34 RR 929; "David, I'm not going to interrogate you, but do you know the penalty for perjury in a case such as this," *id.*; "Are you on parole right now, on probation? . . . What would happen if you were to be arrested today," *id.*; "Well, David, I'm going to ask you these questions once and just come up with a straight answer, because I don't want to interrogate—take the Court's time, because I'm asking you questions about how many times you been busted and what for and you're being evasive, and I can't get to what you said is on the statement, David," 34 RR 930.  The State cross-examined Morquecho about the statement he gave police, and about the meeting with Panetti the day before the murders.  34 RR 930–33.

On redirect, Panetti again suggested Morquecho was lying ("David, alls [sic] I want you to tell is the truth and not put on a show."), and again implied he was a police informant ("I'm going to ask you why when someone gets busted they go to jail, and you been able to stay out of jail with your arrest record.").  34 RR 935.  After several more references to Morquecho's prior convictions, Panetti concluded his questioning.  34 RR 935–37.

Morquecho gave a damaging statement to police about an interaction he had with Panetti shortly before the murders.  Perfectly reasonably, Panetti attempted to impeach Morquecho's credibility, not only by bringing up Morquecho's prior convictions, but also by suggesting Morquecho would lie to police to avoid legal problems of his own.  And although this Court can only speculate how much credence the jury gave Morquecho's testimony, it seems likely Panetti's questions, and Morquecho's often evasive or inconsistent answers, at least raised substantial

questions about Morquecho's credibility. Of course, impeachment of a negative witness is a perfectly sound trial strategy, and one Panetti employed with reasonable effectiveness in this instance.

*Curtis B. Allerkamp*

Panetti's next witness was Curtis B. Allerkamp, a man who apparently knew Panetti from Alcoholics Anonymous meetings, and last saw him one or two years prior to the murders. 34 RR 937–39. Allerkamp's direct testimony was essentially irrelevant to any issue in Panetti's case, but Panetti appeared to be trying to make a connection between intoxication and insanity, as well as validating the idea of being restored to sanity through spirituality. 34 RR 942–44. On cross-examination, the State clarified the legal issue: "Have you ever known the Defendant to not know the difference between right and wrong?" 34 RR 947. Allerkamp: "No." *Id.*

Panetti elicited no relevant testimony on redirect, but he did demonstrate his knowledge of the legal definition of insanity: "Did you know that when the D.A. asked you that question, that the whole stem of an insanity defense depends on a couple of issues and one of them is knowing the difference between right and wrong?" *Id.*

Considering that Panetti obviously knew what he had to prove to prevail on his insanity defense, it is unclear why he called Allerkamp as a witness.[48] However, as Panetti's final question

---

[48] During voir dire, Panetti asked several potential jurors whether they believed a person could be restored to sanity through spiritual means. Panetti may have been attempting to use Allerkamp, and his knowledge of Alcoholics Anonymous principles, to lend credence to the possibility that Panetti was rendered sane by his post-murder spiritual conversion. Of course, as before, this is speculation by the Court and not a basis for any of its conclusions.

amply demonstrates, he had an appreciation of the legal issues central to his guilt or innocence.[49] Although Panetti appears to have called an unnecessary witness in Allerkamp, there is no particular indication this mistake was caused by Panetti's mental illness, nor that it was a mistake of such magnitude that it rendered him constitutionally incompetent to represent himself.

*Kenn Knopp*

Panetti then called as a witness Kenn Knopp, an ordained deacon who visited Panetti in the Gillespie County Jail after the murders.  34 RR 948–49.  Knopp appears to have been a strong proponent of Panetti's multiple personalities theory ("I have never been involved . . . in a situation like this, so I would have to judge it on its own merit and see if I'm not even betraying you or your alter ego. . . . Ego, no, not in a sense of thinking there's something more than what you really are, but in what personalities may be working within you."), and Panetti began by trying to bolster his credibility: "[I]n other words, doctors aren't gospel and—and your [sic] clergy may know as much about—as most doctors."  34 RR 949–50.

Knopp elaborated on his belief about Panetti's mental illness: "I believe that probably you're a victim of chemistry, and in a system, in a bodily system, in schizophrenics that can't handle changes in sugars and drugs and alcohol, whatnot, then they just, like Dr. Jeckyl and Mr. Hyde, they just turn and then you're the victim. . . . And nothing you can really do about it."  34 RR 953.  Panetti added a comment before proceeding to his next question: "And the victims hurt the ones they love the most."  *Id.*

---

[49] Also scattered throughout Panetti's questioning of witnesses is his acknowledgment that voluntary intoxication is not a legal excuse for murder.

Later, Panetti asked a more direct question: "Kenn, before you head back to Fredericksburg or I pass the witness, and to bring it down to the legal matter, in all your years of counseling as clergy, have you ever encountered anybody that was schizophrenic to where you can conceive that they might not know right from wrong?"  34 RR 956.

The State cross-examined Knopp on the issue of Panetti's alter ego, and specifically whether Knopp only learned about Panetti's alleged separate personality during the trial, but Knopp gave fairly unhelpful answers: "Oh, I knew it long ago, in a sense. . . . Where did I learn he had an alter ego?  Well, he's always coming up in costume, you know.  I'm in a costume.  He's in a costume. Everybody is in a costume."  34 RR 958–59.  The State followed up with a series of questions that this Court assumes were intended to impeach Knopp's credibility: "Do you have an alter ego?"; "You're not a medical doctor?"; and, "But you're certain that a demon wasn't roaming around and affected Mr. Panetti on the 8th of September?"  34 RR 959–61.  Panetti did not take the witness on redirect.  34 RR 961.

Talk of demons aside, Panetti's examination of Knopp was most notable for his attempt to link schizophrenia with legal insanity.  Also remarkable was Panetti's sidebar comment, about how schizophrenics are victims, and how they hurt the ones they love most.  These themes—Panetti as a victim of mental illness, his affection for his victims, and, of course, his insanity—were consistent throughout Panetti's trial, and permeated his examinations of witnesses.  Whether Panetti could have come up with a better defensive strategy is debatable, but ultimately irrelevant; what matters is whether Panetti was mentally capable of performing the tasks required to conduct his own defense in a constitutionally sufficient manner.  As the Court has reiterated many times throughout its

discussion, Panetti has failed to demonstrate that his mental illness rendered him incompetent to proceed pro se.

*Marcie Brunschmid Panetti*

Panetti's next witness was his sister-in-law, Marcie Brunschmid Panetti. 34 RR 962. Marcie testified about her strong belief, upon first meeting Panetti and later, that he was mentally ill. 34 RR 964–65. Marcie reiterated the notion that Panetti was a victim, and suggested his mental illness was aggravated by the incorrect and excessive medication he was given. 34 RR 965. During his direct examination, Panetti referred to the "legal range war [he had] had trying to get to a psychiatrist," and blamed his inability to see a psychiatrist on jail officials. 34 RR 976.

Marcie was apparently also a proponent of the separate personality theory. Panetti asked: "[B]efore you came to court and heard testimony or what was on the buckle[50] or did you ever hear of any other names I had?" 34 RR 971. Marcie's reply:

> Yes, I have heard of a Sergeant Ironhorse. I do believe people can have two personalities and when one personality is out there that we see, the other person is hidden, and when Scott Panetti comes out, I don't know he remembers what Sergeant Ironhorse did. I think people can have multiple personalities.

34 RR 972. Panetti asked no further questions, and the State elected not to cross-examine Marcie. *Id.* As September 15, 1995 was a Friday, the court recessed Panetti's case until Monday, September 18. *Id.*

*Vernie Harris*

Panetti's first witness on Monday morning was Vernie Harris, a man who used to attend

---

[50] The name "Ironhorse" was apparently on the belt buckle Panetti was wearing when he was arrested.

church with Panetti.  35 RR 989–90.  Panetti asked several questions about whether Harris had heard

about Panetti's mental illness, or noticed anything unusual about Panetti during church, but Harris

had little to say on the matters.  35 RR 990–91.  In fact, Harris seemed only casually acquainted with

Panetti, and was unable to answer many of his questions.  35 RR 989–91.  Accordingly, Panetti's

direct examination was very brief, and the State asked Harris no questions.  35 RR 991.

*John Paul Ramsey*

Panetti's next witness was Dr. John Paul Ramsey, a family physician in Fredericksburg who

treated Panetti in 1984 or 1985 for a gunshot wound, and who apparently delivered Panetti's

daughter.  35 RR 992–95, 999–1000.  Panetti first asked Ramsey to explain why some of Panetti's

medical records were unavailable, which he did.  35 RR 993–94.  Then Panetti asked Ramsey to

describe how he treated Panetti's gunshot wound.  35 RR 994–95.

Ramsey also testified about several visits Panetti made to him for psychiatric reasons.  35 RR

997.  Panetti asked specifically about Ramsey's impressions of Panetti's mental illness, and whether

Ramsey had heard about Panetti "going into treatment."  35 RR 998–99.

Later, after many irrelevant questions about treatment Panetti received for a sebaceous cyst

while in jail, Panetti asked a catch-all question of Ramsey—one he would repeat, in various forms,

to many future witnesses: "[I]s there anything that I may not have touched on or that you know about

Scott Panetti that may give some insight to the jury about, and may be helpful or—in other words,

honestly anything that I may not have questioned you or asked you about that has anything to do with

the innocence or guilt of—" 35 RR 1004.  In response, Ramsey offered to testify about his treatment

of Panetti, or Panetti's mental illness, but indicated he was uncomfortable with the open-ended

nature of Panetti's question.  35 RR 1004.  Panetti's reply was notable: "No, I think just from my recollection I have asked questions for Scott to find out more about Sarge, and I think if there was anything bizarre or when I initially came in for the Lithobid and I was prescribed to that, I didn't know what you diagnosed or what you thought may have been my problem."  35 RR 1004–05.

The State cross-examined Ramsey about his treatment of Panetti, apparently trying to establish that his treatment occurred well before Panetti's crime, and after it, but not immediately preceding it.  35 RR 1007–08.  Panetti's questions on redirect elicited no significant testimony.  35 RR 1008–09.

In sum, Panetti's questioning of Ramsey further developed the evidence of Panetti's mental illness, and allowed him to discuss the narcotic pain medication he received after his gunshot wound. Although much of this evidence was cumulative, and potentially unnecessary, it was consistent with Panetti's apparent trial strategy; thus, it does not appear to have been unreasonable for Panetti to call Ramsey as a witness.

*Arnulfo Rendon*

The next witness Panetti called was Arnulfo Rendon, who was an old friend of Panetti's.  35 RR 1009–11.  After some preliminary questions, Panetti returned to the subject of his gunshot injury: "[A]bout when I got shot did you notice any change in Scott Panetti?"  35 RR 1012.  Later, Panetti asked a question in a similar vein: "[I]s there just honestly anything that stands out in your mind as bizarre or peculiar about me?"  35 RR 1013.  At the end of his examination, Panetti returned to this theme: "When you saw me smoke [marijuana] once in a while, did I turn into something different than most people when they smoked?"  35 RR 1015.  The State did not cross-examine Rendon.  35

RR 1015.

Panetti got few helpful answers, but it appears he was hoping Rendon would corroborate his separate personality theory, or at least cast doubt on Panetti's sanity prior to the murders. As usual, of course, his examination was peppered with random asides and irrelevant tangents, but nothing that rendered his examination of this witness constitutionally incompetent.

*James S. Bell*

Panetti next called James S. "Mickey" Bell, who had previously attended the same church as Panetti, and who was casually acquainted with him. 35 RR 1016–17. As with several of his prior witnesses, Panetti asked Bell a very open-ended question about his past behavior: "Mickey, as far as my attendance at the church and bringing my daughter to Sunday school, is there anything about me that explains for the jury—I know several different lay witnesses, ideas or impressions or odd conduct or general all—general social functions of me?" 35 RR 1018–19. In response, Bell referred to Panetti as "an unusual person," and noted both his penchant for "very unusual poetry," and his habit of attending church with a "Bowie knife strapped at [his] side." 35 RR 1019.

Apparently fishing for more, Panetti later asked another broad question about his strange behavior:

> [D]o you remember me in church ever doing anything bizarre or do you remember me having any arguments with anybody in church about theology or do you remember anything in your mind before I pass you as a witness that stands out in your mind or anything you know about my mental history or if I was on medicine or anything that would be helpful about my history?

35 RR 1021. When Bell indicated he did not recall anything that would suggest Panetti was imbalanced or argumentative, Panetti concluded: "Well, it's true that I didn't—you didn't ever hear

-99-

around town that I was in jail a lot or an outlaw or although I did strange things, that you weren't aware of me being a criminal?"  35 RR 1021.  The State again opted not to conduct any cross-examination.  35 RR 1022.

With Bell, and several other witnesses, it appears Panetti may have had only a couple of specific topics he wished to cover, after which he would ask very broad questions, presumably hoping for favorable replies about his unusual behavior or reputation for mental illness.  Though questionable as a trial strategy, it does not appear to be product of a person so mentally ill that he cannot perform the basic functions of self representation.

*Harold Clinton Woods, Jr.*

Panetti's next witness was Harold Clinton "Woody" Woods, Jr., who appears to have been another old friend of Panetti's.  35 RR 1022–24.  Panetti started his examination by questioning Woods about a mutual acquaintance, but none of Panetti's questions appear to have had any relevance to his case.  35 RR 1024–26.  Later, Panetti got to a more pertinent issue, specifically Woods's familiarity with Panetti's military gear, and Panetti's tendency to wear it for everyday occasions.  35 RR 1028–30.  Woods also agreed Panetti's camouflage would be appropriate for bow hunting.  35 RR 1031–32.  After getting Woods to acknowledge that Panetti worked, in addition to getting a pension, Panetti asked his typical, wide-open question:

> Could you just sort of straight out from the top of your mind just can you think of me doing anything that stands out in your mind as being bizarre, or can you think just not—the jury can tell if someone is trying to kill me or cure me, and is there anything about me led you to believe I might have had—besides the fact I took medicine, that I wasn't your normal Joe?

35 RR 1034.  Woods's response was remarkable, if only because it aptly describes Panetti's

demeanor during his trial: "'Goofy' would probably be as accurate as—your mind was always working, but it wasn't working in a straight line.  Oh, you would go off on tangents in the middle of a conversation and—" *Id.*

Panetti asked if Woods remembered Panetti going by any other name but his own, presumably hoping Woods would recall the name "Sergeant Ironhorse," but Woods apparently had no such recollection.  35 RR 1035.  Panetti followed up with a shrewd question about his mental illness and personal responsibility:

> You ever remember me saying I could get away with anything because of my mental condition or use that as an excuse to be foolish, or do you think in any way that I ever mentioned that I could do anything that would give me—not just the having disease and the infliction [sic] involved; did I ever mention to you that I could do things and that were unkosher and blaming it on being a sicko or do you remember any offhand remarks?

35 RR 1035.

Panetti continued in similar fashion, asking about his reputation in the community and whether he had ever been "run off because of any cussing," before concluding with unremarkable questions, primarily about Woods's recollection of various items of Panetti's clothing.  35 RR 1036–38.  The State did not cross-examine Woods.  35 RR 1038.

Panetti's direct examination of Woods was fairly typical, with Panetti trying to rebut his Rambo image; to legitimize his Sergeant Ironhorse persona; to establish his odd behavior and reputation for mental illness; and to challenge the State's characterization of him as a violent misfit. However, Panetti's examination contained one particularly notable feature, specifically his question, quoted above, about whether he had ever used his mental illness to get away with improper behavior.

Given Panetti's concern that the jury would view his insanity defense as a mere technicality—a concern he made clear on several occasions during voir dire—this question seems to have been aimed at rebutting the ideas, either that Panetti was simply faking his insanity, or that Panetti was in the habit of using it as an excuse for bad behavior. To the Court, it suggests Panetti was very conscious of his image with the jury, and had an appreciation of some of the difficulties in prevailing on an insanity defense.

*Veronica Keen*

After a recess, Panetti called Veronica Keen,[51] a poet who attended church with him. 35 RR 1039–40. Panetti used Keen to admit into evidence, over the State's relevancy objection, a collection of poems Panetti had written prior to the murders. 35 RR 1041–42.

Panetti then moved to the question of his separate personality, asking: "Victoria, may be uncomfortable, but could you explain if you remember anything about Ironhorse?" 35 RR 1043. When Keen responded she recalled Panetti referring to himself by that name on one occasion, Panetti followed up: "Did you ever find it strange or think that it might have been something than [sic] just a pen name?" *Id.* Keen said she did not find it strange, at which point Panetti asked a superb leading question: "Ms. Keen, is there anything you know about Sarge Ironhorse that you—it is maybe uncomfortable for you, but—and you may not, but is there anything you may wish to share with us about this personality?" *Id.* Keen refused to take the bait, however, replying: "I'm not familiar with that personality." *Id.* Panetti concluded his questioning almost immediately thereafter, and the State

_____

[51] As Keen explained when she was called as a witness, her real name was Veronica, but she wrote poetry under the name "Victoria." 35 RR 1039. Panetti referred to her by the latter name.

did not cross-examine Keen.  35 RR 1044.

*Victoria Panetti*

Panetti's next witness was his younger sister, Victoria Panetti.  35 RR 1044–45.  Predictably, Panetti asked his sister about his purported separate personality: "[W]ould you please tell the jury briefly what you know about Ironhorse or my history or please—" 35 RR 1047.  Unpredictably, after Victoria recounted how Panetti had gone to cosmetology school and used to cut her hair, Panetti asked her if she would like a haircut.  35 RR 1050.  Victoria declined.  *Id.*  Finally, in addition to questions of more dubious relevance, Panetti asked Victoria about his behavior and medications over the years.  35 RR 1050–54.  Again, the State conducted no cross-examination.  35 RR 1054.

*Hugo Maenius*

Next, Panetti called Hugo Maenius, a rancher whose son was married to Panetti's sister.  35 RR 1055–56.  Some of Panetti's questions to Maenius were more disjointed than usual, but Panetti did ask his typical open-ended question: "Any comments, anything strange about things I said or did or looked or anything?"  35 RR 1057.  When Panetti asked an even broader question ("Is there anything you would like to tell the jury about my actions up to the time that I was arrested?"), Maenius balked, asking Panetti to make his question "a little clearer."  35 RR 1058.  After some questions about the hostage situation at the bunkhouse, which Maenius could not answer, Panetti concluded, asking a question that gives some insight into what he believed was relevant to his defense: "Hugo, is there anything that you would like to tell the jury about me, my actions ever since you known me that may be relevant to my guilt or innocence, my mental state, my conduct as a human being, anything at all, sir?"  35 RR 1059.  The State did not cross-examine Maenius.  35 RR

1060.

*Randall L. Maenius*

Panetti's next witness was Randall L. Maenius, Hugo Maenius's son and Panetti's brother-in-law.  35 RR 1061–62.  Panetti asked his traditional open-ended question ("You briefly just explain how I looked [in jail] and how I acted and what I said that might stand out in your mind."), then moved to the topic of his gunshot injury.  35 RR 1063, 1065.  Panetti also asked questions about his purported personality change after he got shot, as well as whether Maenius recalled "any strange names or anything [Panetti] said," or whether he  "one day looked different."  35 RR 1065.  The State opted not to cross-examine the witness.  35 RR 1066.

*John Matthew Penick*

Next, Panetti called John Matthew Penick, a man who was apparently casually acquainted with Panetti.  35 RR 1067–68.  In response to Panetti's standard open-ended question about his strange behavior ("At those Das Ist Alles Fest, at any family or any functions can you think about me doing anything bizarre or strange?"), Penick recounted having seen Panetti on the day prior to the murders,[52] at which meeting Panetti claimed to be a different person.  35 RR 1068.  Panetti got Penick to acknowledge that Panetti had worked with or for him, and Penick identified "Ironhorse" as a nickname Panetti used to go by.  35 RR 1069.  In conclusion, Panetti asked: "[W]ere you aware of anything that the jury needs to know that's relevant to what this is all about?"  *Id.*

The State briefly cross-examined Penick about his meeting with Panetti at the Das Ist Alles Fest, and may have made a tactical blunder when it asked whether Panetti seemed unusual that day,

---

[52] Penick later acknowledged some doubt about the exact timing of the meeting.  35 RR 1070.

because Penick replied: "Yeah, he seemed very unusual that day. I don't know whether it was from the alcohol or what, because I didn't—you know, briefly visited with him." 35 RR 1069–71.

On redirect, Panetti followed up on this line of questioning: "John, when you saw me there at the Das Ist Alles Fest, was there more to it than just the fact that I was drinking? Was I drunk or just drinking and strange or in a word?" 35 RR 1072. Panetti concluded his questioning by once again asking questions about his past work performance and whether he had ever acted especially strange, and the State asked no further questions. 35 RR 1073.

*Doyle Thomas Dickens*

After lunch, Panetti's first witness was Doyle Thomas Dickens, a corrections officer at Bell County Jail. 35 RR 1074–75. Right off the bat, Panetti revealed his lack of preparation in questioning Dickens: "Sir, I didn't have any prepared questions, so I'm just going to have to off the top of my head what's relevant to what's here today." 35 RR 1075. After Dickens testified that Panetti was classified as an "aggressive" prisoner, Panetti questioned that classification: "Do you remember any documentation at all or even just any jailhouse scuttlebutt about my striking, verbally threatening or harming another officer or another prisoner in any way?" 35 RR 1078. Panetti also got Dickens to acknowledge that Panetti displayed mood swings, and that he had visited a psychiatrist while in jail. 35 RR 1078–79, 1081–82.

After a lot of questions about jail conditions generally, and Panetti's experiences in particular, Panetti asked: "Well, could you tell the jury what you heard about my mental state?" 35 RR 1082–84. Dickens replied: "You're very unstable." 35 RR 1084. However, Dickens denied Panetti's suggestion that he had received "strange treatment because of [his] mental afflictions." 35

RR 1085.

The State cross-examined Dickens, first getting him to agree that mood swings were common among jail prisoners.  35 RR 1086.  Dickens further testified that Panetti seemed to know right from wrong, but that he "wasn't really hip on rules."  *Id.*  Finally, he testified that Panetti was classified as aggressive, in part, because of a "confrontation" he had had with some Gillespie County corrections officers.  35 RR 1087.

On redirect, Panetti reiterated his suggestion that he received unusual treatment from jail officials:

> [D]o you sort of feel that I was put in to the same classification as prisoners who, indeed, had a record, not verbal, but a standing record of violence to other corrections officers?  Do you feel that because I was charged with what I was charged with, that I was sort of put into a slot and that there wasn't the record and, indeed, did you not mention that I did not aggressively or threatened [sic] you or harm you or any other officers and that to your knowledge there's no paperwork of that?

35 RR 1088.  Panetti also suggested his negative treatment was a result of religious persecution:

> Do you remember, sir, at the very near the end that you described I was handcuffed with the cuffs and the leg irons and the weight belt?  Do you remember any comments I made to you that they added extra chains for preaching the word of God or did you realize that there was additional chains put on me besides what the ones you just described?

35 RR 1090.

Panetti closed by once again asking whether he had ever threatened or struck a corrections officer, and the State elected not to re-cross Dickens.  35 RR 1090.

Panetti's alleged unfair treatment while in jail, and his purported religious persecution, were obviously matters of great emotional importance to him, though they were of little legal relevance

to his case.  The record is replete with Panetti's complaints about jail conditions generally, his perceived lack of adequate medical care, and alleged discrimination by jail officials.  The Court can only speculate why (or whether) Panetti thought these matters were relevant to his guilt or innocence, but his comments at various points suggest he felt the jury had a right to know about the alleged unfair treatment he received at the hands of the government.  Whether he hoped this would win him sympathy, would explain his lack of trial preparation, or would serve some other purpose entirely, is not clear.  However, many prisoners wish to air before a jury their grievances with their respective jail or prison systems, and the Court does not believe this (often understandable) desire is an indication of mental illness or incompetence.

*Joe Anthony Medrano*

Panetti's next witness was Joe Anthony Medrano, a law enforcement officer in Temple who apparently used to work at the Bell County Jail.[53]  35 RR 1091.  Panetti immediately launched into his classification as "aggressive," asking: "Did you have any records or see any records of why I was labeled 'aggressive prisoner'?"  *Id.*  When Medrano referred to Panetti's past altercation with Gillespie County corrections officers, Panetti suggested Medrano might have him confused with a different inmate.  35 RR 1091–92.

Panetti resumed this line of questioning after a long string of irrelevant questions:

Did you hear of any instance I had with any specific jailer where I threatened them or you said you heard scuttlebutt that you heard from another county that I got into an altercation, which is not for me to say truth or untruth, but the documents will

---

[53] Although Panetti referred to Medrano as both a "corrections officer" and a "police officer," Medrano referred to himself as a "reserves officer."  35 RR 1090–91.  Nevertheless, Medrano appears to have worked at Bell County Jail at the times relevant to Panetti's questioning.

show that?  Did you hear anything about just flat rumor and then when you got to
know who I was, that it sort of changed your mind about who I really was?

35 RR 1092–95.  Reasonably, Medrano responded: "I don't understand what you're trying to tell me,
trying to ask me."  35 RR 1095.

Finally, returning to familiar ground, Panetti asked his famous open-ended question: "[D]id
I have any bizarre ideas or did I make any statements or anything that comes to mind that you find
unusual?"  35 RR 1096.

On cross-examination, the State, apparently trying to establish Panetti's sanity, asked whether
Panetti had been lucid during Medrano's conversations with him, and Medrano said he had been.
35 RR 1096–97.  Standing somewhat in contrast to this statement, when Panetti asked on redirect
why Panetti had given up "all medicine, whatsoever," Medrano responded: "You mentioned
something about evil spirits or something like that."  35 RR 1097.  The State asked no further
questions.  35 RR 1098.

*Thomas Raymond Panetti*

Panetti's next witness was his brother, Thomas Raymond Panetti.  35 RR 1098–99.  After
establishing that Thomas had a criminal record for violent crime, Panetti asked Thomas to recount
complaints that Panetti had made about his treatment in jail.  35 RR 1099.

Later, Panetti referred back to Curtis Allerkamp's testimony, and got Thomas to reiterate the
concept of being restored to sanity through God.  35 RR 1103; 34 RR 942–44.  From this, Panetti
moved smoothly through his reputation for mental illness, the issue of his chemical dependency, and
the existence of his Sergeant Ironhorse personality.  35 RR 1103–06.  Then, in the guise of asking

Thomas questions, Panetti testified about his assault charge from 1980: "Tom, is it true that the details with the nurse and the hair was scuttlebutt and it was no felony and it was a misdemeanor and I did 15 days in jail and never been in any trouble since? Is that a fact?" 35 RR 1108.

Panetti's next line of questioning is significant, because it potentially sheds light on why he asked previous witnesses about his near-death experiences:

> Tom, what happened to me when—what changed in me when you saw the first—not that I had to take a handful of pills or be on medicine, or what event in my life did you think that—and that goes way back to when we were kids. What do you think made me—changed me significantly, stands out in your mind that made me different?

35 RR 1109. Thomas replied that Panetti had changed when he almost drowned as a child. 35 RR 1109–10.

Moving on, Thomas testified about Panetti's difficulties obtaining proper medication, both pre- and post-arrest, Panetti's unfair treatment while in jail, and Panetti's religious conversion. 35 RR 1110–16. Then, Panetti asked a pointed question about his mental illness: "Tom, when is the first time that you realized that I had a mental disease and that I was doing some things that I didn't really have control of or when was the first time you realized that I did things that I didn't know what I was doing?" 35 RR 1116–17. Panetti took pains to separate the issue of his mental illness from the issue of his sobriety: "Tom, do you remember a time when I had a pretty good stretch of sobriety and I was still having problems, that I was doing things that—" 35 RR 1117.

Apparently taking full advantage of both his brother's cooperation and the State's lack of objections, Panetti once again testified through Thomas: "Tom, you're aware of I been arrested three times. Do you remember me ever saying that I couldn't afford to fight it and that I pled out, pled

guilty?" 35 RR 1118.  Thomas replied: "Well, I guess that's why you're here.  It's been a money thing.  Where you're at now, yeah, same thing. . . . Same story."  *Id.*

Thomas testified that Panetti had honored his first wife's protective order, mentioned Panetti's treatment at a psychiatric hospital, and agreed that Panetti had used the money he received as a result of his gunshot wound to pay his ex-wife's family and his bills.  35 RR 1119.

Panetti then moved to more directly relevant matters, first asking: "Tom, can you describe any talk we had about remorse or how I felt about what Sarge did?"  *Id.*  Continuing, Panetti testified in question form: "Tom, when I called you up from the jail did I ever make the remark that Scott would have never went over there?  Did I ever make the remark that Scott fights a knife with a knife, if a knife ever fought?  Did I ever make the remark that it was just impossible for me, Scott, to do that crime?"  35 RR 1119–20.

On the issue of his self-representation, Panetti asked: "Tom, did I ever make a statements [sic] to you that there ain't a team of experts in the world that can explain insanity, except someone who's been?"  35 RR 1120.  Then: "Tom, have many times have you and Mom and the family and all people considered have tried to talk me out of defending myself in this case?"  35 RR 1121.

Panetti's next exchange, which the Court briefly alluded to above, is of particular significance to this case: "Tom, did you ever see me or most recently not as I am now, asking coherent questions, when I found out that I couldn't get evaluated and I couldn't get an expert witness?  Did you see me break down and panic?"  *Id.*  Thomas's response: "Any other time before it would have been a different story, but now I have never seen you this well . . . for years, for years."  *Id.*

Shortly thereafter, Panetti emphasized his remorse: "Tom, did I ever take on the guilty [sic] of what my families and y'all have went through to the point of where I was ready to destroy myself?" 35 RR 1123. And: "Do you remember me talking about my suicide attempts in Gillespie County Jail?" 35 RR 1124. Finally: "Tom, did I ever make a remark ever that when I got arrested, that I wanted to be a drunk cowboy and go to meet my death? Did I ever remark that I wanted to die, that I wanted to be specifically request shot through the heart?" *Id.*

Once again testifying through his questions, Panetti later asked:

> Tom, in light of this whole situation have I spoke in disrespect or that I—my attitude with untruths and law enforcement of being just part of the way things are done? Tom, have I ever said that I have a deep love affair for the law as the law is written, and that when certain people go ahead and try to do things their way, that—and break the law, that it causes the problems, such as, Tom, did I ever tell you that my—how I felt about the two years of appeal process that I have waited in jail for trial?

35 RR 1125. Thomas's answer was illuminating on several levels: "Yeah, you told me about that, and I want to answer your last question, too. You got to slow up on your questions. I have been trying to help you, Brother [sic], but you got to slow up on them questions." *Id.* The State did not cross-examine Thomas Panetti. 35 RR 1127.

Throughout his questioning of Thomas, Panetti was able to, and did, testify without taking the witness stand. Further, Panetti could hardly have hoped for more helpful and cooperative answers to his questions than those he received from his brother. Panetti hit virtually every major theme of his case during his examination of Thomas, including: his mental illness and insanity; his improper medication before and after the murders; his chemical dependency and alcoholism; his miraculous return to sanity and mental health; his near-death experiences; Sarge Ironhorse; his self-

representation; his unfair treatment by law enforcement and corrections officers; his remorse; and the illegal conduct by police in his case.

Although Panetti's questions give the strong impression he had a pretty good idea what he was doing, perhaps the most significant piece of evidence, for the purpose of this case, was Thomas's statement that he had not seen Panetti so coherent in years. This reinforces the Court's finding that, no matter how incoherent Panetti may have been at other times, he was not incompetent to represent himself during his trial.

*Jacqueline P. Maenius*

Panetti's next witness was his sister, Jacqueline P. Maenius. 35 RR 1128–29. In summary, Panetti's questions to his sister covered the general issues of Panetti's disability pension; Panetti's willingness to give those funds to Sonja, Panetti's concern for their daughter; Maenius's eventual role as representative payee of Panetti's funds; Panetti's difficulties obtaining proper medical care; Panetti's mental states at various times; and Panetti's suicidal thoughts.[54] 35 RR 1129–48.

Later, Panetti moved to more novel areas, such as his past belief that the Devil was in his house and had to be exorcised from it, and his having had conversations with animals. 35 RR 1148–49. Panetti concluded with questions about Sarge Ironhorse. 35 RR 1149–50. The State did not cross-examine Panetti's sister. 35 RR 1150.

*Russell Thomas*

Next, Panetti called Russell Thomas, a veterinarian who had worked briefly with Panetti

---

[54] As Panetti's questions covered topics already discussed, and were otherwise unremarkable, the Court does not recite them at length or in detail.

approximately fifteen years prior to the trial, and who attended the same church.  35 RR 1151–52.

Although Panetti asked various broad questions, Thomas was unable to provide any relevant

testimony, and the State did not cross-examine him.  35 RR 1152–55.

*Shelly Britton*

Panetti's final witness of the day was Shelly Britton, a former neighbor of Panetti and Sonja

Alvarado.  35 RR 1155–57.  Britton testified that she and her husband had seen Panetti in

camouflage at various times, which she took to mean Panetti was a hunting enthusiast.  35 RR

1157–58.  Panetti asked: "Oh, so you didn't think I was a paramilitary Rambo or nothing, huh?"  35

RR 1158.  Panetti asked his usual question about his reputation in the community, which Britton

reported as fairly negative.  35 RR 1158–59.  Following up, Panetti asked: "Shelly, when you did

get to know me, did you feel scared of me?"  35 RR 1160.  Britton responded: "Until I got to know

you, I did."  *Id.*  Later, Panetti got Britton to acknowledge she knew Panetti sometimes went by the

names "Sarge Ranahan" or "Ironhorse."  35 RR 1162.  The State asked no questions of Britton.  *Id.*

*Jerry D. Anderson*

Panetti's trial resumed on September 19, 1995, with Panetti calling as a witness Jerry D.

Anderson, an old hunting and riding friend.  36 RR 1178–79.  Anderson either had no knowledge

of, or could not remember, many of the matters about which Panetti questioned him.  36 RR

1179–82. Eventually, Panetti asked: "[J]ust honestly, did you think there was more wrong with Scott

Panetti than just a drinking problem," and Anderson acknowledged having had such suspicions.  36

RR 1182.  Regarding a six-year gap in their acquaintance, Panetti asked: "From when you knew me

in 1980 to when you saw me that night in 1986 was there anything different about me?  Did I seem

like a different person or did I change in any way or is there anything that sticks out in your mind

that—" 36 RR 1184.  Panetti's apparent attempt to establish his post-gunshot personality change

may have backfired, however, as Anderson responded: "Yes, you seemed very angry."  *Id.*  The

remainder of Panetti's questions were unremarkable and, for the most part, irrelevant.  36 RR

1184–85.  The State declined to cross-examine Anderson.  36 RR 1185.

*Lance Dwayne Bledsoe*

Panetti's next witness was Lance Dwayne Bledsoe, a corrections officer at Bell County Jail.

36 RR 1186.  Panetti confirmed Bledsoe had not heard of any prior altercation between Panetti and

corrections officers.  36 RR 1188.  Bledsoe testified that Panetti changed for the better after he

stopped taking his medication, and was always polite to the female corrections officers. 36 RR 1190.

The State did not cross-examine Bledsoe.  36 RR 1191.

*Curtis Allen Eckhardt*

Panetti's next witness was Curtis Allen Eckhardt, a veterinarian who did work for Panetti's

father. 36 RR 1192–93.  In response to Panetti's questioning, Eckhardt testified that Panetti was a

farrier, and had previously made a hoof pick for him.  36 RR 1194.  Panetti asked about his

reputation as a farrier, which Eckhardt described as "good."  36 RR 1195.

In conclusion, Panetti asked a familiar open-ended question: "[I]s there anything in your mind

you would like to share with the Court about Scott Panetti that may have relevance to getting to

know me or how I acted in the community?"  36 RR 1195.  The State asked no questions.  36 RR

1196.

*Eugene Charles Waters*

Panetti's next witness was Eugene Charles Waters, a contract psychologist for the Bell County Jail, who had spoken with Panetti while he was incarcerated. 36 RR 1198–99. With two notable exceptions, Panetti's questioning of Waters was unremarkable, and primarily consisted of a walkthrough of Panetti's various medical visits while in jail, and his resulting changes in medication. 36 RR 1199–1218.

The first notable aspect of Panetti's direct examination was that he once again testified in the form of a question: "Do you remember me making a remark or trying to assure you that no matter what they said about me when I got to jail, that I'm nonviolent or that I wasn't going to hurt anybody or anything like that? Do you remember any remarks that don't believe what they—the reports they they [sic] said about me?" 36 RR 1204. Second, Panetti made an unusual remark on the issue of subpoenas: "Well, we subpoenaed Dr. Howell and I mean, I didn't want to go subpoena crazy and I turned the Pope loose and J.F.K. and I never subpoenaed them, but Jesus Christ, he didn't need a subpoena. He's right here with me, and we'll get into that." 36 RR 1207.

Although neither exception is of profound significance, the former demonstrates that Panetti was willing and able to take advantage of his pro se status by effectively testifying without taking the stand; and the latter represents a substantial departure from Panetti's typical questioning style and substance.

*Daniel Patrick O'Neal*

Next, Panetti called Daniel Patrick O'Neal, another veterinarian, whose grass Panetti apparently had mowed, and whose veterinary services Panetti apparently had employed. 36 RR

1219.  Panetti quickly became suspicious of O'Neal, however, when the latter testified he was forced

to euthanize Panetti's dog because the dog had consumed marijuana and had become comatose.  36

RR 1220.  In response, Panetti said:

> Well, Doc, you're just flat blowing my cookies.  In light of that situation of
> everything that has happened, have you formed an opinion of me or a dislike or has
> it consolidated your fear in—or have you changed your ideas?  In other words, you
> didn't tell me nothing about, if—and correct me—about marijuana, dog being drunk,
> and we're going to get into this bit right here and nip it in the bud, sir.

36 RR 1221.  O'Neal maintained his opinion about the dog's cause of death, despite additional

questioning by Panetti.  36 RR 1221–22.

Panetti then asked whether O'Neal remembered Panetti dressing in military clothing (he had),

whether he believed it was for hunting or for some other reason (hunting, or a war fantasy), and

whether he had ever heard Panetti refer to himself as Sarge or by a different name (he had not).  36

RR 1222–23.

Panetti's examination of O'Neal also featured an unusual, somewhat amusing, exchange.

After O'Neal expressed some displeasure at the night-time and early-morning braying of Panetti's

mules back when they were neighbors, Panetti asked: "Sir, you're a hostile witness," to which

O'Neal replied: "No, I'm not a hostile witness.  I just have an opinion that I would like to express."

36 RR 1223.  Panetti retorted: "Did you ever hear me complaining about your dogs a'howling and

your chickens a'scooting?"  36 RR 1224.  O'Neal shot back: "Never did.  I didn't complain to you

about your mule."  *Id.*  Neither Panetti, nor the State, asked any further questions of the witness.  *Id.*

*Joanna Richter*

After briefly considering calling himself,[55] Panetti called Joanna "Maggie" Richter, a fellow member of the Memorial Presbyterian Church. 36 RR 1225–26. Panetti asked Richter to "describe Scott Panetti in the church, Fredericksburg church, and anything [she knew] about Scott Panetti." 36 RR 1227. Later, he asked: "[W]hen did you realize or did you ever think that I wasn't quite—or that I might have had problems?" 36 RR 1228.

Apparently at a loss for relevant questions, Panetti finally asked: "Is there anything that could be helpful or unhelpful? Is there anything honest?" 36 RR 1230. When Richter responded that Panetti was "a nice guy basically," and people used to wish he would "[g]et control of [him]self," Panetti seized on those words: "Do you think sometimes that I wasn't in control of myself?" *Id.* When Richter equivocated in her answer, Panetti persisted: "Did you ever hear anything on the order of I was doing things that I didn't know what I was doing?" *Id.* Richter gave no definite reply, and the State elected not to cross-examine her. *Id.*

*Milton Curtis Bierschwale*

After a brief recess, Panetti called Milton Curtis Bierschwale, a retired Presbyterian pastor from Panetti's church, who had also visited Panetti in jail. 36 RR 1232, 1243–44. Although the first part of Panetti's examination contained little of significance to his trial, or to this case, the latter half was noteworthy for several reasons.

First, in response to a question regarding what Bierschwale remembered about Panetti's attendance at church, Bierschwale recounted an interesting encounter he had had with Panetti: "I

---

[55] "By golly, I might call myself, but then again it's not time, but then again I might not." 36 RR 1225.

remember one morning . . . you were between the two buildings sitting on a stump or a bench or

something . . . . You said you almost killed a person that morning with a crossbow before you came

to church, Sunday school."  36 RR 1236.  Understandably, Panetti did not want this statement to go

unexplained before the jury, so he commented on the incident, using his familiar testifying-through-

questions tactic:

> I don't know if I subpoenaed Mark [Cosper] or for a character witness, because that
> would really clear up the—do you remember him and I talking about getting in
> arguments or anything . . . . We're dear friends, but we had a spat and he—I don't
> remember if you remember any details.  He held a shotgun on me, and I didn't have
> any guns, so I only had a bow and do you remember me saying that "I'll drive an
> arrow up the barrel of your shotgun," or any details about that? . . . Don't remember
> any people [sic][56] I wrote about it? . . . It would have started like, "When a man faces
> a shotgun with a bow, that even single shot obsolete slugs and buck are hard to beat,"
> or anything like that?

36 RR 1239–40.

Then, immediately on the heels of that series of questions, Panetti asked a superb leading

question: "Sir, when is the first time you knew that I wasn't right?"  36 RR 1240.  He followed that

up with a testimonial leading question about his purported personality change: "Did you know me

well enough before then to know what drastic change in me when I got burned then or you did you

know me well enough before I got burned to know that there was a drastic change in my when I got

that burn?"  36 RR 1241.  Later, when Bierschwale made passing reference to having had "strange"

conversations with Panetti after church, Panetti ran with that answer: "About that word 'strange,'

sir, did you ever see me seem like I was a different person one day and the next a different person

---

[56] Given Bierschwale's answer to this question, "No, I had some of your poems, but I'm not aware that you ever
wrote anything about that," it appears this may reflect a transcription error, and Panetti may actually have said "poem."
36 RR 1240.

or change from cowboy to commando or—"  36 RR 1242.

Shortly thereafter, Panetti asked a question, presumably intended to help rebut his Rambo image: "In all our visits, religious counseling is really secret, but do you remember me talking about wars or hurting children or—" 36 RR 1243.  If that was Panetti's intention, however, Bierschwale's answer was decidedly unhelpful: "Well, you talked about having killed people and that you were going to change your life." *Id.*  Panetti: "In jail?" *Id.*  Bierschwale: "No, that was out in front of the church one morning, and you were rather high." *Id.*

Finally, Panetti turned the discussion to Bierschwale's visits to Panetti in jail, and Panetti asked: "Sir, do you remember in the jail was I—do you feel I was sincerely remorseful?"  36 RR 1244.  Again, Bierschwale's answer was probably not what Panetti was looking for: "You never did exactly express it." *Id.*  After a short Biblical discussion, Panetti asked a direct question, "[D]id you ever see Sarge come out in jail or not," and he received a direct answer: "No."  36 RR 1245.

The State did not cross-examine Bierschwale.  36 RR 1250.

*Margaret Ann Bierschwale*

In spite of Milton Bierschwale's less-than-glowing testimony, Panetti next called Milton's wife, Margaret Ann Bierschwale.  36 RR 1252.  Panetti tried, several times, to get Margaret to talk about Sarge Ironhorse, but she proved no more helpful as a witness than her husband had been.  36 RR 1253–55.  Nor did the State opt to cross-examine her.  36 RR 1255.

*Veronica Keen — Recall*

Next, Panetti recalled his poet friend, Veronica "Victoria" Keen.  36 RR 1256.  After using her to introduce into evidence his book of poetry, Panetti asked her about his alleged alter ego

("[T]ell what you know about Ironhorse."), but Keen had little to say.  36 RR 1258.  The State did

not question Keen.  *Id.*

> *Trial Hearing*

After Keen was excused, the court asked Panetti to call his next witness, to which Panetti

replied:

> Sir, I have been shuffling so many papers and so much has been going on so fast that
> I'm a bit confused, and at the risk of taking [sic] off the jury, I think they're going to
> make a decision either way.  I don't think they expect me to act like a smooth
> attorney, Your Honor.

36 RR 1259.  The court then held a bench conference, at the conclusion of which the court excused

the jury to lunch, and held a hearing outside the jury's presence.  36 RR 1259–60.

> Panetti explained his request for the hearing:

> I wanted to explain a few things about witnesses and subpoenas and reason and
> whatnot, but I find myself in my—I don't have my papers, Your Honor. . . . The
> papers what you're going to guide me, and what I'm going to say to request properly
> reasons why I wish to ask for or recall certain witnesses, Your Honor.  I felt I needed
> to explain it and then I hand you documentation such as children in question from
> different marriages—some are victims and some are not—and in my brief study of
> law of children victims, there is a proper procedure and certain reasons and
> documentations I must show when I request the presence of children, whether they're
> victims or not, and I don't have the paperwork right now to match up what I need to
> present to you to adequately explain.

36 RR 1260–61.

Panetti asked to call his daughter, Amanda Alvarado, and, when Judge Ables asked why,

Panetti replied: "Well, I don't have the documentation, but it regards her being a victimless victim."

36 RR 1261.  The court denied Panetti's request to call Amanda, noting "she was three at the time

of the incident."  *Id.*  Panetti objected to the court's ruling, saying:

> [F]rom the evidence given to the jury shows a child in the law enforcement building who seems besides her top, unaffected, and I heard through testimony, reliable witnesses, who I could have questioned had we had this hearing earlier in the church that my daughter did not see, that she was not affected, that she made request after request to see me, that she was used as a puppet and interrogated to the point where she went into a speech impediment.  I'm very concerned over my gringita being turned—although I feel the credibility of my former wife as a mother, but they're as adequate or great, but in light of this situation, I have deep fear of the welfare of my daughter, and I think it would be adequate or appropriate for the jury, after explaining that this is an unaffected child, for the jury to see, in fact, Your Honor, an unaffected child.  I do not wish to question her.  I do not wish to interrogate.

36 RR 1262.  Panetti further said that Amanda had been five at the time of the murders, but the court maintained its prior ruling.  36 RR 1262–63.

Panetti also wished to call his fifteen-year-old[57] son, Chase Louis Panetti, for the purpose of showing that Panetti had been insane in 1986, but the court denied that request as well.  36 RR 1264–65.  By way of explanation or objection, Panetti said:

> No, sir, he can testify that he would go bring me beers.  He could testify whether or not he seen me beat his mom.  He can testify as much as I could testify as lots of things, Your Honor, and him being a 14-year-old-boy, I do not think it would cause him to wet the bed at this point, to state the facts, if Dad was cuckoo in 1986 or if Dad—if he ever witnessed his father beating his mom or dad.  "Dad, why are you"—he made a remark to his mother maybe once that—about comments I made or why is Dad doing certain bizarre acts, where I mentioned he asked me, "Dad, why are you doing this?"  I said, "I don't know."

36 RR 1265–66.  Again, the court stood by its original ruling.  36 RR 1266.

Finally, after the jury returned, but before Panetti called his next witness, he introduced into evidence, without objection, records from Bell County Jail.  36 RR 1272–73.

---

[57] As the Court quotes below, Panetti later referred to his son as having been fourteen years old at the time of the trial.  36 RR 1265.

*Evonne Panetti*

Panetti's next witness was his mother, Evonne Panetti.  36 RR 1274.  Panetti asked his

mother to testify about Sarge Ironhorse, which she did at some length.  36 RR 1276–78.  Among

other things, Panetti also: asked his mother about his having almost drowned, 36 RR 1281–82; made

a suggestion that the SWAT team commander, who responded to the hostage situation at the

bunkhouse, had stolen his lighter, 36 RR 1284; implied he had been sexually abused by a babysitter

in his youth, 36 RR 1291–93; asked his mother about his electrical burn, 36 RR 1296–97; and asked

about his strange behavior during his first marriage, 36 RR 1298–1303, 1305, 1307.

Later, Panetti and his mother had a potentially significant exchange:

| | |
|---|---|
| Scott Panetti: | You don't know what I'm doing, do you?  You think I'm just head running, myself, don't you? |
| Evonne Panetti: | No, I don't.  I think you're trying very hard to be professional. |
| Scott Panetti: | I'm not professional.  I'm not competent. |
| Evonne Panetti: | But you're trying. |
| Scott Panetti: | And I was insane, and the document— |
| Evonne Panetti: | Yes, that's true. |

36 RR 1312.

Another important exchange, which the Court has previously mentioned, occurred slightly

thereafter.  In reference to the news coverage of his crime, Panetti asked his mother who he looked

like during the broadcast (presumably hoping she would say "Sarge Ironhorse" or something

similar), but she responded: "Oh, no, no, no, no, you are so much more—you improved.  I have never

seen you—well, I take it back.  Sometimes in Gillespie County jail when I would visit you there

would be times when you looked halfway decent, but you are sounding better than you have in a long

time now."  36 RR 1315.

-122-

Panetti's final question was also telling:

Is there anything the jury needs to know what, hasn't been said by Dad, in earlier testimony of other witnesses that has relevance, that has a meaning to whether I was or was not responsible for my actions, that I did not know right from wrong, not putting a label on it from a doctor of a mentality disease, or serious defect, but is there anything the Court—that you would like to say before I pass you as my Mom witness with all apologies for my interrogation?

36 RR 1319.

The State did not cross-examine Evonne Panetti.  36 RR 1310.

*Meridel Solomon Solbrig*

Panetti's next witness was Meridel Solomon Solbrig, who had occasionally represented him as his attorney, including during his divorce from his first wife.  36 RR 1321–22.  Panetti questioned Solbrig at great length, but, with the few exceptions discussed below, the examination was routine, and the matters they discussed were not novel, having been covered with prior witnesses.  36 RR 1322–58.

The first notable part of Panetti's examination of Solbrig was that he used her to introduce a fair amount of evidence, in one case over the State's objection.  36 RR 1332, 1334, 1337–38. Second, Panetti took advantage of his pro se status by (improperly) using a discussion with the court about the introduction of evidence, in the presence of the jury, to attempt to impeach David Morquecho: "Your Honor, that David Morquecho already testified and lied about his criminal record, and I couldn't present it to the jury." 36 RR 1348.  Finally, Panetti asked a question in which he explicitly attempted to link his mental illness, his alternate personality, and his insanity defense: "Meridel, do you feel, because of my mental illness and the serious mental disease and all factors

-123-

concerned, that it's probably [sic] that I didn't know what I was doing, as Sarge Ironhorse, as that personality?" 36 RR 1355. And Panetti received a helpful answer: "The Scott Panetti that I know would not, could not have done that." *Id.* The State's cross-examination of Solbrig was very brief, and not significant to this case, as was Panetti's redirect. 36 RR 1356–58.

*Ernest Louis Betts*

Panetti's final witness of the day was an old friend of his, Ernest Louis Betts. 36 RR 1359–60. Although Panetti and Betts covered a variety topics, none were particularly novel in light of Panetti's prior questioning, nor is the examination otherwise especially significant to this case. 36 RR 1360–75. The State asked no questions. 36 RR 1375.

*Proceedings Outside the Presence of the Jury*

Before the court recessed for the day, Judge Ables had a discussion with Panetti about his other anticipated witnesses, and in particular the fact that one of Panetti's potential witnesses, Dr. Simes, would be unavailable for the remainder of the trial. 36 RR 1375–76. Panetti objected, claiming he had confused doctors Simes and Selck, but the court nevertheless released Simes, as he was scheduled to undergo surgery. 36 RR 1379–80. Panetti persisted in his objections, saying: "I have an untreated thought disorder, sir, and I'll use it as excuse, sir, and I apologize, sir." 36 RR 1380.

Shortly thereafter, Panetti explained why he wanted Simes to testify: "I wish to have my few professional doctors . . . that I think will have great weight to the jury on whether or not I was insane at the time." *Id.* Finally, Panetti asked if he could use "prior documentation of Dr. Simes," and Judge Ables replied: "I'm not going to make a ruling in advance, but he has testified at two

-124-

competency hearings under oath."  36 RR 1382.

The next morning, before the jury was brought into the courtroom, Panetti told the court he was experiencing confusion: "Your Honor, I'm having a little bit—I'm confused and I'm having a little bit of trouble, and I want to get this trial over with, sir, and I'm not throwing up a flag, but—" 37 RR 1394.  Indeed, Panetti seemed fairly unfocused during the morning hearing outside the presence of the jury.  37 RR 1392–96.

The jury was brought in briefly, but, after Panetti tried calling Dr. Simes and another unavailable witness, he requested another hearing outside the presence of the jury, and the jury was consequently excused. 37 RR 1396–97. Judge Ables expressed his frustration with Panetti: "When you insisted on representing yourself, and I tried to talk you out of it, your attorneys tried to talk you out of it, the last thing I told you was I cannot—the law does not allow me to treat you differently from anybody else who represents, who stands before this bar."  37 RR 1397.

Panetti referred again to his "thought disorder," and requested a recess, which the court denied.  37 RR 1398–99.  Panetti tried again: "Sir, because of my mental illness and thought disorder—I'm not throwing up an excuse, but it's untreated.  I know unmedicated and I was very confused and I was told, sir, that I could have a few moments with these few expert veterinarians." 37 RR 1399.  Without going into needless detail, Panetti and the court went back and forth for some time, with Panetti objecting that he was not able to call the witnesses he desired, and the court instructing him to choose an available witness to call.  37 RR 1399–1403.  The court then brought the jury back into the courtroom and asked Panetti to call his next witness.  37 RR 1403.

*Donald P. Langehennig*

After once again suggesting he might call himself,[58] Panetti decided to call as his next witness Donald P. Langehennig, a deputy sheriff with the Gillespie County Sheriff's Department.  37 RR 1405–06.  With the exception of questions about his two competency hearings, 37 RR 1413–15, 1416–17, Panetti's questioning of Langehennig was unremarkable, and the State elected not to cross-examine the man.  37 RR 1406–18.

*Evonne Panetti — Recall*

Next, Panetti recalled his mother to the stand.  37 RR 1419.  Panetti had difficulty coming up with a question that was both specific and relevant, 37 RR 1420, but, after some additional procedural problems, ultimately entered into evidence a picture of the bunkhouse, 37 RR 1421–23, as well as an affidavit, 37 RR 1427–28, and, without objection, a report by Dr. Simes, 37 RR 1429–30.  The remainder of Panetti's questioning of his mother was lengthy and rambling,[59] but, being that it was mostly repetitive of his previous examination of her, not especially noteworthy at this stage in the Court's discussion of Panetti's trial.  37 RR 1430–42.  The State asked no questions. 37 RR 1442.  At Panetti's request, the court then recessed for fifteen minutes.[60]

*Scott Louis Panetti*

After the recess, Panetti elected to testify on his own behalf.  37 RR 1446–47.  Panetti's

---

[58] Panetti: "I might just call myself, sir."  The Court: "Do you wish to call yourself, Mr. Panetti?"  Panetti: "No, I wish to call Officer Langehennig."  37 RR 1405.

[59] Notably, Panetti indicated toward the end of his questioning that his "thoughts [were] getting a little clearer." 37 RR 1441.

[60] This break, too, prominently featured Panetti objecting to the court that he was unable to call what witnesses he wanted to call, when he wanted to call them.  37 RR 1443–46.

-126-

narrative can only fairly be described as semi-coherent, with Panetti rambling from topic to topic without apparent regard for chronology or theme.  Indeed, Panetti seems to have exercised his right to testify mostly for the purpose of telling the jury select parts of his life story.[61]

Panetti began by recounting two of his near-death experiences, 37 RR 1447–48, then launched into an explanation of his haircut and attire, his confusion about Dr. Simes, and moved from that to an appeal to the jury to carefully consider the documentary evidence in the record.  37 RR 1449.  Panetti then showed the jury a tattoo he got while he was in the Navy, and explained the story behind it.  37 RR 1450.

From that, Panetti transitioned to when he lived with his parents in Tomahawk, Wisconsin, describing a horse they owned, their cabin, and his father's various jobs.  37 RR 1451.  Panetti testified about how he worked with his father, and how his father's desire to return to farming brought Panetti's family to Poynette, Wisconsin.  37 RR 1451–52.  Panetti told the jury about the work he and his father did on the farm.  37 RR 1453.

Panetti recalled how he received a camouflage outfit for Christmas one year, and how at that time he idolized cowboys, sailors, and soldiers.  *Id.*  Panetti discussed bows and bow-hunting, then his school days.  37 RR 1454.  After Panetti made an inappropriate comment about one of his

---

[61] In fact, after Panetti had gone on for some time about wholly irrelevant matters, the court interrupted him, saying:

> Mr. Panetti, let me stop you a second.  Mr. Panetti, we need to get to the issues that are relevant to this jury about the guilt/innocence stage of this trial, and I'm not sure that with everything you're going into is relevant to the issues of whether or not you're guilty of the offense that you're charged with or whether or not it has anything to do with your issue of your affirmative defense of insanity that you have raised, so we don't need to hear all the details of your life story.

37 RR 1463.

teachers, the court admonished him to move on to something relevant.  37 RR 1454–55.

The court's instruction went unheeded, however, and Panetti proceeded to discuss two plays he had acted in, his overall school performance, and his high school football career. 37 RR 1455–56. Panetti then moved on to his first love, his first rodeo, his going to school to be an artificial insemination technician, and his first experiences with drugs and alcohol.  37 RR 1457–59.  After that, Panetti told the jury about a palomino he used to own, his feelings about cowboy boots, and about selling his horse to buy a minibike.  37 RR 1460–61.

The Court could go on: Panetti's testimony continued in this same fashion for some time, despite the trial court's best efforts to redirect him to areas of potential relevance to his case.  For the sake of brevity, this Court will skip ahead in Panetti's testimony, to areas of potential relevance to this one.

Unfortunately for the judge and jury in his case, Panetti continued telling various stories from his life until lunch, at which point the court excused the jury and addressed Panetti:

> Mr. Panetti, for the last 35 minutes we have been listening to Navy stories that I do not deem relevant.  I am not going to let you ramble and tell the jury your life story. . . . I'm going to insist that you get to issues that you think this jury can use in making their determination of whether or not you're guilty or innocent of the charges against you.

37 RR 1478.  Panetti's reply was probably not what Judge Ables was hoping for:

> Your Honor, with all due respect, I found my brief stint in the military dramatic and I was moving right up to the incident [an alleged LSD overdose], but to leave out that short duty station where I was trained as a combat medic—I was not going to touch on anything classified that I did or didn't know to need to do my job, but in Pensacola, Florida, Your Honor, they went ahead and sent me to the hospital corps school, not on my request, but that comes back into—

*Id.* Unsurprisingly, the court interrupted Panetti at this point, saying: "I asked you what was it about your Navy experiences that are relevant, and you said, 'The LSD incident,' and I told you to go straight to the LSD incident and I would let you testify about it, and you refused to do it. . . . [I]f you get to rambling and telling stories, I'm going to cut you off again."  37 RR 1478–79.

Proving that hope springs eternal, when the jury was called back into the courtroom, Judge Ables said to Panetti: "Mr. Panetti, I think where we were is that I had allowed you to go ahead and testify about what you described as an LSD overdose incident when you were in the Navy, so if you want to testify about that event, you need to go right to that event."  37 RR 1482.  After a brief preamble, and some talking to himself,[62] Panetti launched back into his Navy stories, and—eventually—got to the alleged LSD overdose incident.  37 RR 1482–88.

Panetti continued his narrative, discussing his first wife, his severe electrical burn, his drinking, his brief stint as an extra in a movie, his commitments to (and escapes from) the State Hospital, and his father's return to drinking after years of sobriety,[63] before the State objected, asking that Panetti "be instructed to talk something about guilt or innocence," which objection the court sustained.  37 RR 1488–1504.  After several more objections, and some pauses while Panetti

---

[62] Panetti: "I prayed I'm not going to have a flashback and—" 37 RR 1482.  The court reporter added the note: "At which time the Defendant talked out loud to himself." *Id.*  The Court: "Don't talk out loud, Mr. Panetti." *Id.*  It is unclear whether this aside was the result of Panetti's mental illness, or mere theatrics.

[63] Even within the rambling narrative of his testimony, Panetti briefly lapsed into greater-than-normal incoherence during this discussion: "Decade, fear of water in the Navy.  Bulls scared me.  Broncs, get on a bronc, but a bull is different.  Maybe the Navy and water confront.  I don't know.  Maybe it's a macho thing.  I don't know.  I don't know, but—don't know, and on a hay farm, and we took—Don Nehr owned the Nehr ranch and Dad terrified me." 37 RR 1503.  Again, whether this confused speech was genuine or feigned is a matter about which the Court can only speculate.

apparently examined his ring, he continued his testimony, but not on relevant issues.[64]  37 RR

1504–07.

Thankfully, Panetti then moved to potentially relevant topics, testifying about his time at

various hospitals, his codeine and alcohol addictions, his lithium prescription, and his hallucinations

and insanity.  37 RR 1508–15.  Gradually, however, Panetti's narrative lost focus, and the court

sustained the State's objection on relevancy.  37 RR 1515.

After a meandering journey, Panetti eventually mentioned his purported separate personality:

[Sonja Alvarado] wasn't too thrilled when . . . she got the new telephone.  I would
leave an answering machine and I started not just be the other personality.  I—he
developed a handle, Sarge, Sarge Ironhorse, and I started using Ranahan, and I had
Ironhorse, but Sarge, and early I put in Sergeant Ranahan Ironhorse, but the Sarge
really came into.  It wasn't hanging back.  It wasn't underlying.  It wasn't asleep.  It
was—wasn't just a pen name.  It scared me, and Sarge—Sarge—excuse me, Your
Honor.

37 RR 1524.

After a lot more rambling by Panetti, and several further instructions by the court to move

to relevant topics, Panetti finally began testifying about the events leading up to the murders.  37 RR

1524–41.  He told the jury how he bought a bottle of liquor, returned to the bunkhouse, and drank

until he fell asleep.  37 RR 1541–42.  Panetti continued:

I wanted to go to sleep, but I didn't wake up, and that next morning, early in the
morning, Sarge woke up and there was a mirror on the wall . . . and Sarge looked in
the mirror and seen Scott and Scott was gone, but Sarge said, "Scott, your hair," and
that's when Sarge and Scott parted ways, and I picked up them shears . . . and I

---

[64] In the middle of a story about bounty hunting, the court interrupted Panetti, asking him how it was relevant.
37 RR 1507.  Panetti replied, in part: "This gets directly to when I ended up at Starlite Village Hospital. . . . [W]hat's
relevant is that's the first time that I didn't know what I was doing or that first time—and I hate using the 'I' word—that
I was insane."  37 RR 1508.  This exchange shows that Panetti was aware of the relevant issues in his case, even if he
refused to stick to them.

-130-

clipped off my head and I didn't know why and then when I give myself a close clip,
I grabbed the razor.  Sarge says, "Get it all off."

37 RR 1542–43.

Later, Panetti elaborated about the interaction between his two alleged personalities: "I don't

believe I could be hypnotized or trying to describe Sarge and from Scott's viewpoint is darn difficult,

and there's a lot of things Sarge—Scott wanted to know about Sarge.  Scott remembers about Sarge,

what Sarge did."  37 RR 1543.

In a disturbing counterpoint to his earlier rambling life stories, Panetti then purported to adopt

the Sarge persona ("Sarge, I'm Sarge and I woke up.  I'm Sarge and I woke up and I looked in that

mirror."), and proceeded to describe the murders, occasionally as himself, describing "Sarge"'s

actions, but mostly from the viewpoint of "Sarge," an entity separate from himself.[65]   37 RR

1544–46.  After Panetti's chilling account, the court recessed briefly.  37 RR 1546.

In concluding his testimony, Panetti referred to his fate if the jury acquitted him by reason

of insanity, a subject he covered often during the trial:

Scott Louis Panetti will end his testimony by saying you end up in—I can't tell you
what happens on a decision that the jury make [sic], but that if—they're tough.  It's
rough, and they can keep you, and this ain't no free bird situation that ever had
anything to do with any of this.  There just is no win win.  There's no win.  There's
no victory.  There's the outcome is the outcome, and then there's advantages and
disadvantages to any of them.

---

[65] Panetti's account was disturbing and, if accepted at face value, would raise substantial doubts about Panetti's
sanity at the time of the murders.  However, it is of relatively limited relevance to this case, for two reasons.  First, no
matter how incoherent Panetti's own testimony was, it was only a small portion of his overall trial performance.  Second,
and more important, it was potentially to Panetti's great benefit to appear as unstable as possible during his testimony,
in light of his insanity defense.  This latter point is emphasized by Panetti's apparent ability to move between in-court
dialogue and his Sarge persona with ease: "Just that—to wind it up, Your Honor.  Yeah, the demons were cackling at
me and Scott went out the front and got in his Jeep and Sonja and Birdie jumped in the Jeep and I went to the bunkhouse
and Sonja was in shock."  37 RR 1547.

37 RR 1554–55.  Shortly thereafter, Panetti made a statement about his mental state at the time of the murders versus the time of trial, a statement also potentially relevant to the issue of his future dangerousness: "Because the Lord ain't got nothing to do with what Sarge did, and I'm not saying it was the Devil that got me, but I would say there was some demon spirits, and they did.  They did cackle at me, and—but that's all been defeated by the blood of the Lamb . . . ."  *Id.*

The State did not cross-examine Panetti.  37 RR 1556.  The court then recessed for the day.  37 RR 1556–57.

In this Court's estimation, Panetti's firsthand account of his murders did as much to convict him as anything else in his case, with the possible exception of Sonja Alvarado's testimony on the same subject.  However, a bad decision is not the same as incompetence to conduct one's own defense by reason of mental illness.

Further, it is not clear that the decision to take the stand in his own defense, standing alone, *was* a bad choice.  Indeed, if Panetti's story was true, and he was insane at the time of the murders, but nevertheless had a recollection of events, it seems nobody could possibly have been in a better position to both explain Panetti's state of mind, and also to rebut Sonja Alvarado's version of events.  And, if the jury had believed Panetti, it would have had little legal choice but to acquit him.

Finally, Panetti's comments in the record, some of which are quoted above, demonstrate he understood he had the right to, but did not have to, testify.  That Panetti made a knowing choice that appears foolish in retrospect, or that he failed to persuade the jury, are not, in light of the entire record in this case, grounds for a finding of incompetence under *Edwards*.

*F. E. Seale*

September 21, 1995, the final day of the guilt–innocence portion of Panetti's trial, started with Panetti calling Dr. F. E. Seale, who had treated Panetti in 1986, while Panetti was at the Starlite Hospital. 38 RR 1567–68. Seale testified about Panetti's substance abuse and schizophrenia, as well as his various medications.  38 RR 1568–74.  After a discussion about Panetti's antipsychotic medications, Panetti asked a significant question: "[D]o you think that in that state without the antipsychotics that I knew right from wrong?" 38 RR 1574.  Seale replied: "I don't think you do at times when you're psychotic." *Id.* Shortly thereafter, Panetti asked an even more pointed question: "If I was to go several days without my antipsychotics, do you think in your professional opinion I could be insane?" *Id.* Seale: "Yes." *Id.* Panetti continued, asking, "And being insane, do you think I could tell right from wrong," to which Seale replied, "Not at all times." 38 RR 1575.

Panetti later asked a question that was probably improper, but was definitely advantageous to him: "Doctor, does there exist in your knowledge a maximum security department of Texas place for the criminally insane?" 38 RR 1577.  Seale answered, "At Rusk State Hospital," before the State could object. 38 RR 1577–78.

On cross-examination, the State confirmed that Seale had not treated Panetti since 1986, emphasized the difference between the legal definitions of insanity and incompetence, and likewise differentiated between mental illness and insanity. 38 RR 1578–87. The State also used statements from Panetti's confessions to try, with little success, to get Seale to admit that Panetti likely knew right from wrong at the time of the murders. 38 RR 1587–92.

During his redirect examination, Panetti tried to explain how he could be insane at the time

of the murders, yet sane several hours later during the interrogations: "Being that I was insane without the medicine, as you described, that you would be without it, if you took that medicine and five or six hours later, could I be—my psychosis be in control?"  38 RR 1594.  Seale acknowledged that was possible.  *Id.*  Panetti also confirmed with Seale, several times, that he could be rendered insane by not taking his medication.  38 RR 1594–99.

*Wolfgang W. Selck*

Panetti's next witness was Dr. Wolfgang W. Selck, a psychiatrist and psychotherapist who had previously treated Panetti.  38 RR 1600–03.  Panetti tried, with some success, to get Selck to echo Dr. Seale's opinions about Panetti's insanity.  38 RR 1603–06.  Likewise, the State cross-examined Selck in much the same way it had Dr. Seale.  38 RR 1606–10.  Except to emphasize Selck's opinion that Panetti was not malingering, Panetti's redirect examination was not particularly novel or remarkable.  38 RR 1610–16.

*Louis John Panetti — Recall*

Finally, Panetti recalled his father, Louis John Panetti.  38 RR 1624.  Panetti's direct examination was unremarkable, and the State elected not to cross-examine the witness.  38 RR 1624–29.  The State and defense both rested and closed, and the court excused the jury until closing arguments that afternoon.  38 RR 1629–31.

*Charge Conference*

Panetti made a general objection to the proposed jury charge, which was overruled.  38 RR 1636–37.  Notably, Panetti had standby counsel also review the charge, albeit briefly, and he found it unobjectionable based on his limited review.  *Id.*  After instructions about how closing argument

would be conducted, the court recessed until the afternoon.  38 RR 1637–39.

*Closing Argument*

The first topic Panetti covered during his closing statement was his own testimony: "[Y]ou might wonder a little bit about when I testified, and Scott and Sarge and who talked and who talked about who and who talked about what in light of Dr. Simes not being here, he did leave this letter and it will explain that . . . . I wish you not to mistake charisma for sanity."  38 RR 1645–46.

Panetti then moved on to the issue of legal insanity:

> I would just comment on the State giving you part of the enchilada, and I'll give you the rest.  The elements of this insanity defense are that the Defendant at the time of the conduct charged, as a result of mental disease or defect, did not know his conduct was right or wrong or was incapable—this is the part you didn't hear from the State—was incapable of conforming his conduct to the requirements of the law he allegedly violated.  That's *Grand vs. the* [sic] *State* . . . , the being incapable of conforming conduct.

38 RR 1646.  Predictably, the State objected to Panetti's citation to a case outside the charge, and, equally predictably, the court sustained the objection.  38 RR 1646–47.  Panetti then briefly discussed another of his hot-button issues, the legality of his confession.  38 RR 1647.

Panetti continued:

> The evidence shows without reasonable doubt, as I presented it and professionals and lay witnesses, that I was so severely impaired with mental defect and the mental afflictions, disease, I couldn't reason and know right from wrong.  This is no poker game.  There are no winners and many, many losers.

38 RR 1648.

Later, Panetti apparently reverted back to his "Sarge" persona, and, perhaps, added a third:

> I don't want to get into more scooters and mares that went to the kill or my broken heart for any situation, but to be capable of conforming my conduct to the

-135-

requirements of the law, that I, Sarge, violated, speaking of Scott Louis Panetti, but I have to depend on Will a bit to give me the eloquence, the confidence to be convincing . . . .

38 RR 1649.

As he had in his testimony, Panetti emphasized that he was no longer insane or dangerous:

The hell of insanity and having a mental disease is the lack of personal understanding of not knowing what's happening to you.  Now, I wish I could put a handle on everything, and I wish I could say that I will never be on that bridge again, but I honestly can say this, that Sarge is on a leash, and he might have come out for a little while yesterday, because Lord had him on a leash, but I don't think, ladies and gentlemen of the jury, you felt threatened, and I didn't see an officer standing between me and you . . . .

38 RR 1653.

Somewhat later, Panetti returned to the topic of his insanity, and the interplay between his separate personalities:

I didn't intentionally hurt anyone.  Sarge, but when I tried to figure out Sarge and his motives, I probably don't know a whole lot much more about him as Scott Panetti or mediator Will than you do.  I know it's bad medicine.  I know without the medicine insanity will come back in several days, but you know when I found that out?  When the doctor said it.

38 RR 1656.

At the conclusion of his argument, Panetti made a final appeal to the jury:

I proved without a preponderance of a doubt but I didn't know right from wrong and that I was insane, not lay experts or doctors, and in your hearts everybody knows.  Do you honestly think any of you are going to go home after making a decision and second guess it?  I think that without a hesitation you won't, and God bless Texas. Thy will be done.

38 RR 1663.

The State delivered its rebuttal argument, throughout which Panetti made many speaking

objections, and the jury was subsequently sent to deliberate.  38 RR 1663–84.  The jury deliberated

for slightly under two hours before returning a guilty verdict.  38 RR 1684–85.  The court recessed

the case until the following morning.  38 RR 1686.

**c.    Punishment Phase**

*Opening Statements*

On September 22, 1995, after some preliminary matters, the parties made their opening

statements in the punishment phase of Panetti's trial.  39 RR 8–23.  Although the State's opening

was very brief, 39 RR 16–17, Panetti's went on for some time.  39 RR 17–23.  He twice addressed

the issue of his future dangerousness, first saying, in part, "[S]incerely in my heart I don't feel like

I'm a threat to anyone," 39 RR 18; and second, saying it more directly, "I pose no future

dangerousness to anyone, including myself, and even less and less if I was given a proper

medication," 39 RR 22.  Otherwise, Panetti's opening statement was meandering and of little

relevance to his punishment.  39 RR 17–23.

*State's Case-in-Chief*

*Mel Gideon*

The State first called Mel Gideon, chief deputy with the Gillespie County Sheriff's Office.

39 RR 23.  Gideon testified that, while he was working at Gillespie County Jail, Panetti had

threatened him on "many occasions."  39 RR 24.  Most damning was Gideon's testimony that Panetti

had threatened to "kill [Gideon] if he had half a chance."  39 RR 29.

Panetti began his cross-examination with a testifying-via-question preamble: "Mel Gideon,

with all your years of professional law enforcement training, I wish you to look me in the face and

know that Officer Tschirhart can be called to state the facts contradictory.  Do you know the penalty for perjury in a case such as this?  Of course you do." 39 RR 30.  All of this was preface to the question: "Can you briefly describe when we first met?" *Id.*  When Gideon responded, "Oh Lord, I really can't," Panetti shot back: "The Lord ain't going to help you lie, sir.  Just answer the questions." *Id.*

The remainder of Panetti's cross-examination continued in the same vein, with Panetti frequently implying, and occasionally outright saying, that Gideon was lying.  39 RR 30–39. Panetti's comments continued even after Gideon was excused.  39 RR 39.

*James P. Grigson*

The State's second witness was Dr. James P. Grigson, a medical doctor who specialized in psychiatry.  39 RR 42.  By way of a lengthy and detailed hypothetical, Grigson effectively testified that Panetti "certainly" represented a "continuing threat to society," and "that the likelihood of future violent acts would be very great." 39 RR 45–49.

On cross-examination, Panetti got Grigson to confirm that psychiatry is not an exact science, and that the presence of the canteen at the scene seemed "strange." 39 RR 52–53.  Grigson further acknowledged that a person might become "overtly psychotic" if that person failed to take antipsychotic medication for a period of days.  39 RR 54.

On redirect, the State emphasized the possibility of Panetti's future dangerousness to prison staff and other inmates.  39 RR 60–61.  On recross, Panetti broached the subject of brain damage, and whether it could cause both mental illness and increased hostility.  39 RR 61.  Grigson acknowledged it could, and testified that medication could alleviate both mental illness and the

symptoms of brain damage.  39 RR 61–63.  On redirect, the State suggested Panetti did not have

brain damage, because it was not listed in his medical records, and Panetti responded on recross by

getting Grigson to agree that almost drowning could cause brain damage.  39 RR 63.  Although the

State conducted a redirect examination of Grigson, and Panetti recrossed, none of the testimony

elicited was of particular novelty in light of Grigson's previous comments.  39 RR 63–69.

      After Dr. Grigson was excused, the State rested.  39 RR 69–70.

*Panetti's Case-in-Chief*

*Scott Franklin Monroe*

      Panetti's only witness was his standby counsel, Scott Franklin Monroe.  39 RR 71.  On

direct, Monroe testified he was not afraid of Panetti, and said that, although he was present for the

altercation between Panetti and Deputy Gideon, he did not hear Panetti threaten Gideon's life.  39

RR 73–74.

      On cross-examination, the State asked Monroe to recount the entire interaction between

Panetti and Deputy Gideon, which he did.  39 RR 75–78.  Panetti and the State then closed and

rested.  39 RR 79.

*Closing Argument*

      After a brief charge conference, at which neither party objected, and a recess for lunch, the

parties delivered their closing statements.  39 RR 80–98.  During his closing, Panetti stressed his

potential value to society, and his lack of dangerousness:

> [W]ith proper treatment and medication and mucking a lot of stalls, maybe I'll prove
> myself, because when I was on medicine and I have the references, I'm—I believe
> I could be a benefit to society, and in my heart, my heart of hearts, I don't think on

a daily basis with my sobriety and all things considered and the proper medicine I
would ever hurt anybody, and I never intended to, but I take responsibility for Scott
Panetti, and that includes no scapegoats.

39 RR 86.  Toward the end of his closing, Panetti reiterated this point:

The evidence, and this is where the hesitation and the doubt does come in and I think
it may be to my favor, that I think there is some doubt in lot of y'all's—ten, twelve,
many of y'all that I won't hurt anybody again.  I don't think that's been proved that
I will hurt anybody ever again, and I won't.  Now—and given proper medication,
that's a double won't, and my sobriety.

39 RR 88.

Ultimately, the jury answered the special issues such that Panetti was sentenced to death.  39

RR 102; 40 RR 5–6.

### d.    Conclusion — Panetti's Competence Under *Edwards*

As stated at the outset of this case, the Court finds Panetti was sufficiently competent to

conduct his own defense.  The Court recited Panetti's trial in fairly exhaustive, occasionally

excruciating, detail to demonstrate that, although Panetti obviously suffered from mental illness, and

was often unfocused, he was nevertheless actively engaged in every part of his trial.

The record shows that Judge Ables, the other court staff, and even the State, went to great

lengths to accommodate Panetti's inexperience and confusion, and that Panetti was meaningfully

involved in every aspect of the proceedings.  Indeed, Panetti took a more active role, and presented

a more thorough defense, than most pro se litigants this Court has seen: he questioned potential

jurors during voir dire; made deliberate decisions about which potential jurors to challenge for cause

or to strike; had extended discussions with the court about what witnesses to subpoena; made

opening and closing statements; actively examined his own witnesses, and cross-examined the

State's; impeached witnesses, both with their own prior inconsistent statements, and with the testimony of other witnesses; objected to testimony, statements, and questions he felt were improper; and introduced evidence into the record.  Finally, his statements before and during trial show he knew the issues relevant to both the State's case, and to his affirmative defense.  In short, Panetti's conduct at trial persuades the Court he was able to "carry out the basic tasks needed to present his own defense without the help of counsel."  *Edwards*, 554 U.S. at 175.

Balanced against this, of course, was a great deal of irrelevant, sometimes incoherent, conduct by Panetti.  The Court acknowledges, there were times when Panetti skirted the line of incompetence to represent himself, but these situations were brief and intermittent.  More commonly, Panetti simply shifted quickly between relevant and irrelevant matters, and subjected the court and jury to frequent tangents and asides as he proceeded in his stream-of-consciousness fashion.

Panetti's manner and lack of overall strategy certainly made him a poor advocate for his defense, but the Court cannot conclude he was constitutionally incompetent to represent himself. As mentioned briefly above, this Court believes Panetti introduced enough evidence that the jury could have found in his favor, if it had been so inclined.  Panetti's failure to organize evidence, to present it in an effective manner, or simply to persuade the jury, hardly makes him unique amongst litigants, pro se or otherwise.

Moreover, the Court's consideration of Panetti's performance must be made in the context of his particular circumstances.  As the Court has observed, in light of the overwhelming evidence of Panetti's factual guilt—which included both eyewitness testimony from Sonja Alvarado, and Panetti's own confession—his only reasonable hope for an acquittal was the legal defense of

insanity.  Given the reality of Panetti's situation, his decision to proceed pro se, though it may have been desperate, may not have been wholly unwise.  Indeed, Panetti's self-representation allowed him to show to the jury, in a manner and to an extent otherwise impossible, evidence of his alleged insanity.[66]  Although it was ultimately unavailing, Panetti's strategy may in fact have been his best option, under the circumstances.

The affidavits submitted by Panetti in support of his habeas petition do not change the Court's conclusion.  *See* Am. Pet. [#17], Exs. 7, 8, 10–17.  To the extent these affidavits suggest Panetti was mentally ill, and that his mental illness affected both Panetti's performance at trial, and the jury's perception of him—and many of them do so suggest—the Court agrees.  The record is replete with examples of Panetti's loose associations, unfocused narratives, and seeming lack of appreciation for the potential impact of his conduct on the jury.

However, the Court disagrees that these deficiencies in Panetti's performance equate to his constitutional incompetency to represent himself.  Many people without mental illness are poor public speakers, and would make atrocious advocates.  Likewise, the Court suspects it would be a rare mental illness that would have no effect whatsoever on one's advocacy, and would go unnoticed by a jury, over the course of a two week trial.  However, *Edwards* does not authorize trial courts to unilaterally appoint counsel for every person with a mental illness, nor even for every person with a *severe* mental illness.  Instead, a person's constitutional right to self-representation may be

---

[66] As this Court has noted, both in this opinion and in the past, there are substantial questions about the degree and sincerity of Panetti's delusions and other mental health problems, especially his alleged multiple personalities.  *See, e.g., Panetti v. Quarterman*, No. A-04-CA-042-SS, 2008 WL 2338498, at *11, 13, 16–17, 23–26, 28–29 (W.D. Tex. Mar. 26, 2008).

overrided by the trial judge only when that person is incompetent, by reason of severe mental illness, to carry out the basic tasks required to present a defense on his or her own behalf.  That was simply not the situation in Panetti's case, despite his poor performance.

Although the Fifth Circuit does not appear to have meaningfully addressed the standard required by *Edwards*, the Court's conclusion in this case is supported by precedent from other Circuits.

First, the Court considers a pair of cases from the Ninth Circuit, *United States v. Ferguson*, 560 F.3d 1060 (9th Cir. 2009), and *United States v. Thompson*, 587 F.3d 1165 (9th Cir. 2009).  In *Ferguson*, the Ninth Circuit remanded the potential *Edwards* issue to the district court, but made some instructive observations along the way.  560 F.3d at 1066–70.  In particular, the *Ferguson* court said there were "many indications in the record that *Edwards* might apply," including the following examples of Ferguson's "decidedly bizarre" behavior:

> He repeatedly demanded that his counsel follow his six made-up "duties" and fired his lawyers when they were unable to meet those "duties." He repeatedly insisted that he was making only a "special appearance," asked to settle the case "in the private," requested the judge to recognize the "public policy" exception in the UCC and dismiss the case "for value," and attempted to file a motion of "dishonor" against his lawyers. Finally, Defendant's behavior at trial and sentencing gives us pause, as it did the district court. At trial, Defendant did absolutely nothing—no voir dire questions for the judge to ask, no opening argument, no closing argument, no objections, no cross-examination, no evidence, and no witnesses. At sentencing, he submitted three nonsensical motions, did not object to the PSR, and did not make any legal arguments.

*Id.* at 1068–69.

As noted above, although Panetti's behavior at trial could sometimes be described as "decidedly bizarre," he was aware of, presented evidence on, and otherwise pursued, a valid legal

-143-

defense to his crime.

Indeed, Panetti's case more resembles *Thompson*, in which the Ninth Circuit refused to remand the case in light of *Edwards*. 587 F.3d at 1173. In so deciding, the Ninth Circuit noted that Thompson, like Panetti, "engaged in lengthy colloquies with the district court in which he seemed acutely aware of what was occurring," and "participated extensively throughout his trial." *Id.* at 1173.

Similarly, the Eighth Circuit's decision in *United States v. Turner*, 644 F.3d 713, 725–26 (8th Cir. 2011), is in accord with this Court's conclusion. In *Turner*, the court held the district court did not abuse its discretion by failing *sua sponte* to order a competency hearing, after observing the pro se defendant's "bizarre and irrational" courtroom conduct. *Id.* In reaching this conclusion, the court noted Turner "was polite and respectful at all times," and participated in his trial in meaningful ways: "He invoked the rule on witnesses leaving the courtroom, used cross-examination to his benefit, and tried on several occasions to appeal to the jurors' consciences in an attempt for them to 'forgive' him by finding him not guilty." *Id.* at 726. The Eighth Circuit deferred to the district court's judgment, and noted "the evidence does not raise doubts sufficient to find an abuse of discretion." *Id.*

Although *Turner* is obviously distinguishable in that this Court cannot defer to any finding by the trial court, it is notable that the Eighth Circuit focused on Turner's active, if ineffectual, involvement in his case—a level of involvement displayed by Panetti in his trial.

The Court's conclusion in this case finds further support in an unpublished opinion from the Second Circuit, *United States v. VanHoesen*, No. 10–0713–CR, 2011 WL 6117294 (2d Cir. 2011) (unpublished). In *VanHoesen*, the Second Circuit affirmed the defendant's conviction, and rejected

-144-

his *Edwards* argument, saying there was "ample support" in the record for the district court's

conclusion that he was competent to represent himself.  2011 WL 6117294 at *3, 1–3.  In particular,

the Second Circuit noted "VanHoesen's written submissions to the district court demonstrating his

active interest in his own defense, and his testimony and responses to court inquiries indicating that

he had performed his own legal research and had a detailed understanding of how a trial works."

*Id.* at *3.

Like VanHoesen, Panetti clearly had an active interest in his own defense; and, although

Panetti may not have been an expert on trial procedure, the record shows he had a meaningful

understanding of the proceedings—an understanding that was augmented by Judge Ables's frequent

(and patient) assistance.

A final interesting case comes from the Seventh Circuit.  In *United States v. Berry*, 565 F.3d

385, 390–92 (7th Cir. 2009), the court affirmed a defendant's conviction in the face of his *Edwards*

challenge.  Judge Evans described the defendant's trial conduct as follows:

> To be sure, Berry consistently behaved in a bizarre manner. Beginning with
> a slew of pro se motions filed in 2004, Berry made statements that we can only
> generously call absurd. (Berry was represented by three different lawyers from 2004
> to 2006, but the vast majority of motions he filed were pro se.) He said he met with
> Condoleezza Rice at the White House; that Citibank robbed him of $420 million
> (perhaps this is not as far-fetched as it seems given the situation in the spring of
> 2009!); that he was in the process of "[n]egotiat[ing] to reduce [o]il prices and create
> millions of jobs in America"; that he drafted an international treaty; that two bankers
> (former associates) were killed after working with him, and his own life was in
> danger due to some sort of global financial conspiracy; that he was business partners
> with the "controller of the space station"; that he represented the governments of
> China, Russia, and Taiwan, and had met with finance ministers all over the word; and
> that Bill Clinton and Boris Yeltsin had personally made promises to him.
>           . . . .
> The trial lasted five days before the jury found him guilty as charged. Though

his strategy failed, Berry aimed throughout the trial to convince the jury that he was indeed a mover and shaker in global finance. And to the extent his own view of things conflicted with the testimony of prosecution witnesses-experts and otherwise-he chalked it up to their relative ignorance (in comparison to his own sophistication) of things financial.

*Berry*, 565 F.3d at 387, 389.

The court ultimately concluded *Edwards* was inapplicable because there was no evidence Berry suffered from mental illness, thus making the case legally inapposite here. *Id.* at 391–92.

However, the case is nevertheless instructive for its evaluation of Berry's performance:

As far as *pro se* defenses go, it wasn't the worst we've seen. Berry managed to lodge objections, cross-examine witnesses, call a witness of his own, and make opening and closing statements. He didn't call himself as a witness, but by choosing to represent himself he was effectively able to testify throughout the trial without facing cross-examination. But to say that it wasn't an unmitigated disaster for a pro se defense isn't saying much. Berry's decision to ride solo was clearly a poor one. At best, his performance served as a distraction from the government's case, doing little (if anything) to undermine it.

*Id.* at 389.

Panetti's performance here could be described similarly. Panetti performed better than many pro se litigants this Court has observed, and it seems he may have performed better than Berry; nevertheless, Panetti's decision to represent himself was obviously unwise, and his defense unpersuasive. But the Constitution does not allow a trial judge to ignore a defendant's right to self-representation just because it is a mistake to exercise it; nor, despite his mental illness, was Panetti constitutionally incompetent to conduct his own defense.

## Conclusion

For the foregoing reasons, the Court finds Panetti is not entitled to habeas relief. First, the

Court finds the *Edwards* rule does not apply retroactively to Panetti's case, under the principles announced by the Supreme Court in *Teague v. Lane*. In the alternative, the Court finds Panetti was not incompetent to represent himself, under the standards articulated in *Indiana v. Edwards*.

An appeal may not be taken to the court of appeals from a final order in a proceeding under § 2254 "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Proceedings, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejects a movant's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

A certificate of appealability shall issue in this case. The Court finds that reasonable jurists could differ about both the retroactive application of the *Edwards* rule, and the ultimate merits of

Panetti's *Edwards* claim.  The *Edwards* rule is a significant one, with substantial implications for the actual and apparent fairness of trials for mentally ill defendants.  The Court's conclusion, that the *Edwards* rule is not retroactive under *Teague*, is based in large part on the fact that the Supreme Court has been so unwilling to recognize exceptions to nonretroactivity.  Further, as the Court has stated on multiple occasions, Panetti's mental illness had an impact on the quality of his self-representation.  Although the Court concludes the impact was insufficient to render him incompetent under *Edwards*, the issue is by no means one-sided, particularly in the absence of a clear standard for determining competence to represent oneself.  Although these conclusions represent the considered judgment of this Court, Panetti's claims are meritorious enough that they should be heard by another one, which might decide these issues differently.

Accordingly,

IT IS ORDERED that Respondent Rick Thaler's Motion for Summary Judgment [#22] is GRANTED;

IT IS FURTHER ORDERED that Petitioner Scott Louis Panetti's Amended Petition for Writ of Habeas Corpus [#17] is DENIED;

IT IS FINALLY ORDERED that a certificate of appealability is GRANTED.

SIGNED this the 31st day of January 2012.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE

774 2254 sj ord final mjh.wpd